1 | VERNA WEFALD
Attorney at Law
2 | 35 South Raymond Ave., Suite 420
Pasadena, California 91105
3 | Tel: 818-432-5100

4 | WILLIAM J. GENEGO
Attorney at Law
5 | 100 Wilshire Blvd., Suite 1000
Santa Monica, California 90401
6 | Tel: 310-394-5802

7 | Attorneys for Petitioner
Ricardo Rene Sanders

8 |

9 | UNITED STATES DISTRICT COURT

10 | CENTRAL DISTRICT OF CALIFORNIA

11 |

12 | RICARDO RENE SANDERS,                Civ. No. 96-7429-JSL

13 |              Petitioner,           **DEATH PENALTY CASE**

14 |        v.

15 | ARTHUR CALDERON, Warden of           STATEMENT OF FACTS
     San Quentin State Prison,           (GUILT PHASE) IN
16 |                                      SUPPORT OF PETITION
                  Respondent.            FOR WRIT OF HABEAS
17 |                                      CORPUS UNDER; INDEX
                                         OF EXHIBITS
18 |                                      28 U.S.C. § 2254

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

1

## TABLE OF CONTENTS

2

3   I.    EVIDENCE PRESENTED AT TRIAL REGARDING THE BOB'S BIG BOY
4         ROBBERIES AND HOMICIDES .................................................. 1

5         A.    The Events of December 14, 1980 ...................................... 1

6         B.    Suspect Descriptions ................................................ 3

7         C.    Identification Testimony ............................................ 6

8         D.    Physical Evidence .................................................. 9

9   II.   EVIDENCE PRESENTED AT TRIAL ABOUT EVENTS PRECEDING DECEMBER
          14, 1980 .......................................................... 11

10        A.    Orasteen Freeman .................................................. 11

11        B.    Jerry Lankford .................................................... 11

12        C.    Bruce Woods ...................................................... 13

13        D.    Andre Gilcrest .................................................... 14

14        E.    Brenda Givens ..................................................... 15

15        F.    Rodell Mitchell .................................................... 17

16  III.  EVIDENCE DISCOVERED POST-CONVICTION .......................... 18

17        A.    Tami Rogoway ..................................................... 18

18              1.    The Jailhouse Informant Scandal ............................ 18

19              2.    Leslie White and Tami Rogoway ............................ 22

20              3.    Leslie White's 1981 Conjugal Visits With Rogoway .............. 26

21              4.    The Furlough Orders ...................................... 27

22              5.    DDA Giss' Handwritten Notes ............................ 28

23              6.    DDA Giss' 1990 Testimony About Leslie White In
                        People v. Garmanian .................................... 30
24
          B.    Bruce Woods ...................................................... 31
25
          C.    Rhonda Robinson .................................................. 33
26
          D.    Michael Malloy .................................................... 35
27
          E.    Ismael Luna ...................................................... 37
28

1

F.    Andre Gilcrest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

G.    Brenda Givens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

H.    Rodell Mitchell . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

I.    Derwin Logan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

K.    Jerry Lankford . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.   **EVIDENCE PRESENTED AT TRIAL REGARDING THE BOB'S BIG BOY ROBBERIES AND HOMICIDES**

A.   <u>The Events of December 14, 1980</u>

On December 14, 1980, the Bob's Big Boy restaurant at 1845 South La Cienga Boulevard, was scheduled to close at its usual time of approximately 2:00 a.m.  The night manager, Michael Malloy, locked the front doors, removed the cash receipts drawer from the register and took it to the office.  As Malloy prepared to count the money, Derwin Logan, the cook, told him that the last two customers, Tami Rogoway and David Burrell, wanted to leave.  Malloy locked the office door behind him as he walked to the front of the restaurant and gave Logan the keys to unlock the front doors.  RT 6739-42, 10,431.

As Logan opened the doors, two armed black men pushed their way in, forcing Logan, Burrell, and Rogoway back inside.  RT 6747-48, 8306-07, 9803, 9863.  One of the men said "It's a jack."  RT 10,431.  Once inside, the men separated.  The robber, who some of the witnesses later referred to as the shorter man, walked toward the cash register.  Ahmad Mushuk, the cashier, came forward and asked "What's going on?"  He was hit over the head and fell to the floor.  RT 6754-55, 9501-02, 9806, 9812-13, 9866, 9885-88.

The man then ordered waitresses Dionne Irvin, Evelyn Jackson, Dita Agtani, Rhonda Robinson Batiste [hereafter referred to as Robinson],[1] and dishwasher Cesario Luna, who were all near the counter area, to lie face down on the floor and they complied.  RT 9814, 9888-89.  Several minutes later they were led to the kitchen area, where they were again ordered to lie face down on the floor.  RT 9816, 9892-94.

Meanwhile, the robber, who some of the witnesses later referred to as the taller man, directed Logan, Malloy, Burrell, and Rogoway to the back hallway next to the office.[2]

---

[1] At Mr. Sanders' trial, Robinson testified under her married name, "Batiste."  RT 9801. However, other witnesses generally referred to her by her maiden name.

[2] According to Logan, it was the shorter man who led them to the back hallway.  RT 10,435;
(continued...)

1

1   They were also told to lie face down on the floor. RT 6754-60, 8307-10, 8370-71, 10,434.
2   While on the floor they heard the men checking the restrooms and the lockers in the employee
3   lunchroom, and the sound of a phone being pulled from the wall. RT 6761, 7304-09, 8084-89,
4   10,443.

5       After several minutes, the taller gunman returned and asked for the manager.
6   Malloy responded by standing up and, at the man's direction, unlocked the office door. Once
7   inside, the man pulled the wires from the phones on the office desk and ordered Malloy to empty
8   the safe. Malloy placed an estimated $1,300 from the safe and cash drawer into a box, which he
9   then slid out into the hallway. RT 6761-66, 7212-13, 7312-38, 7746-56. During this time,
10  Rogoway and Logan remained face down in the hallway outside the office. RT 8372-75,
11  10,592-595.

12      Moreno Luna Cortez [hereafter referred to as Luna],[3] the son of Cesario Luna,
13  was alone in the kitchen when the men entered the restaurant. At some point he was confronted
14  by a man with a shotgun, who told him to lie face down in the hallway. (RT 9091-94) He
15  identified the man as the taller of the two suspects. (RT 9202-03, 9144)

16      Shortly thereafter, both groups were told to get up and were led into the freezer.
17  RT 6767-74, 8320, 9095-96, 9502, 9817, 9896, 10,444-447. Mushuk, apparently unconscious,
18  was dragged into the freezer with the others. RT 8383, 9831, 10,448-449. Although Malloy
19  recalled at trial that the taller man said "You are going to get hurt," (RT 6767, 7338-39,
20  7586-91, 7624-28, 7947-48, 10,246) neither Logan nor Rogoway recalled hearing such a
21  statement. RT 8320, 8376, 10,444, 10,596.

22

23

24  [2](...continued)
    10,692-693.

25

26  [3] For the first day of testimony, Cortez testified under the name Ismael Luna, his brother's
    name, which he had used to obtain employment in the United States. RT 9183. Despite the
27  revelation of his true and correct name, witnesses and counsel referred to him throughout the
    proceedings as Ismael Luna. In order to avoid confusion, he will be referred to in this brief as
28  "Luna".

Inside the freezer, the victims were directed to give up their watches, wallets, and jewelry. All complied, placing the items in a bucket which Malloy slid out into the hallway. RT 6784-89, 7644-46, 8323-25, 8384-92, 9108-09, 9504, 9820, 9829-30, 10,449. They were then told to turn around and face the wall. RT 6791, 8330, 8339, 8393, 9504, 10,450. One of the gunmen said something like "you're going to be first," (RT 8340, 9505, 10,452) and the gunfire ensued. RT 6796, 8341-42, 9115, 9505, 9832, 10,450, 10,633-634. At some point during the shooting, Jackson stood up and asked the men not to hurt her. The firing continued and she fell to the floor. RT 6800, 9852-53. After the shooting stopped, Malloy heard one of the gunmen ask "How many rounds do you have?", to which the other replied "None." RT 10,247. Others recalled hearing only "Come on. Let's go." RT 10,059, 10,452, 10,596.

The shooting left four persons fatally wounded. Burrell died from a shotgun wound to the chest (RT 8791). Agtani from multiple gunshot wounds to the back and left leg. RT 8814-8816. Mushuk from a bullet wound to the head. RT 8831-8832. Cesario Luna died several months later of complications resulting from a bullet wound to the head. RT 8836-8838.

Malloy lost his right eye from a shot in the head. RT 6803, 6844-6845. Tami Rogoway received severe shotgun injuries to her back and spine, which resulted in limited feeling on her right side. RT 8346-8350. Jackson sustained a cranial injury which required the removal of brain tissue and resulted in permanent impairment of brain function. RT 9506-11, 10,362-369. Irvin was less seriously injured, receiving a gunshot wound to the arm.[4] RT 10,420-428.

Logan, Ismael Luna, and Robinson were not physically harmed. RT 9563. Robinson, however, developed serious mental problems which required psychiatric treatment for approximately one and a half years following the incident. RT 9834-35, 9870-71.

B.    **Suspect Descriptions**

The initial police broadcast described the suspects as "two male Negroes, 5'9" to 5'11", 160 pounds, one large afro, one medium afro, 19 to 25 years old, two single barrel

---

[4]   After a hearing in chambers, the court found Irvin to be incompetent, under Evidence Code § 701, to testify as a witness at Mr. Sanders' trial. RT 6890-6945, 9398-9445.

1  shotguns, sawed, one blue trench coat, one maroon trench coat." RT 14,030.  On the morning

2  following the incident, Luna and Logan assisted in the preparation of composite drawings.  Peo.

3  exhs. 46-A and 46-B; RT 9631-34.[5]  The resulting drawings and descriptions, based upon a

4  compilation of all the witnesses' statements, were released to the news media between December

5  14 and 17, l980.  RT 8194, 8196, 10,732-736.

6           The witnesses provided different descriptions of the suspects. Throughout the

7  pretrial investigation stage and the court proceedings, not only did the descriptions vary and

8  conflict among the witnesses, but individual witnesses provided different and conflicting

9  descriptions at different times.  Estimates of the "taller" suspect's height ranged from 5'7" to 6'3";

10  his age from 19 to 30.  RT 7760-62, 7686-88, 7807, 7834-42, 8364, 8486-91, 8521-22, 9883,

11  10,062-063, 10,096, 10,233, 10,243, 10,549, 10,618, 13,867-868, 14,030.  He was variously

12  described as:  medium build (Malloy, RT 8066, 7693, 7869), thin build (Malloy, RT 7803-08,

13  10,243; Rogoway, RT 10,096, 13,867-868); dark complected (Malloy, RT 10,243; Luna, RT

14  9203, 9099), medium complected (Malloy, RT 7694-98, 7786-90, 8064-67), light complected

15  (Robinson, RT 9883; Rogoway, 13,867-868; Logan, RT 10,054); with dark brown or black hair

16  styled in a possible jeri curl (Logan, RT 10,549), a one- to three-inch jeri curl[6] (Malloy, RT

17  7699-705, 8059, 8064), a medium afro (Robinson, RT 10,062; Rogoway, RT 13,867-868), a

18  large afro (Rogoway, RT 8418), a six- to seven-inch afro (Logan, RT 10,611); no facial hair

19  (Malloy, RT 10,243; Robinson, RT 9883; Rogoway, RT 8491), light sideburns only (Malloy, RT

20  7808, 10,243), mustache (Malloy, RT 8061; Logan, RT 10,549), mustache and goatee (Malloy,

21  RT 7790-91; Logan, RT 10,549-551, 10,624-627), red eyes, golden brown eyes, no glasses

22  (Malloy, RT 6763, 7419, 7694, 7699, 7759, 8060), dark sunglasses (Robinson, RT 10,062),

23  carrying a gun that was said to be a sawed-off shotgun (Rogoway, RT 8521-22), a full-length

24

25

---

26       [5]  A copy of the composite drawings is attached as exh. 5.

27       [6]  A distinctive relaxer-induced curly "wet look" hairstyle worn by African-Americans.

28  Malloy testified at the Freeman preliminary hearing that by jeri curl he meant "tight curls, wave,
    wavy hair." RT 8066.

4

1  shotgun (Robinson, RT 10,064), single-barreled (Malloy, RT 7818; Logan, 10,615),

2  double-barreled (Luna, RT 9106, 9199-9200).

3  The "shorter" suspect was described as light complected, with a medium build.

4  RT 7766-75, 7786-90, 9099, 9883, 10,234, 10,243, 13,867-868.  Estimates of his height ranged

5  from 5'6" to 6'; his age from 19 to late twenties.  RT 7688, 8363, 8521-22, 10,069, 10,096,

6  10,243, 10,618, 13,867-868, 14,030.  He was further described as having hair styled in a smaller

7  afro (Rogoway, RT 8418), a medium afro (Logan, RT 10,627-630), a larger afro (Rogoway, RT

8  13,867-868), a long bush-style afro (Malloy, RT 7705-06, 10,243), a four- to five-inch jeri curl

9  (Logan, RT 10,612), no facial hair (Logan, RT 10,627-630), a thin mustache (Malloy, RT

10 8521-22; Logan, RT 10,624-627), light mustache and sideburns (Malloy, RT 7786, 7790),

11 prescription glasses (Rogoway, RT 10,096; Malloy, RT 14,112-114), carrying a gun that was

12 described as a full-length double-barreled shotgun (Malloy, RT 7762-7765, 7819), a sawed-off

13 shotgun (Rogoway, RT 10,233, 10,096; Robinson, RT 10,069), single-barreled (Logan, RT

14 10,547, 10,627-630) double-barreled.  (Luna, RT 9106, 9199-9200).  Luna also observed a .38-

15 caliber handgun in the man's waistband.  RT 9105.

16 Malloy was the only witness who described the taller suspect as wearing a long

17 periwinkle blue cotton coat with fake fur and black leather trim (RT 7706-08), but on other

18 occasions, Malloy said it was a black leather coat (RT 7808, 10,243) and a black fabric coat with

19 shiny black material on the back.  RT 7834-42.  The shorter suspect, according to Malloy, wore

20 a long beige wraparound coat.  RT 7755-66, 10,243.

21 The other witnesses described different coats, one lighter and one darker in color,

22 and were either inconsistent or uncertain regarding which suspect wore which coat.  The

23 descriptions included a knee-length dark brown or maroon coat with shiny leather, a grayish coat

24 with a fur collar (Rogoway, RT 8411-12, 8523-24, 8484, 10,069); a beige coat, a velvet coat, a

25 black leather jacket, a blue trench coat, a maroon trench coat (Robinson, RT 9882, 10,063,

26 10,069, 14,018-031); a knee-length beige coat, a long beige trench coat with fur collar, a

27 knee-length burgundy coat with light, dark, or brown fur.  Logan, RT 10,545-551, 10,612-614.

28

1   At trial, Logan "seemed to recall" that one of the men wore gloves. RT 10,627.
2   In one of her statements to the police, Rogoway indicated that the taller man wore gloves; at
3   trial, however, she did not recall any gloves. RT 8417, 13,867-868. Malloy had told police,
4   prior to trial, that one of the men wore gloves with the fingers cut out, but at trial, he testified
5   that he was certain that the taller man did not wear gloves. RT 14,112-114, RT 6762, 7746,
6   7759, 7766-75. Malloy also testified that he had a very specific memory of the man's hands from
7   the time he was in the office, describing them as "laborer's hands," which seemed to be discolored
8   with some type of residue. RT 7656-58. Malloy also recalled that the taller man had an
9   unusually low voice. RT 7572.

10   When he spoke to the police, Luna could only remember one of the suspects, who
11   he described as 5'8", 140 pounds, light complected, with black hair in "Chinese style rolls"[7] at the
12   end and rear of the hairline, a black mustache, no glasses; white shirt, black shoes, wearing a
13   beige coat with a fur collar, brown jacket with brown or black fur collar. RT 9321-25, 9329-31.
14   Due to the confused and inconsistent nature of Luna's trial testimony, however, it is unclear
15   which suspect he was describing to the police during the pretrial investigation. RT 9154,
16   9203-14, 9325-31.

17

18   **C.   Identification Testimony**

19   To assist in the identification of suspects, the police displayed photographs from
20   the West Los Angeles Division CRASH book to the witnesses. Mr. Sanders' photograph was
21   not in that book. RT 9347, 9611-14, 9621-22, 9626, 10,110, 10,650-655, 10,070-080,
22   10,096-098. On December 19, 1980, a lineup of possible suspects was conducted. Mr. Sanders,
23   not yet arrested, was not included in that lineup. RT 7063-64, 9519-22.

24   Mr. Sanders was arrested on December 22, 1980. RT 8154. While in police
25   custody, he was physically injured, suffering fractured ribs and subcutaneous emphysema, which
26   caused him to have difficulty breathing and speaking. RT 14,709-747. A live lineup was held the

27

28   [7] According to the court interpreter, the literal translation of "pelo chino" was "Chinese rolls." However, it could be translated as "kinky." RT 9325-29.

6

1  next day, December 23, 1980. Mr. Sanders, who was without counsel, was displayed in the

2  lineup as the only suspect who was barefoot and the only suspect who had a jeri curl hairstyle.

3  RT 7050-54, 7738, 8120-27, 8140-50, 14,660-662, 14,720-724, 14,748-764.[8]

4          Malloy made an identification of Mr. Sanders from a videotape [9] of the December

5  23 lineup. Peo. exh. 13; RT 6988-96.[10] At the preliminary hearing and at trial, Malloy identified

6  Mr. Sanders as the taller robber. RT 6749, 6809.[11]

7          While in the hospital, Rogoway identified CRASH photograph no. 132 as the tall

8  suspect. RT 10,098. At trial, she could not recall this selection. RT 8492-95. She did recall

9  that she had viewed a video lineup after her release from the hospital and that one person in the

10  line looked familiar. However, she could not recall whether Mr. Sanders was in that video. RT

11  8707. After viewing the tape in court, she was "pretty certain" that Mr. Sanders was the person

12  she had selected. RT 8715-18.[12] Rogoway testified that her mental picture of the men was "very

13

14      [8] A color copy of a photograph of the lineup is attached as exh. 6.

15      [9] A copy of the videotape is attached as exh. 7.

16      [10] Malloy was scheduled to view the live lineup, but arrived late. RT 7054-55.

17      [11] Malloy acknowledged writing on his lineup card that the "suspect in my case is No. 4."
18  RT 6994. When asked if he put under remarks the word "positive," Malloy replied that "the
    'positive' doesn't look like my handwriting." He then said he remembered writing 'positive" but
19  allowed that it was "possible" someone else had written that word. He reiterated on the stand
    that "this really doesn't look like my handwriting." RT 6995. LAPD Detective Richard Jacques
20  testified that he "forgot" to have Malloy sign the lineup card and that he, Jacques, personally
    printed the word "videotape" on the card. At Freeman's subsequent trial, Jacques testified that
21  the absence of Malloy's signature on the card was a "pure oversight on my part." Freeman RT
22  10,211. He said he saw the lineup and looked at Malloy's card immediately afterwards to see
    who he had picked. RT 8161-8162. Detective Jacques was also the one who turned the lineup
23  cards over to the robbery section when Rogoway's lineup card disappeared. See n. 12, infra. RT
24  8162-8164.

25      [12] The Rogoway witness-identification cards for the December 23, 1980 lineup disappeared
    from police custody sometime after the Freeman preliminary hearing. (RT 8609-11) Therefore,
26  there was no contemporaneous documentation of any identification or its degree of certainty.
    Although the trial court, during the Evidence Code § 402 hearing regarding the loss of the cards,
27  deemed it "ambiguous" as to whether or not Rogoway made an identification when initially
28  viewing the lineup, Rogoway had testified at both Mr. Sanders' and Freeman's preliminary

(continued...)

1   hazy." RT 8715-18. Despite this memory deficiency, she identified Mr. Sanders at trial as the
2   taller robber. RT 8309.

3       The morning after the incident, Robinson selected CRASH photographs no. 96
4   and no. 132 as "looking like" the suspects. RT 10,070-072. At the December 23, 1980 lineup,
5   she identified Mr. Sanders but also indicated that another man in the same line "sounded like" the
6   robber. RT 9824-25. Several months later at Mr. Sanders' preliminary hearing, she did not
7   identify him. RT 9881. However, during the earlier Freeman preliminary hearing she had looked
8   at police pictures in the jury room with other witnesses, who had pointed out Mr. Sanders as one
9   of the suspects. RT 9910-11, 9915. At trial, she no longer remembered selecting photograph
10  no. 96 and no. 132. RT 9880-81. She admitted that she had blocked the Bob's Big Boy incident
11  from memory and had "no mental picture" of either man. RT 9866, 9870-71. Nonetheless, she
12  identified Mr. Sanders as one of the robbers, and added that she hoped Mr. Sanders would die as
13  a result of the trial. RT 9803, 9944.

14      Luna selected CRASH photograph no. 77 as similar to one of the suspects. RT
15  9615-17. He did not identify Mr. Sanders at the preliminary hearing. Luna said Mr. Sanders did
16  not appear to be the man in the restaurant. 3/20/81 RT 39; RT 9306-10. At the lineup, assisted
17  by a bilingual police officer who had been present at Mr. Sanders's arrest, Luna had tentatively
18  selected Mr. Sanders as the taller, darker man. RT 9282, 9536-39. At trial, however, he testified
19  that Mr. Sanders "looked like" the shorter, lighter man. RT 9282-83. He also testified that all
20  black men looked alike to him. RT 9282. When questioned at trial about the lineups he attended

21
22

23  [12](...continued)
    hearings that she had never picked anyone from the video lineups that included Sanders and
24  Freeman. (RT 8659-62) At Mr. Sanders' preliminary hearing on March 23, 1981, Rogoway was
    asked on cross-examination, "Now, you never picked anyone out of any video line-ups; is that
25  correct?" Rogoway answered, "I don't believe so." (3/23/81 RT 119) Mr. Sanders was sitting
    behind a board at the preliminary hearing. Defense counsel Earl Broady objected to Rogoway
26  being allowed to make an in-court identification: "Just for the record, since she did not I.D. any
    person at the video tape line-up, and she studied the line-up for at least 20 minutes, I would
27  object to any identification now in this courtroom merely because my client is the only one in the
    courtroom." DDA Giss replied, "I have nothing to say." 3/23/81 RT 142. Referenced excerpts
28  of Rogoway's preliminary hearing testimony are attached as exh. 8.

on December 23, 1980, Luna could not recall whether he had seen either suspect in the lineups nor could he recognize anyone when shown still photos of those lines. RT 9269-9274. Further, although Luna's tentative identification of Mr. Sanders at the lineup was as the taller robber, when asked at trial by defense counsel to identify from all those present in the courtroom the person who had the same skin color as the taller, darker man, Luna selected an alternate juror, not Mr. Sanders. RT 9250, 9253. Nevertheless, when asked to "look in this courtroom and see if you see one of the two men in this room that was there that night," Luna pointed to Mr. Sanders and said "I think he's there in front of that lady ... the man with the glasses." RT 9099.

Logan selected six photographs from the CRASH book as resembling the suspects, including two photographs, no. 77 and no. 132, as strongly resembling the taller suspect. RT 10,556-558. He attended the December 19, 1980 live lineup and chose two persons as closely resembling the suspects but neither Mr. Sanders nor Freeman were in the December 19 lineup. RT 10,561-569. At trial, while viewing still photographs of the December 19 lines, he indicated that still another person in line 2 looked "most familiar as the shorter suspect." RT 10,567. On December 23, 1980, he attended live lineups which included Mr. Sanders and Freeman. He made an identification from each line but neither of the individuals he selected were Mr. Sanders or Freeman. RT 10,668-671. Logan did not identify Mr. Sanders at any court proceedings.

Due to her physical condition, Jackson did not participate in any identification procedures that involved Mr. Sanders (RT 9524-26, 9554-56, 9598-9600, 9603), nor was an identification elicited from her during trial. RT 9486-88.

### D.    **Physical Evidence**

No expended shell casings were found at the scene. RT 8991. Examination of the projectiles and waddings recovered from the freezer and bodies indicated that the guns fired in the freezer were 12- and 20-gauge shotguns loaded with common brand pellets consistent with No. 00, No. 6, and No. 7 or 7.5 shot, and a revolver loaded with ammunition consistent with .32 S&W type bullets. RT 8822-25, 8834-35, 8839-43, 8899, 9008-11, 9529-31, 10,341,

1    10,349-354, 10,377, 10,420-428, 10,962-978, 11,483-485, 11,488-494, 10,975-978. However,

2    except for those pellets actually recovered with wadding or other debris, it was impossible to

3    determine what gauge gun had fired any particular shot. RT 10,973.

4    Pursuant to a search of Mr. Sanders' home on December 22, 1980, police seized

5    from his bedroom one single-barreled sawed-off 20-gauge shotgun (Peo. exh. 2), one full-length

6    single-barreled shotgun (Peo. exh. 40), and 20-gauge high base game load, No. 8 shells. Found

7    in his father's bedroom were three twelve-gauge shotgun rounds containing No. 6 shot (Peo.

8    exh. 31), two spent 12-gauge shotgun rounds stamped "No. 7.5" (Peo. exh. 32), and an empty

9    holster. Peo. exh. 35; RT 8958-61, 8968-77, 8981-83, 9019-20, 9681-84, 9756-59, 9766-69.

10    The holster was capable of holding a .22, .32, or possibly a .38 revolver, but also could have held

11    a toy gun or replica. RT 10,991-995, 11,007-008.

12    A search of Freeman's father's house resulted in the seizure of a 12-gauge pump

13    shotgun (Peo. exh. 3), a .22-caliber handgun, Federal 12-gauge shells (Peo. exh. 82) and No. 6

14    Federal magnum .00. Peo. exh. 83; RT 14,352-356, 14,377-381. It was determined that the

15    spent 12-gauge rounds found at Mr. Sanders's residence were not fired by the shotgun found at

16    Freeman's father's home. RT 14,065-072.

17    There was no evidence presented that the shotguns found at either Mr. Sanders's

18    or Freeman's home were the guns used in the Bob's Big Boy robbery. The prosecution's own

19    ballistics expert acknowledged that he could not connect the guns and ammunition with the crime

20    (RT 10,973, 11,494), and also admitted that the only attempted ballistics match proved negative.

21    RT 14,068. No witness could identify the weapons in evidence as having been used in the crime.

22    RT 6768, 6771, 7946, 9155-9158, 9199-9200, 9245, 9323, 9348-9349. Further, according to

23    the prosecution's ballistics expert, literally "millions" of shotguns circulated in Los Angeles

24    County in 1980. RT 11,000-11,004. Nevertheless, the prosecution was allowed to introduce all

25    of the items.

26    Found at the search of co-defendant Carletha Stewart's residence were rolls of

27    coins in Bank of America wrappers (Peo. exh. 4) and 90 one-dollar bills (Peo. exh. 5). RT

28    10,261-278. Even though neither the coins nor the bills could be identified as money taken from

1  Bob's Big Boy, (RT 6774-78, 10,290-293, 13,324-333), and even though the money found in

2  Stewart' home did not remotely approximate the amount taken in the robbery (about $1300), the

3  prosecution was allowed to introduce them at trial. RT 6781, 10,264-278. No personal property

4  belonging to the victims was found at any of the locations. RT 14,683.

5       No clothing matching the descriptions of the suspects was found. RT 9787-88.

6  A long black rabbit fur coat was seized from Mr. Sanders's residence, but it was not identified by

7  any witness, and it tested negative for gunshot residue. RT 13,886-889.

8       Sixty-six identifiable latent fingerprints were lifted from along the path taken by

9  the robbers at the restaurant, but no prints belonging to Mr. Sanders or Freeman were found. RT

10 13,345. After comparison of these 66 prints to the employees and police officers who were

11 present, as well as those of Mr. Sanders and Mr. Freeman, 42 prints lifted from non-public areas

12 remained unmatched to anyone. RT 13,415. The 42 unmatched prints included prints taken

13 from the back door and door frame (RT 13,381-382), the electric board on the north wall of the

14 back hallway (RT 13,362), the office door, the inside office wall, the top of the desk, the office

15 phone receiver (RT 13,386), the freezer door and frame (RT 13,382), the refrigerator door, the

16 wall between the refrigerator and the freezer, and the storeroom door and frame. RT 13,383.

17

18 II.    **EVIDENCE PRESENTED AT TRIAL ABOUT EVENTS PRECEDING**

19      **DECEMBER 14, 1980**

20

21      A.    <u>**Orasteen Freeman**</u>

22           Orasteen Freeman, the mother of co-defendant Franklin Freeman, testified that

23 Mr. Sanders was at her house with Stewart, Freeman, Thomas Carver, and Lisa Sanders on

24 December 13, 1980 between 8 and 9 p.m. RT 10,303-331.

25

26      B.    <u>**Jerry Lankford**</u>

27           On December 17, 1980, the police received an anonymous tip implicating Mr.

28 Sanders in the Bob's Big Boy incident. The police determined that the tip was from Jerry

1    Lankford, a twice-convicted felon. Police promptly confronted Lankford and obtained a

2    statement from him on December 19, 1980. RT 11,513-517. At the time, Lankford was on

3    felony probation for armed robbery and had recently been arrested for possession of more than an

4    ounce of marijuana. RT 11,600-605. In return for his cooperation, the police arranged for the

5    release of property seized at the time of his arrest and interceded on his behalf in the prosecution

6    of the new charges. RT 11,962-964, 11,975-980. Lankford ultimately pleaded guilty to a

7    reduced charge and received a fine. RT 13,505-524.

8            The statement Lankford signed for the police on December 19, 1980, said that

9    two weeks before the incident, Mr. Sanders approached him about robbing the Bob's Big Boy

10   restaurant.[13] According to the statement, Mr. Sanders told Lankford that he was dating a

11   waitress who had "cased" the place. Also according to the statement, Mr. Sanders was wearing a

12   long burgundy overcoat with a light fur collar.

13           At trial, Lankford repudiated the statement and explained that the statement had

14   been prepared by the police and was **not** what he had told them. RT 11,655-656. Lankford

15   specifically denied that he had ever been approached by Mr. Sanders to commit the robbery. RT

16   11,547-548, 11,532-537, 11,517-520, 11,696-697. He insisted that he told the police that the

17   information he had given them was based solely on neighborhood rumors and on radio and

18   newspaper reports, not on any personal knowledge. RT 11,619-623. Lankford related that

19   approximately two weeks before the incident, as he was hanging out on a corner drinking beer

20   with a group of "guys," one of them said that Mr. Sanders was planning to rob Bob's Big Boy,

21   but he added that there had been many rumors in the neighborhood and other people said Mr.

22   Sanders "didn't do it." RT 11,517-520, 11,532-537, 11,586-587, 11,619-623, 11,629-632,

23   11,649-653, 11,666. Lankford knew who Mr. Sanders was from the neighborhood, but had

24   never had a conversation with him other than to say hello on the street. RT 624, 11,649.

25

26

27   [13]  Lankford signed the statement after he had been interrogated in a room with four or five
     police officers. RT 627. At a pretrial motions hearing Lankford testified that the police prepared
28   a statement which he did not really read because he "was anxious to get out of there." He signed
     it so he could leave. RT 635-636. Referenced excerpts of his testimony are attached as exh. 9.

## C.    Bruce Woods

Bruce Woods read about the Bob's Big Boy incident in the newspaper while incarcerated at the County Jail and recognized a picture of recently arrested Stewart as a woman he knew only as "Collie." RT 11,337-342. Aware of the $10,000 reward and the potential benefit such information might have on his pending felony burglary case, Woods contacted the police and recounted an incident that he said had occurred in August 1980.[14] RT 11,337-342, 11,346-349, 11,384, 11,411-413. As related by Woods in his trial testimony, he was riding in a car on La Cienega Boulevard with his friend Connie and a woman named Collie. He heard Collie ask Connie if he wanted to make some money by robbing Bob's Big Boy. Connie replied, "Are you crazy?" Collie said, "Are you sure?" and dropped the subject. RT 11,332-336. In addition to testifying about this alleged incident involving Carletha Stewart, Woods also testified at Mr. Sanders' trial to remarks allegedly made to him by Mr. Sanders. According to Woods, after he testified at the joint preliminary hearing for Stewart and Mr. Sanders, he rode back to jail in the same van as Mr. Sanders, even though he was being detained on his cases under protective "K-9" status. RT 11,349-357; 11,377-382. According to Woods, Mr. Sanders told him that he should not "talk" because Carletha was "young," and that if "they" were convicted, "they" would give him the "gas." RT 11,353, 11,356. Woods also claimed that Mr. Sanders said that "they" had his (Woods') address and that his family was going to get involved if Woods talked.[15] RT 11,357.[16]

---

[14] Woods testified that the incident occurred while he was briefly out of custody on a pending receiving stolen property charge. RT 11,336.

[15] DDA Giss denied Woods had been given a "deal," and said that Woods pled guilty before testifying at the preliminary hearing. RT 11,361-362. However, just after Woods testified at the preliminary hearing, DDA Giss accompanied Woods to court where he was to be sentenced. After Giss told the judge that Woods was a prosecution witness in the Bob's Big Boy case, Woods only received six months in county jail. RT 11,445-455. Woods was then placed on the bus with Mr. Sanders.

[16] Referenced excerpts of Woods testimony relating to the sentence he received and to his placement on a bus with Mr. Sanders are attached as exh. 10.

13

1

### D.    Andre Gilcrest

2    Under a grant of immunity from the prosecution, Andre Gilcrest testified that on

3    September 27, 1980[17] he met Stewart at her house between 10 and 11 p.m.  Stewart told him that

4    "Frank and Ricky" were going to rob Bob's Big Boy that night.  RT 12,058-065, 12,067-068.

5    According to his testimony at the preliminary hearings, he thought Stewart was just kidding.  RT

6    12,408-412.  At trial, however, he testified that he believed a robbery was about to happen, but

7    did nothing to stop it.  RT 12,065-067.

8    Gilcrest and Stewart went to Bob's Big Boy, that evening between 11:30 p.m. and

9    12:30 a.m.  Stewart told him that she wanted to "check out" who was working that night.  RT

10   12,065-067.  Gilcrest claimed that his only purpose in accompanying Stewart was to drink

11   coffee.  RT 12,065-067, 12,323-324.  While at the restaurant, Stewart used the phone and talked

12   to the waitresses.  RT 12,070, 12,508-514.  For part of the time, Gilcrest spoke to two friends of

13   his sister who were in a car in the parking lot.  RT 12,514.  Gilcrest and Stewart stayed and

14   drank coffee until fifteen minutes before closing time, and then returned to Stewart's residence.

15   RT 12,068-070.

16   Gilchrest testified that at some point that night,[18] while he was outside Stewart's

17   apartment, he saw Stewart talking to Mr. Sanders and Freeman, who were sitting in a blue sedan

18   DeVille across the street.  Gilcrest related that from his position across the street, he saw Mr.

19   Sanders show Stewart a sawed-off shotgun, and he also saw another shotgun balanced on

20   Freeman's knee.  RT 12,070-076.  Later that same night, Stewart told Gilcrest that Ricky had

21   called and said that "they" didn't do "it [the robbery]" because the manager didn't come out and

22

23

24   _____

25   [17]  Police determined this date by reference to an unrelated homicide which occurred three
     blocks from Bob's Big Boy on September 27, 1980.  RT 11,788-796.  Gilcrest had no
26   independent recollection of this date and no knowledge of the unrelated homicide.  He had
     previously stated at various times that he saw Stewart in November.  RT 12,124-126,
27   12,432-441.

28   [18]  Gilcrest gave conflicting testimony as to whether this occurred before or after he and
     Stewart went to Bob's Big Boy.  RT 12,070-072, 12,074, 12,518-521, 12,567-570.

14

1  that they would do it the next night. RT 12,086-087. Stewart and Gilcrest never talked about

2  this incident again. RT 12,088.

3         According to Gilcrest, when he heard about the Bob's Big Boy homicides on the

4  news, he told his brother Anthony about the night at Stewart's house and Anthony then told his

5  mother, who in turn pressured him (Gilcrest) into contacting the police. RT 12,127-133,

6  12,580-581, 13,176-183. Aware of the $10,000 reward, he told police that he came forward "to

7  be a good citizen and for the money." RT 12,604-606.

8         By the time Gilcrest contacted the police, he was also aware that Mr. Sanders was

9  Stewart's current boyfriend. RT 12,190-194, 12,251-261, 12,070. Gilcrest had been

10 romantically involved with Stewart off and on since 1973, and was still in love with her at the

11 time of trial. RT 12,048-049, 12,108-116, 12,077, 12,584-590. However, he denied that he was

12 angry, jealous, or despondent over Stewart's relationship with Mr. Sanders. RT 12,593, 12,188-

13 194.[19]

14        Gilcrest, who had a lengthy criminal record (RT 12,168-180)[20] and who had once

15 been hospitalized after taking PCP (RT 12,248-249), initially called a police officer named

16 Becker with his story. After Becker had arrested him in 1972 or 1973, they kept in touch.

17 Gilcrest, however, denied that he was a police informant. RT 12,130. Within a day or two after

18 Gilcrest called the police, Mr. Sanders, Freeman, and Stewart were arrested. RT 12,099.

19

20        **E.    Brenda Givens**

21        Brenda Givens, a waitress at Bob's Big Boy restaurant, testified that while visiting

22 her boyfriend at the Los Angeles County Jail on September 27, 1980, she saw Stewart and a

23 ///

24

25

---

26  [19] Despite his denials, the depth of his unrequited love was graphically set forth in letters he
    wrote to Stewart while she was in jail. RT 12,207-226, 12,229-251.

27
28  [20] Gilcrest also admitted that he had forged a name to some "hot" money orders which were
    endorsed by Stewart's mother. She turned him in to the FBI when she herself got caught.
    Nevertheless, he denied harboring any resentment against the Stewart family. RT 12,186-187.

woman named Carla in the visitor's area.[21]   Stewart, a former Bob's Big Boy waitress,
approached her and said: "Good thing I seen you. Because they gonna rob Bob's Big Boy
tonight. I don't want you hurt."  Givens testified at trial that she noticed that Stewart was with
two black males, but in her initial statement to the police on December 14, 1980, when she
recounted her conversation with Carletha, Givens made no mention of seeing any men with
Stewart. (RT 10,889-890; 13,987-993).  Even though Givens made no mention of seeing any
men in her statement given on December 14, the police had her attend the December 23, 1980
lineup, where she identified Mr. Sanders and Freeman. RT 10,855-866, 10,885-889, 10,914,
10,932-940.

Prior to trial, Givens had stated to a defense investigator that she had seen
Stewart at the jail on three occasions, but had spoken to her only on the first; that Stewart was
alone the day she told her (Givens) about the robbery; and that a week later she saw Stewart with
a black male, who she was "careful not to look at." RT 14,257-266.

Givens testified that when she went to work the evening she had the encounter
with Stewart at the County Jail, she told Rodell Mitchell, the night manager, what Stewart had
said. RT 10,867, 11,169-181, 11,324. Around 11:30 p.m. Stewart came in with a black male,
later identified as Andre Gilcrest, and sat at a booth drinking coffee. Stewart made some phone
calls. RT 11,181-184, 10,871-878. At one point the manager observed Gilcrest talking to some
black males in a car in the parking lot. RT 11,275-278. After Stewart and Gilcrest left, Givens
received a phone call from Stewart, who asked her how long it would be before she left and how
many employees were still inside. When Givens left the restaurant at around 2 a.m., she saw
Stewart knocking on the front door.  The manager did not let Stewart in.  RT 10,871-878,
11,181, 11,189, 11,250-254. Despite the presence of several police officers in the restaurant that
night, Givens did not tell them about the incident. RT 10,917-922.

---

[21]   As with Gilcrest, this date was determined by reference to the unrelated homicide which
occurred in the neighborhood. RT 10,869-871, 11,169-181. Givens testified that she had no
independent recollection of the date. She had previously told police that it occurred in the first
or second week of September. RT 10,900-907, 14,257-263.

16

F.  **Rodell Mitchell**

Mitchell testified that Givens had told him about a threat of a robbery, but believed it happened at the end of August or early September. RT 11,177-78; 11,183; 11,209-211. Mitchell also testified that he made what he referred to as a "fake phone call" to the police to "get them inside my store" to prevent the incident. RT 11,177-78; 11,183. In fact, Mitchell said he made a number of calls to the police that evening; every time Stewart "popped up and went to the phone booth," he "popped up and called the police," and this occurred at least "three times." RT 11,242. Mitchell said he told the police he was "sorry" for calling so many times but told them "would you please send someone down to my store, I think we might be robbed now." RT 11,243-44. Mitchell said he was told they would send someone out. RT 11,180.

According to Mitchell, the police eventually did come and specifically told him they were there in response to his call. RT 11,246. Mitchell testified that when the police arrived, he pointed out Stewart and said the person who "threatened robbery was sitting in the store right then and there." Mitchell also testified that other police officers were in the restaurant that same night about another incident in the neighborhood, and he claimed that he also told those other officers of the planned robbery of the restaurant that had been conveyed to him by Givens. RT 11,180; 11,240. Mitchell filed a report with Bob's Big Boy security soon after the incident, according to his testimony. RT 11,250-45.

The officers who had investigated the unrelated homicide on September 27, testified that they had interviewed personnel at Bob's Big Boy that night but said no one told them about a potential robbery. RT 11,788-96; 13,847-61. Nor was there any evidence presented substantiating Mitchell's supposed calls to the police, or his testimony that the police had actually responded to his repeated "fake calls." Further, David Lind, the head of Bob's Big Boy security, testified that he did not receive any incident report regarding these events, contrary to Mitchell's claim that he made a report. RT 11,777.

///

///

///

17

## III.   EVIDENCE DISCOVERED POST-CONVICTION

Six years after Mr. Sanders was convicted and sentenced to death, a scandal erupted when it was discovered that the Los Angeles County District Attorney's had a longstanding practice of using lying jailhouse informants to help win high profile cases.  As will be detailed below, the illegal methods uncovered through the jailhouse informant scandal had fatally infected the testimony of both Tami Rogoway and Bruce Woods at Mr. Sanders' trial.  It was also discovered post-conviction that the prosecution unlawfully influenced the testimony of the eyewitnesses.

### A. <u>Tami Rogoway</u>

#### 1. The Jailhouse Informant Scandal

In October 1988, Leslie Vernon White, a longtime jailhouse informant with a lengthy criminal record, demonstrated for the Los Angeles Sheriff's Department that by using the telephones at the Los Angeles County Jail, he could easily obtain confidential information about other defendants and their cases in order to fabricate confessions.[22]  Then, by arranging to be placed in physical proximity to a defendant about whom he had obtained information, White could plausibly maintain that the defendant had confessed to him.  He repeated this demonstration on nationwide television on February 26, 1989.[23]  White's scheming could be traded for a handsome payback from prosecutors in the form of leniency, money, conjugal visits, furloughs, and other favors.[24]

---

[22]  See Rohrlich "Review of Murder Cases Ordered" <u>Los Angeles Times</u>, Oct. 29, 1988 and "Special Directive 88-10" from Chief Deputy District Attorney Gregory Thompson to All District Attorney Personnel, Nov. 1, 1988, attached as exh. 11.  These internal memoranda were disclosed by the Los Angeles County District Attorney's Office under the Public Records Act in 1989.  See accompanying "Acknowledgment of Discovery" form.

[23]  See transcript of "The Snitch" 60 Minutes; Reinhold "California Shaken Over an Informer" <u>New York Times</u>, February 17, 1989, attached as exh. 12.  The videotape of the 60 Minutes show is also attached as exh. 13.

[24]  Exhs. 12 and 13.

1      Numerous news articles followed up this story with revelations about the frequent

2   use of jailhouse informants in high-profile murder cases in Los Angeles County.  The myriad

3   benefits offered by law enforcement for testimony from these informants, most, if not all of

4   whom were hardened criminals, enticed them and enabled them to commit perjury on an

5   unprecedented scale.  Many of these informants not only won their freedom with their lies, but as

6   soon as they were released from custody, they again began preying upon the innocent public.[25]

7      In the course of the exploding scandal, other informants came forward and

8   disclosed that law enforcement officers encouraged them to commit perjury by supplying them

9   with information about a defendant's case, and sometimes by telling them exactly what to say on

10  the stand.[26]

11      These allegations of widespread perjury and serious misconduct by law

12  enforcement prompted the District Attorney's Office to begin an internal review of more than 100

13  murder cases where jailhouse informants had testified.[27]   The Jailhouse Informant Litigation

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23

24   [25] See Rohrlich, "Trading Lies for Freedom, "Los Angeles Times, Apr. 16, 1989, attached as
exh. 14.

25   [26] See Rohrlich, "Jailhouse Informant Says He Lied at 3 Murder Trials," Los Angeles Times,
26   Nov. 5, 1989, and Rohrlich, "Police Go Fishing for Jailhouse Confessions," Los Angeles Times,
Mar. 4, 1990, attached as exh. 15.

27   [27] Special Directive 88-11 and Berg, "Defense Attorneys Notified of Jailhouse Informant
28   Use," Los Angeles Daily Journal, January 18, 1989 and Berg, "Call Renewed to Reopen
Jailhouse Informant Cases," Los Angeles Daily Journal, February 9, 1989, attached as exh. 16.

Team (JILT) was set up to compile memoranda, retrieve old files,[28] set new policy, and deal with requests from defense counsel and the media.[29]

The 1989-1990 Los Angeles County Grand Jury was impaneled to investigate the jailhouse informant scandal. An independent prosecutor was appointed because of a conflict of interest on the part of both the District Attorney's Office and the Attorney General's Office.[30]

The grand jury released its report at a news conference on July 10, 1990. Special counsel Douglas Dalton hailed the investigation as the most comprehensive of its kind anywhere in the nation.[31] He also acknowledged that innocent people may have been convicted on perjured testimony.[32] Although the report is entirely anonymous -- not even Leslie White's name is mentioned -- its findings parallel for the most part the stories uncovered by the press.[33]

---

[28] Between 1988 and 1994, the Los Angeles District Attorney stipulated to a protective order re informant files. However, the District Attorney now seeks to destroy most of their felony files more than 15 years old. On December 12, 1996, after a taxpayer's lawsuit (Calif. Code of Civ. P. § 526a) was filed in Los Angeles County Superior Court (Calif. Attys. for Crim. Justice, et al. v. LADA, et al, No. BC161572), the Honorable Diane Wayne granted a preliminary injunction preventing the District Attorney from destroying any records. See Berg, "Judge Forbids Destruction of Records by DA," Los Angeles Daily Journal, Dec. 12, 1996 and Abramson, "Judge Prevents D.A.'s Office From Destroying Old Files," Los Angeles Times, Dec. 13, 1996. The District Attorney has appealed. A copy of these articles, Judge Wayne's ruling, and the notice of appeal are attached as exh. 17.

[29] See Special Directive 88-15, attached as exh. 18.

[30] Report of the 1989-90 Los Angeles County Grand Jury "Investigation of the Involvement of Jail House Informants in the Criminal Justice System in Los Angeles County," June 26, 1990, attached as exh. 19.

[31] See August 30, 1990 Order of then Presiding Judge Byrne preserving indefinitely the "material accumulated and used" by the 1989-1990 Grand Jury, attached as exh. 20. In 1991, petitioner sought access to these records, but the Superior Court denied his request for lack of jurisdiction.

[32] See Rohrlich "Report on Informants Draws Fire" Los Angeles Times, July 11, 1990, attached as exh. 21.

[33] See Berg, "Jury's Report on Informant's May Spur Suit, Defense Lawyers Blast Secrecy of Year-Long Probe" Los Angeles Daily Journal, July 11, 1990 and Editorial, "Make it a Federal Case -- Grand Jury Report on Informant Scandal Doesn't Go Far Enough," Los Angeles Times, July 11, 1990, attached as exh. 22.

1    Specifically, the grand jury found that the "Los Angeles District Attorney's Office

2  failed to fulfill the ethical responsibilities required of a public prosecutor by its deliberate and

3  informed declination to take the action necessary to curtail the misuse of informant testimony."[34]

4    The Sheriff's Department, which operates the county's jail facility and also

5  transports inmates to and from court, was singled out for failing to "establish adequate

6  procedures to control placement of inmates [in the county jail] with the foreseeable result that

7  false claims of confessions or admissions would be made."[35]

8    The grand jury concluded that the enormous benefits bestowed by law

9  enforcement foster the incentive for jailhouse informants to lie.[36]  Even more significant, the

10  grand jury found that in many cases jail officials intentionally moved informants close to

11  defendants in order to facilitate the scam.[37]

12    In addition, the grand jury noted that the District Attorney's Office deliberately

13  failed to establish a central index of informants in order to foil defense discovery motions.[38]  The

14  report mentions internal memoranda from the District Attorney's Office that reveal prosecutors

15  had long suspected that the Sheriff's Department moved informants in order to gather infor-

16  mation on criminal defendants. "Management Staff suspected that L.A.S.D. intentionally put

17  jailhouse informants in jail cells with defendants from whom law enforcement could use a confes-

18

19
_____

20    [34]  Grand Jury Report at 6 (emphasis added)

21    [35]  Ibid. (emphasis added)

22    [36]  Grand Jury Report at 10-15; see also Editorial, "Grand Jury Report on Jailhouse
   Informants -- A Favor for Your Lies -- L.A. County Prosecutors Have Shown More Interest in

23  Winning than in Discovering Whether Their Witnesses are Telling the Truth," Los Angeles Daily
   Journal, July 30, 1990, attached as exh. 23.  The grand jury found that informants have a wide

24  variety of ways to gather information with which to fabricate confessions, e.g.:  (1) information
   directly supplied by law enforcement; (b) impersonation of law enforcement officers on the

25  telephone; © the coroner; (d) the media; (e) information gathered by informants' family and
   friends; (f) reading defendants' transcripts and legal papers; (g) sharing information with other

26  informants; (h) prodding a defendant for information about what he is charged with to twist into
   a confession.  Grand Jury Report at 27-31.

27    [37]  Grand Jury Report at 58-68.

28    [38]  Grand Jury Report at 111-122.

1  sion."[39]  "It is suspected that snitches are housed close to arrestees whose statements we would

2  like to obtain.  The defense's efforts to show this has been done intentionally have been

3  problematical for them.  Our files might be used by the defense in these efforts."[40]

4          Upon the recommendation of the 1989-1990 Grand Jury, Leslie White and Sidney

5  Storch, another well known jailhouse informant, were indicted for perjury in unrelated cases.

6  Storch, who was arrested in new York City, died of AIDS while in custody and awaiting

7  extradition to California.[41]  However, White subsequently pleaded guilty.[42]

8          In the wake of the scandal, a number of Los Angeles County murder convictions

9  have been reversed -- and the defendants released from custody -- due to tainted informant

10  testimony.  See e.g., Arthur and Senon Grajeda (No. A034284); Sheldon Sanders (No.

11  A039120); Ruben Luna (No. A532898); Kenneth Tillman (No. A623621).

12          Post-scandal, the California Supreme Court held that the testimony of a jailhouse

13  informant is "inherently suspect."  In re Wilson, 3 Cal.4th 945, 957 (1992).

14          **2. Leslie White and Tami Rogoway**

15          Prior to trial it became apparent to Mr Sanders' defense counsel Leslie Abramson

16  that various prison inmates were somehow involved with Rogoway.  Thus, on February 24,

17  1982, at the request of the defense, a pretrial discovery hearing was held before Judge Ideman at

18

19

20

21  [39]  See memorandum from Denis K. Petty to Richard Hecht on "Informants," November 1,
1988, and memorandum from Richard Hecht to Philip Wynn, on "Management Staff
22  Discussion(s) Regarding Establishment of a Central Index of Jail House Informants,"
December 7, 1988, attached as exh. 24.

23  [40]  See memorandum from Michael E. Tranbarger to Denis K. Petty, on "Informant File,"
January 26, 1987, and Berg, "D.A. Memo Airs Private Suspicions of Snitch Misuse -- 'Massiah'
24  Issue at the Jail?" Los Angeles Daily Journal, August 17, 1989, attached as exh. 25.

25  [41]  See Berg, "Informant Sought in Perjury Count Arrested in N.Y." Los Angeles Daily
Journal, February 19, 1992; Rohrlich, "L.A. Jailhouse Informant Seized on Perjury Charge," Los
26  Angeles Times, February 20, 1992; Berg, "Testimony of Informants Now under Scrutiny," Los
Angeles Daily Journal, February 24, 1992; and Rohrlich, "AIDS Kills Informant Awaiting
27  Extradition," Los Angeles Times, March 31, 1992, attached as exh. 27.

28  [42]  See Rohrlich, "Perjurer Sentenced to 3 Years," Los Angeles Times, May 20, 1992,
attached as exh. 26.

1    which DDA Harvey Giss testified under oath, inter alia, about his knowledge of Tami Rogoway

2    and her relationship with prison inmates.

3          Giss testified that a county jail inmate "by the name of Les White" gave him a love

4    letter written by prison inmate Richard Quine to a friend of Rogoway's named Gina Gutierrez.[43]

5    RT 1691. After White told Giss that Quine might be a defense witness, Giss turned the letter

6    over to Abramson. RT 1691.

7          Giss said the love letter showed that Quine would "play with whoever wants to

8    make a deal with him, prosecution or defense." RT 1692. In the letter, Quine was "offering

9    himself up as a fake informant." RT 1964.

10          The letter read in pertinent part,

11       "How is my sweet baby feeling? I need you to tell Tami that I can help her out on

12       putting Freeman away .... Ask her if she is going to court on him still, and if so, all

13       she has to do is tell me about his case, then call the D.A. and tell him she knows

14       someone that Freeman told he did what he is in jail for.[44] If Tami wants me to do

15       this, tell her to write me and let me know all about the case or come back up to

16       see me and tell me about it. Then after I know all about the case, she can tell the

17       D.A. to get hold of me so we can talk -- we can talk if the D.A. wants to use me

18       in court ..." RT 1693-1694.

19          Giss said that White reported to him that the defense attorneys had interviewed

20    Quine and that they were going to use him as a defense witness "for purposes of allegedly

---

22    [43] Referenced excerpts of Giss' testimony at this pretrial hearing are attached as exh. 28.

23    [44] At Freeman's preliminary hearing Rogoway initially failed to identify him. However, after
24 sitting through Rhonda Robinson's testimony in which she identified Freeman, Rogoway told
DDA Giss that she was certain Freeman was one of the robbers. She was recalled to the stand
25 and identified him. Freeman Prelim RT 9921. At Freeman's trial, Rogoway was not asked to
identify Freeman. On October 20, 1983, prior to her testimony at the Freeman trial, DDA Giss
26 said that the reason Rogoway would not be asked to make an identification was because her
testimony was arguably tainted at the preliminary hearing. Freeman Trial RT 9921. This portion
27 of Freeman's transcript is attached as exh. 29.

28

1  manufacturing testimony" to contradict potential prosecution witnesses. RT 1694. Giss said that

2  Quine "is never going to be released," (RT 1692) and "the sole reason he's cooperating is he has

3  a hopeless future."

4  When asked, "How do you know Les White," Giss replied that he had spoken to

5  White by phone about five months earlier and that he sent officers to interview him. RT 1695.

6  Giss averred that he received so many calls from people who wanted to inform on the Bob's Big

7  Boy case that he did not go to see these potential witnesses anymore but would send an officer.

8  RT 1695.

9  Giss also testified that White was "romantically linked" to Rogoway in a "sordid

10 sort of way." RT 1692. According to Giss, Rogoway had been friends with Gutierrez before the

11 restaurant shootings and had accompanied her to Chino State Prison to visit Quine. Since

12 Gutierrez was underage and Rogoway was already 18, Rogoway went in to see Quine as an

13 emissary. RT 1692. Quine suggested that Rogoway should meet "this guy Les White" (RT

14 1693), "so she met up with him in the system." RT 1693.

15 Giss was "shattered," "shocked," and "surprised" at Rogoway's involvement with

16 prison inmates. Because she was from a "good" and "affluent" family, Giss testified that he had

17 initially considered not even calling Rogoway as a witness to spare her parents' "reputation."

18 Giss, while on the witness stand, raised his own objection to the following

19 question, which was sustained: "Didn't you consider it a little peculiar that this guy, Les White,

20 who was Tami Rogoway's boyfriend, all right, is running around suddenly turning witnesses who

21 have been talking to the defense, giving apparently useful information to the defense, next thing

22 you know these people recant and Les White is in the middle of it all?" RT 1696. Abramson

23 continued to express concern about White's "tampering with defense witnesses" and wanted to

24 find him. RT 1699.

25 Giss said that White had been released from custody "unbeknownst to me" and he

26 did not know where he was; however, he thought he could find him. RT 1697.

27 Giss further testified that "**Les White was never used as an agent of the police.**

28 It may be that someone would argue that he was a police agent, but we never made a deal with

24

1   him, never offered anything, **never asked for anything**.  He apparently was serving out a 30 or

2   60 day sentence, and that was the end of it."  RT 1701 (emphasis added).

3         During Rogoway's trial testimony, at sidebar, Giss said "there is a lot of snitches

4   in the county jail coming forward to both sides," claiming that Rogoway "allegedly said

5   something to the effect she's going to take care of Freeman ... or something like that."  Giss said

6   he did not "believe it for one moment."  "I'm not saying what the truth is, because I don't have it,

7   but I don't believe for one moment that [Rogoway] ever made that statement.  There is a man by

8   the name of Quine in the system who is trying to lay that on her and cooperate with the defense.

9   Likewise, **I have a man** who is a friend of Quine's who told me what he is allegedly doing."

10  RT 8186-8187 (emphasis added).[45]  Giss did not say whether the "man" was Leslie White.

11        Giss denied that Rogoway had "collaborated with certain State Prison inmates" to

12  fabricate her identification of Freeman.  RT 8676.  Giss reiterated that Rogoway's sole contact

13  with Quine was the visit to Chino with her girlfriend Gina Gutierrez.  RT 8681-8682.  This visit

14  was supposed to have taken place after the preliminary hearing.  RT 8682.  Giss said he had

15  "word from another snitch in the jail system that this guy Quine is willing to sell himself to

16  anyone."  RT 8683 (emphasis added).  Giss did not say whether the "snitch" was Leslie White.

17        Sustaining Giss' objection, the court refused to let Abramson ask Rogoway

18  whether she knew Quine, whether she had ever discussed the case with him, and/or whether she

19  knew Leslie White (RT 8684) -- unless Abramson first called these inmates to the witness stand.

20  RT 8686.

21        In an "affidavit" signed May 15, 1982, Leslie White stated that he did not possess

22  any adverse information about Mr. Sanders and Freeman, nor had he received any statements

23  from them.[46]  However, in a contemporaneous police report White repudiated this "affidavit."[47]

24  Thus, the defense did not call White to the stand.

25

26  [45] Referenced excerpts of this sidebar are attached as exh. 30.

27  [46] See May 15, 1982, "Affidavit/Statement" of Leslie White, attached as exh. 31.

28  [47] See handwritten police report re interview with Leslie White, attached as exh. 32.

### 3. Leslie White's 1981 Conjugal Visits With Rogoway

On March 13, 1989, Leslie White testified as an expert witness when called by the defense in the case of People v. Gregory Marshall and Edward Harris, Los Angeles County Superior Court No. A954922. He described numerous ways in which the prosecution employed informants both in court and behind the scenes.[48]

White testified that in 1981 he was brought from state prison to the Los Angeles County Jail to testify in a case. DDA Andrew Diamond then arranged to have White transported to the Long Beach City Jail to cooperate in another case. White requested, as a favor, that he be allowed to leave the jail on weekends. Marshall RT 3653-3654. DDA Diamond arranged for Judge Leethem to sign furlough orders allowing him to be released from Thursday at midnight until Tuesday at 2:00 a.m. Marshall RT 3654.

In White's words, these furloughs "became so frequent, at one point they just typed up the court orders and left the days blank and the secretary xeroxed about 50 copies of it, put it next to the secretary's desk. When I turned myself in on Tuesday, I would stop by the District Attorney's Office and tell them what dates I wanted and walk the court order down to the judge's courtroom and the judge would sign it and give it to me without the DA even being present." RT 3654-55.

White further testified that during that same time period he provided information to DDA Giss about the Bob's Big Boy case. Marshall RT 3656. White said that Giss visited him at the Long Beach jail and that DDA Giss was aware that DDA Diamond had transported him down there. Giss also knew that White was having "sexual relations" with Rogoway over a period of three months. Marshall RT 3656-3657.

White testified that his "involvement with [Mr. Sanders's case] was basically behind the scenes in the sense the D.A. was asking me to do certain things on the street and in jail I was doing -- I would collect the results." Marshall RT 3658.

---

[48] See Marshall transcript, referenced excerpts of which are attached as exh. 33.

1     White would relay to Rogoway "things" he had heard in the informant tank from

2 those inmates trying to fabricate stories about the defendants in the Bob's Big Boy Case, so as to

3 obtain favors from the District Attorney. Marshall RT 3658, 3749, 3797. White was specifically

4 told that some of the information he got from other informants in 1981 were "lies," but

5 nevertheless he passed this "detrimental" information on to Rogoway. Marshall RT 3795-3797.

6     DDA Giss was interviewed by newspaper reporter Martin Berg about White's

7 testimony in the Marshall and Harris case. Giss "emphatically denied that White helped

8 prosecutors on the case. 'He's a liar,' Giss said. 'He's one of the lowest people on this planet.'

9 Giss said he visited White in the Long Beach jail after White told him he had information about

10 [Mr. Sanders's] case. 'He was in custody for some caper he committed,' Giss said. 'I never knew

11 anything about weekends, and **I never knew anything about a sexual relationship**. He wanted

12 us to bring him a porno magazine. He was horny.' Giss ... said White never gave him

13 information in the case. 'This sounds like sour grapes because the district attorney in this case

14 wouldn't be hoodwinked by him' in the Bob's Big Boy case."[49]

15          **4. The Furlough Orders**

16     Furlough orders corroborate White's testimony in the Marshall and Harris case.

17 On October 2, 1981, the Honorable Julius Leetham, Supervising Judge of the Superior Court

18 signed an order releasing state prison inmate Leslie White to the custody of the Long Beach

19 Police Department.[50] Thereafter, Judge Leetham issued numerous furlough orders for White to

20 be temporarily released from jail for days at a time from October to December 1981. Supp. RT

21 of December 6, 1981, pp. A-10-A-82.[51]

22 ///

23

24

[49] See Berg, "He's a Liar; He was Horny, DA Denies Informer Got Weekends out of Jail to
25 Woo a Witness," Los Angeles Daily Journal, March 15, 1989, p.5, attached as exh. 34.

26 [50] See "Order for Transfer of Prisoner" in Ex parte application of Leslie Vernon White, Los
Angeles Superior Court No. A148932, attached as exh. 35.

27
[51] Copies of these furlough orders (In re Leslie Vernon White, Los Angeles Superior Court
28 No. A148932) dated 10/14/81, 10/22/81, 10/29/81, 11/2/81, 11/9/81, 11/16/81, 11/24/81,
12/7/81, and 12/9/81, are attached as exh. 36.

### 5. DDA Giss' Handwritten Notes

Documents obtained from the Los Angeles District Attorney's Office under the Public Records Act (Gov. Code, § 6250, et seq) also corroborate White's testimony in the Marshall and Harris case about Mr. Sander's case. These documents reveal that DDA Giss hid the truth about White's behind-the-scenes activities in connection with Mr. Sanders' case.

A handwritten note[52] authored by DDA Giss and dated February 17, 1982, states in pertinent part:

> **LES HAD A CONJUGAL VISIT WITH TAMI. ONE**
>
> **REGULAR VISIT (NO FORMS, POLICE ESCORT)"**

This February 17 note shows Giss was well aware of White's sexual furloughs with Rogoway when he testified at the discovery hearing one week later on February 24, 1982. It also establishes that Giss certainly knew of the White-Rogoway sexual furlough prior to Rogoway's testimony at Mr. Sanders's trial on May 18, 1982, when Giss objected to Rogoway being asked questions about her relationship with White.

The note also contradicts Giss' public statements denouncing as false White's testimony that he knew about the sexual furloughs with Rogoway.

Another handwritten note[53] authored by DDA Giss regarding the use of Rogoway as a witness in Freeman's trial reads in pertinent part:

> "1. ONLY FOR INJURIES AND NOT FOR IDENTIFICATION
>
> AS IT OPENS UP A CAN OF WORMS RE PRISON VISITS
>
> AND LESLIE WHITE."

---

[52] A copy of this note is attached as exh. 37. In addition to the fact that this note was in DDA Giss' prosecution file, proof that this and other handwritten notes were penned by Giss, whose handwriting is very distinctive, is provided by comparing the handwritten note with the lengthy sample of Giss' handwriting that is attached as exh. 38. This sample is an entirely handwritten "Memorandum of Points and Authorities in Opposition to Motion for Mistrial and Dismissal" filed by Giss on November 1, 1983, during the trial of Franklin Freeman.

[53] A copy of this note is attached as exh. 39.

1    This note contradicts Giss' assertion at Freeman's trial that Rogoway would not be

2  asked to identify Freeman because her testimony might have been tainted at his preliminary

3  hearing.  See n. 44, supra.

4    Another document obtained from the District Attorney under the Public Records

5  Act reveals that White was indeed an informant working behind the scenes for DDA Giss,

6  contrary to Giss' testimony.  Giss signed a declaration under penalty of perjury on July 2, 1982,

7  that "today, an **informant** by the name of Les White .... told me, in person, at the Los Angeles

8  County Jail, that he wrote a letter for an inmate named "Doc" Holiday ... which contained various

9  lies calculated to hurt the prosecution in the Bob's case."  Giss also declares that White told him

10  he was being pursued by Abramson to bear false witness against the prosecution.[54]

11    Attached to the declaration was a proposed order[55] which states in its entirety:

12    **"IT IS HEREBY ORDERED THAT THE LOS ANGELES**

13    **COUNTY SHERIFF PERMIT THE PERSON OF LESLIE**

14    **WHITE, ALSO KNOWN AS CHRISTOPHER JAMES, AN**

15    **INMATE AT THE LOS ANGELES COUNTY JAIL**

16    **(MODULE 7000, INMATE #6626019) BE WIRED FOR**

17    **SOUND BY THE LOS ANGELES COUNTY DISTRICT**

18    **ATTORNEY'S OFFICE IN ORDER TO RECORD ANY**

19    **CONVERSATION WITH ATTORNEY LESLIE**

20    **ABRAMSON BETWEEN 6:00 P.M. ON JULY 2, 1982 AND**

21    **12:00 A.M. ON JULY 5, 1982.**" (emphasis added).

22  ///

23  ///

24  ///

25  ///

26

27    [54] A copy of Giss' declaration is attached as exh. 40.

28    [55] A copy of the proposed order is attached as exh. 41.

### 6. DDA Giss' 1990 Testimony About Leslie White In People v. Garmanian

In October 1990, DDA Giss testified at a motion to suppress in People v. Garmanian, Los Angeles County Superior Court No. A738948.[56] He said that "I never deal with informants. It's a real rare occasion with me. I'm afraid of them." Garmanian RT 715.

Giss also said that he had been "set-up" by informants in the past. "It's happened before. People have tried it on me with Leslie White. **I was one of the fortunate few who never used Leslie White.**" Garmanian RT 734.

After being asked if he was referring to the "informant scandal the last couple years," Giss replied, "Yes. Then [sic] eventually told me -- which set my mind for all future times, including this case. And I didn't use him in the Bob's Big Boy cases. He told me -- **and I don't know whether he was telling the truth or not. He could have made this up**. But Leslie Abramson implored him to give me information. Then set me up, quote, to use his words, to piss in my face in court and make me look like a heavy, as if I made him lie. **And when I heard that back in 1985, I was glad I never dealt with him,** never knew what was to come down the tube with him. And I also decided never to deal with informants because you don't know." Garmanian RT 734-735 (emphases added).

Giss also distanced himself from prosecutors who use informants in court. "I honestly believe that informants have to be taken with a grain of salt. The worst thing is that they ad acess [sic] baggage to your trial. And I've been in trials where I've seen what really skilled lawyers can do, like when I used them once or twice at a prelim. That's why I decided not to use them at trial. I've seen what Leslie Abramson has done with one. I want nothing to do with it. It created a trial within a trial." Garmanian RT 723.

Giss further testified that adding informants to your trial "creates a circus sideshow to your actual trial which could dilute the strength of your case and put your own credibility as a prosecutor as someone who offers honest evidence in issue." Garmanian RT 723.

---

[56] See Reporter's Transcript for hearings in October 1990, in People v. Rodney Garmanian, Los Angeles Superior Court No. A738948, referenced excerpts of which are attached as exh. 42.

## B. **Bruce Woods**

As noted above, Woods testified at Mr. Sanders' trial that after testifying at the joint preliminary hearing for Stewart and Mr. Sanders, he was taken to his own courtroom for sentencing, where DDA Giss spoke on his behalf. He said that after the sentencing, he was transported back to the County Jail in a station wagon-like van with Mr. Sanders, and, in fact, was handcuffed and chained in the seat behind Mr. Sanders. Woods told the jury that during the trip, Mr. Sanders made incriminating remarks to him. RT 11,373-375. Woods admitted that he had been classified as "keep away" or "K-9" status during the time of the preliminary hearing and that he was classified as "K-9" because the bailiff knew he was a "snitch" against Mr. Sanders. RT 11,371-11,372.

During closing argument at Mr. Sanders' trial, DDA Giss told the jury "what an incredible Godsend Bruce Woods is because Bruce Woods tells us after the preliminary hearing, he's now in what is known as K-9 status ... And that K-9 status should have entitled him to be kept separate and apart from the person he was testifying against, the very defendant in this case. And yet he is transported back on the same bus .... And this defendant makes a very **damning statement**." RT 14,967-968 (emphasis added).[57]

After the jailhouse informant scandal broke, DDA Harvey Giss wrote that the reason Woods was on the same jailhouse bus with Mr. Sanders was because the "Sheriff's Department screwed up .... despite a keep away request."[58] Giss also claimed in his letter that Woods was a "juvenile housed at juvenile hall" when he first contacted the police about Stewart. Woods, however, who was born on September 8, 1960, was already twenty years old at the time of the Bob's Big Boy incident.[59]

---

[57] This portion of Giss' closing argument is attached as exh. 43.

[58] See May 26, 1989 memorandum from DDA Harvey Giss to Richard W. Hecht, Director, Bureau of Branch and Area Operations re "Response to Special Directive 88-11," attached as exh. 44.

[59] Woods was born September 8, 1960. See 12-6-80 "Arrest Report" of Bruce Llewellyn Woods, attached as exh. 45. In fact, when Woods testified at Mr. Sanders' trial on June 23, 1982, he said he was 21 years old (RT 11,326)

1    Woods' supposed "inadvertent" encounter with Mr. Sanders on a bus between the

2    court and the jail is cast in a different light by the post-trial revelations provided by the jailhouse

3    informant scandal. Woods' placement with Mr. Sanders on the bus and Woods' claim of an

4    admission by Mr. Sanders during his brief trip is typical of the illegal machinations of the Sheriff's

5    Department in facilitating false claims of confessions. The Grand Jury found "there appeared to

6    be an **unusual number of claims of defendants confessing on buses while being transported**

7    **to and from court**. Some of these confessions were alleged to have occurred in very short time

8    intervals, such as during movement from the Hall of Justice Jail to the Central Jail (both located

9    within the central downtown area)."[60]

10    It cannot be overemphasized that the Grand Jury found that law enforcement

11    facilitated illegal placement of informants in close proximity of defendants "with the foreseeable

12    result that false claims of confessions or admissions would be made." Exh. 19, p. 6.

13    The conclusion that Woods' placement on the bus with Mr. Sanders was not an

14    inadvertent "Godsend," and that Woods' claim that Mr. Sanders made admission to him on the

15    brief bus trip was fabricated and a product of misconduct is consistent with later admissions by

16    DDA Giss. Testifying at the suppression hearing in Garmanian concerning violations of Massiah

17    v. United States, 377 U.S. 301 (1964) and United States v. Henry, 447 U.S. 264 (1980) [both

18    holding that using an informant to elicit incriminating information after counsel has been

19    appointed violates the Sixth Amendment], DDA Giss said he was familiar with both of these

20    cases but characterized them as "technicalities." Garmanian RT 731.

21        **"To hell with some legal technicality, as long [as] it's not going**

22        **to be anything that ruins the case per se."** Garmanian RT 731-

23        32 (emphasis added).

24

25

26
[60]    Grand Jury Report at 46, n.22 (emphasis added) In the case where Sidney Storch was
27    indicted for perjury, People v. Sheldon Sanders, Los Angeles Superior Court No. A039120, the
      white, middle aged Storch claimed to have obtained a confession while seated next to Sanders, a
28    black juvenile, on a courthouse bus for only a few minutes. On July 14, 1992, the District
      Attorney's Office stipulated that Sheldon Sanders' conviction should be overturned.

## C. **Rhonda Robinson**

As set forth in section I. B., Robinson had not identified Mr. Sanders at his preliminary hearing, and she admitted at trial that she had blocked the incident form memory and had "no mental picture" of either man. RT 9866; 9870. Robinson, however, identified Mr. Sanders at trial as one of the robbers. RT 9803.

During trial, defense counsel pointed to some three ring binders on the desk and asked Robinson if whether she had seen any "blue" three ring "binder books" in the witness room while she was waiting to testify at Freeman's preliminary hearing. RT 9909-9911. Robinson twice stated that she did not remember seeing any such notebooks, although she acknowledged that other witnesses made "comments" about photographs while she was in the witness room. When defense counsel attempted to cross-examine her as to whether these other witnesses had mentioned seeing pictures of Mr. Sanders in a notebook, DDA Giss objected on hearsay grounds. RT 9911.[61]

At sidebar, defense counsel said that she would be able to prove through another restaurant employee that the witnesses had been exposed to a highly prejudicial and misleading picture of Mr. Sanders and Stewart that the Court had ruled inadmissible earlier in the trial.[62] RT 9912. The court said, "putting aside the hearsay for a moment. How is this -- how is the fact that somebody mentioned a name germane to her identification of your client." RT 9913.

---

[61] This portion of Robinson's testimony is attached as exh. 46.

[62] On June 2, 1982, at Mr. Sanders's trial, out of the presence of the jury, DDA Giss and defense counsel Abramson argued the admissibility of various items of prosecution evidence. RT 9729-9755. DDA Giss said that he "very badly" wanted to introduce a photograph of Mr. Sanders and co-defendant Stewart. RT 9753. Giss described the photograph thus: "It is the defendant in a cocky pose, for lack of a better term, or an arrogant pose with a Cigarillo coming out of his mouth and a hat on .... And he is holding what appears to be a Thompson machine gun. Whether it is a genuine article or not, I can't say. And Miss Stewart is next to him holding what appears to be a semi-automatic weapon. I would admit that there appears to be a screw like device in the barrel." RT 9753. Abramson said witnesses would testify that "the photograph was taken at the arcade at the Long Beach Pike. And the supervisor of that arcade is prepared to testify those are his machine guns. That they are plastic. It is a toy pose just like all those kids do in arcades." RT 9755. The court ruled that the "photograph is too damaging with the brandishing of what may be automatic weapons in a gangster-like way" and therefore it was "inadmissible." RT 9754-9755.

1    Defense counsel explained that she was going to ask "whether there was any discussion he did it
2    or he was one of the guys, because I still can't figure out why she's identifying him, because she
3    has no recollection of these guys." RT 9913 (emphasis added).

4        . When cross-examined further, Robinson said she remembered "other" witnesses
5    looking at pictures and "suggesting" that Mr. Sanders "was one of the guys that did this thing."
6    RT 9915. Robinson, however, never revealed that she herself had seen this highly prejudicial
7    picture; nor did she ever reveal that she saw the blue binders.[63] .

8        At Freeman's trial, more than a year after Mr. Sanders' trial, the reason why
9    Robinson was able to identify Mr. Sanders at trial became apparent--prior to Mr. Sanders' trial,
10   she had seen the photograph[64] of Mr. Sanders in the witness waiting room at Freeman's
11   preliminary hearing. Not only had Robinson been untruthful in her testimony at Mr. Sanders'
12   trial, but the extent and deliberate nature of her perjury was dramatically demonstrated by her
13   detailed testimony at Freeman's trial. At the Freeman trial, Robinson testified that prior to
14   Freeman's preliminary hearing in February 1981, the police brought her to court and put her in a
15   room in the back of the courtroom with other witnesses. Freeman RT 9163. In the room,
16   Robinson said that she saw a "blue notebook" which "someone" opened and "we saw a photo."
17   Freeman RT 9166. Robinson said the picture was of **"Ricky Sanders and a girl .... They were
18   standing together holding a gun."** Robinson recalled that "a number of the ... employees" also
19   looked at the picture. Freeman RT 9168-9169, 9177 (emphasis added). Robinson further
20   testified that this photograph "stuck out" in her mind. Freeman RT 9175-9176.[65]

---

22   [63] Brenda Givens, who was not an eyewitness, testified at Mr. Sanders' trial that she had seen
     the photograph but did not tell others about it. RT 10,839-10,840. She also testified that
23   Rhonda Robinson was in the room with her and several others and looked at pictures. RT
     10,945.

24   [64] A copy of this photograph is attached as exh. 47.

25

26   [65] Freeman's defense counsel, Madelynn Kopple, moved to exclude Robinson's testimony on
     the grounds that it was impermissibly tainted by her exposure to the photograph of Sanders with
27   the fake machine gun. Freeman RT 9159-9186. The court denied the motion because there was
     no evidence she had been similarly exposed to pictures and/or other prosecution evidence about
28   Freeman. Freeman RT 9185. This portion of Robinson's testimony in Freeman's trial is
                                                                                    (continued...)

34

1 | **D.  Michael Malloy**

2 |        Defense counsel questioned Malloy at Mr. Sanders' trial about what he may have

3 | been told or shown "before he went to see the first lineup," in order to determine if suggestions

4 | had been made to him.  RT 7857.  Malloy answered that although he had watched television and

5 | read newspapers prior to attending the first lineup, he saw only the composite pictures and "did

6 | not see any photographs or moving pictures or videotapes of suspects."  RT 7886.

·7 |        Malloy also denied knowing that suspects had been arrested prior to viewing the

8 | first lineup:

9 |                Abramson:  "Had you heard before you were told that you

10 |            were going to go downtown to identify anybody, had you heard

11 |            that there were suspects arrested and in custody for the incident?"

12 |                Malloy:  "No, I didn't."

13 |                Abramson:  "Did a policeman call you and tell you you had

14 |            to go downtown to try to identify somebody?"

15 |                Malloy:  "I don't recall."

16 |                Abramson:  "Well, how did you know you had to go

17 |            down?"

18 |                Malloy:  "I believe someone called me, but I don't know

19 |            when."

20 |                Abramson:  "Okay.  Apart from when, do you know who?"

21 |                Malloy:  "No, I can't -- no, I don't."  RT 7849 (emphasis

22 |            added).[66]

23 | ///

24 | ///

25 | ///

26 |

27 | [65](...continued)
attached as exh. 48.

28 |        [66]  This portion of Malloy's testimony is attached as exh. 49.

1         Malloy's testimony was untrue.[67]  More than three years later, on July 12, 1985,

2 Malloy was deposed under oath by counsel for Tami Rogoway in her civil lawsuit against the

3 restaurant.[68] <u>Rogoway v. Marriott, et al.</u>, Los Angeles Superior Court No. C 397948.  Malloy

4 said that David Lind, security liaison between Bob's Big Boy and the prosecution -- a de facto

5 prosecution agent ( RT A361)[69]-- told him to go downtown for a lineup.  Malloy said Lind

6 instructed him to "**identify the guys.**"[70]  <u>Malloy</u> RT 88 (emphasis added).[71]

7         While testifying at Freeman's trial, Malloy also revealed for the first time that he,

8 too, had seen the highly prejudicial photograph of Mr. Sanders and Stewart holding machine

---

10     [67]   Malloy was arrested in Los Angeles on February 19, 1981, for burglary, but released the next day.  This was after he identified Mr. Sanders at the video lineup but prior to his testimony

11 at the preliminary hearing in March 1981.  The California Department of Justice rap sheet dated 7/16/91, attached as exh. 50, shows that Malloy was "exonerated."  Judicial notice (Fed. R.

12 Evid. 201) can be taken of the fact that for a rap sheet to state that an arrestee has been "exoner-ated" would be highly unusual.  Malloy's arrest was not disclosed to Mr. Sanders.  In fact,

13 prosecution trial discovery affirmatively stated that Malloy had had no contact with law enforce-ment.  See the Local Criminal History Summary stating "NO PRIOR RECORD WITH LAPD."

14 attached as exh. 51.  Thus, the circumstances of Malloy's arrest and subsequent "exoneration"

15 remain unknown.

16     [68]  Unlike the employee-victims, whose compensation for their injuries was limited by law to sums provided by workman's compensation, Rogoway, who was not an employee, was able to

17 bring a lawsuit against Bob's Big Boy and Mariott Corporation.  Rogoway settled her lawsuit for

18 an annuity of $500,000.

19     [69]  At the commencement of the preliminary hearing on March 20, 1981, DDA Giss said: "The People want to call the court's attention that we have a private investigator here that

20 represents the Bob's Big Boy chain.  His name is David Lind, L-I-N-D.  Mr. Lind is orchestrating the movement of witnesses and he is instrumental in making certain everybody is here and being

21 transported home.  He is not a percipient witness in this case and is really only <u>important relative to assisting the prosecution</u> and the Los Angeles Police Department move the witnesses in an

22 expeditious manner.  I ask that he be permitted to remain because he is helping in the procedural aspect." CT 4 (emphasis added).  On March 28, 1985, Harvey Giss wrote to Tom Petika, CEO

23 of Bob's Big Boy, praising David Lind as "invaluable" to the prosecution.  A copy of this letter is attached as exh. 52.

24     [70]   David Lind said the same thing to Derwin Logan.  At Mr. Sanders' trial, Logan testified

25 that several days after the incident but before the lineup on December 23, 1980, David Lind "**told me someone had been arrested**.  He said 'Good news.  Someone had been arrested connected

26 with it .... **Someone they believed did it.**" RT 10,570, attached as exh. 53.  Logan, however, never identified petitioner, see infra.  Ismael Luna, see <u>infra</u>, also testified that the police told him

27 suspects had been arrested prior to viewing the lineup.  He could not remember details but thought that he had been told this over the telephone.  RT 9285-9288.

28     [71]  Excerpts of Malloy's deposition are attached as exh. 54.

1   guns prior to testifying at Mr. Sanders' trial, and prior to making an in-court identification of Mr.

2   Sanders. <u>Freeman</u> RT 9449.[72]

3           In their testimony at Freeman's trial, both Givens and Malloy testified that

4   Detective Jacques was in the room when they saw the photograph. <u>Freeman</u> RT 6441, 9442,

5   10,942. The record reflects that other eyewitnesses -- Luna and Rogoway -- were also present

6   when the photograph was displayed. RT 10,942-945; <u>Freeman</u> RT 9164, 9442-9448, 9705-

7   9711, 9913-9918. There was no evidence, indication, or reason to believe that Malloy, or any of

8   the other witnesses exposed to the photograph, knew that the guns were toys or that the picture

9   had been taken at a carnival.

10

11          **E. Ismael Luna**

12          At Freeman's trial, Luna testified at a 402 hearing that prior to Freeman's

13  preliminary hearing (and prior to Mr. Sanders' trial) he was in a room and was shown some

14  photographs which he could not "recall very well." <u>Freeman</u> RT 9636. In front of the Freeman

15  jury, Luna acknowledged testifying at Mr. Sanders' trial and said he remembered the restaurant

16  shooting on December 14, 1980, "very well." <u>Freeman</u> RT 9644-45. He affirmed that he had

17  written "parese numero cuatro" or it "looks like number 4" on the lineup card and signed his

18  name. <u>Freeman</u> RT 9658-9659, 9691.[73]

19          However, when shown a photograph of the lineup and asked **"is that the person**

20  **(no. 4) that you thought you could -- was one of the two men that was there that night?"**

21  Luna responded, **"For me, it was kind of difficult to identify the black person."** Luna, again,

22  acknowledged picking number 4, but again he insisted **"It is very difficult for me to identify**

23  **black people due to the fact that I don't live with black people."** <u>Freeman</u> RT 9659

24  (emphasis added).

25

26

27  [72] Referenced excerpts of Malloy's testimony in Freeman's trial are attached as exh. 55.

28  [73] Excerpts of Luna's testimony at Freeman's trial are attached as exh. 56.

1    Luna remembered that a man drew a picture "according to the description of the

2    person that I received." However, when DDA Giss asked him "is this the person you picked out

3    of the lineup on the card that you have in your hand?" Luna replied, "When I went to court, I do

4    not recall very well when I appeared in court." Freeman RT 9661. When DDA Giss asked Luna

5    "Does that appear to be the picture that you picked out of the man you could best describe as

6    being the one you were able to identify," Luna replied, "I do not recall very well. The only thing

7    I can tell you is that this person looks very much like the person." Freeman RT 9661.

8

9    **F. Andre Gilcrest**

10    During his closing argument at Mr. Sanders' trial, DDA Giss insisted that Andre

11    Gilcrest was credible and was "corroborated all the way down the line." RT 14,997. He

12    dismissed any suggestion that Gilcrest was not truthful, telling the jury, "If he's a liar, he's one of

13    the luckiest liars on earth, because everything there supports what he says." RT 15,006.

14    According to DDA Giss, "there's nothing to show Andre was a liar." RT 15,013. DDA Giss

15    further advocated Gilcrest's credibility by telling the jury that Gilcrest was motivated by "having

16    something heavy on [his] mind." RT 15,015. After having a "catharsis" Gilcrest came forward

17    to "get it off his chest" (RT 15,009) and to "share this horrible secret." RT 15,015. Giss went

18    on to "thank" Gilcrest [and other informants] for coming forward because they "cracked this

19    case." RT 15,017. He even went so far as to tell the jury that "we ought to get down and kiss

20    the ground they walk on whatever wrongs they have done in the past, they've in a great sense

21    redeemed themselves in the eyes of society." RT 15,016 (emphasis added) .

22    At Freeman's subsequent trial, however, DDA Giss' presented a different picture

23    of Gilcrest in his closing. Giss conceded that without Gilcrest he could not prove there was a

24    conspiracy and thus continued to argue that Gilcrest's story about September 27, 1980, was true.

25    Freeman RT 12,908.[74] DDA Giss also continued to maintain that Gilcrest did not come forward

26

27

---

28    [74]    DDA Giss' handwritten trial notes which reveal that he was concerned about "how thin my case is against Freeman," are attached as exh. 57.

1    for the reward but only because he was forced to do so by his mother.  Freeman RT 12,780,

2    12,860.

3            These points, dictated by tactical necessity, were, however, isolated instances in

4    what was otherwise a frontal assault on the character and credibility of the same witness for

5    whom Giss had told the Sanders' jurors they should "kiss the ground."  The following are

6    excerpts of Giss' closing remarks about Gilcrest:[75]

7        ● "I got snookered -- by -- "this sneaking little Andre" (Freeman

8            RT 12,816-818)

9        ● "I'd be a fool and a liar if I told you that I expect you to believe

10           everything Andre told you" (Freeman RT 12,820)

11       ● "I'm going to show you where he is lying and ... I'm going to

12           try and show you where he is corroborated[76] despite the fact that

13           you may want to disbelieve him" (Freeman RT 12,720)

14       ● "Andre is the only person whose motives you have a right to

15           question as to why he came forward -- [he] did not come forward -

16           - out of a matter of decency" (Freeman RT 12,910)

17       ● "He's everything we all despise and detest" (Freeman RT

18           12,911)

19       ● "He's slippery.  He's evasive.  He's very selfish.  That's very

20           clear.  And he's possibly immoral" (Freeman RT 12,911)

21       ● "detestable" (Freeman RT 12,913)

22       ● "I have contempt and disdain for him" (Freeman RT 12,971)

23       ● "you can cast his testimony to the wind, if you want" (Freeman

24           RT 12,720)

25       ● "He was an opportunist" (Freeman RT 12,972)

26

27       [75]  Referenced excerpts of Giss' closing argument are attached as exh. 58.

28       [76]  Giss argued that Gilcrest was "corroborated" by Rodell Mitchell and Brenda Givens
     (Freeman RT 12,722), who also have serious credibility problems, see infra.

- "type of sleaze" (Freeman RT 12,719)
- "type of crumb off the streets" (Freeman RT 12,720)
- "slime" (Freeman RT 13,714)

DDA Giss told the court that "one or two times I felt like sliding under the counsel table" during the cross-examination of Gilcrest. Freeman RT 8495. The following are excerpts of Gilcrest's testimony in Freeman's trial:[77]

Gilcrest said that on the night of September 27, 1980, he was asked by Stewart to go with him to Bob's Big Boy to see who was going to work that night or how many people were going to be there at closing. He admitted he had never mentioned this before. Freeman RT 6480.

Gilcrest admitted that he had been "lying" when he previously testified that he did not know why Stewart wanted to go the restaurant and/or that he went with her "just to drink coffee." Freeman RT 6487.

Contrary to his previous testimony, Gilcrest said that he "knew he could have a conspiracy charged against" him before he ever went to the restaurant with Stewart. Freeman RT 6481, 6503. He said that the only reason he went to the police was because he was afraid of being identified with Stewart and being arrested himself. Freeman RT 6503.

Gilcrest now said that he was part of the conspiracy and went with Stewart to the restaurant "to do the planning." Freeman RT 8640.[78] DDA Giss said he was "stunned" by this testimony. Freeman RT 8641.

Gilcrest also admitted that on all the previous occasions where he had testified he "deliberately" left out the "exact, real reason" for going to Bob's Big Boy with Stewart. Freeman RT 8067.

---

[77] Referenced excerpts of Gilcrest's testimony are attached as exh. 59.

[78] Gilcrest had testified that on September 27, he had observed Mr. Sanders, Freeman and Stewart, discussing plans for robbing the restaurant. Freeman RT 7881-7886. As in Mr. Sanders' trial, Freeman's jury found this alleged incident, overt act no. 3, to be not true. Freeman CT 1828.

1    Gilcrest admitted telling the police that when he went to Bob's Big Boy with

2    Stewart to drink coffee it was after Thanksgiving or only about two weeks before the December

3    14, 1980, tragedy. Freeman RT 6499

4    Gilcrest admitted that his previous testimony -- when he said he could remember

5    the date because that was the day he had been paid -- was untrue. Freeman RT 8203.

6    Gilcrest said it was "confusion" which caused him to testify differently at

7    Freeman's trial than he had testified at Mr. Sanders' trial. (Freeman RT 8285.

8    Gilcrest said that his true name was "Andre Gilcrest" but admitted that he often

9    lied about his name. He used the name "Antonio Gilcrest" once when stopped by the police. He

10    used "Anthony Gilcrest" once on a Medi-Cal card. Freeman RT 8050. He also used the last

11    name "Simmons" on a traffic ticket and another time when he went to jail. He "probably" used

12    the name "Andrew" for a traffic ticket. Freeman RT 8051. He used the name "Andre Jones"

13    when he forged some stolen money orders. Freeman RT 8053. He thought "maybe" he "used a

14    different" name once when the police took him to the hospital for being under the influence of

15    PCP. Freeman RT 8054-8055.

16    Gilcrest admitted that: he would lie about his name when he had "warrants," that

17    he had given a false birth date to match his brother's Medi-Cal card, that he did "not have any

18    moral objection to lying to the police." Freeman RT 8055; 8112; 8115.

19    When asked if had "any moral objection to lying to Mr. Giss, the District

20    Attorney," Gilcrest replied, "Not about this, no." When asked if he had any moral objection to

21    lying to Mr. Giss "about anything," he replied, "Well I wouldn't answer that question." Freeman

22    RT 8055.

23    Gilcrest admitted telling the police that he grew up with Freeman and knew him at

24    LA High. To give the police the impression he knew him. But that was a lie. In truth, and

25    contrary to his previous testimony, he never went to school with Freeman and never went to LA

26    High. He now said that he had talked to Freeman "once." Freeman RT 8134-8137. At another

27    point in his testimony he said he did not "personally" know him. Freeman RT 8450.

28

41

1    Gilcrest also admitted that there "had never been an occasion" when he and Mr.

2    Sanders had had a conversation. Freeman RT 8146. Gilcrest also admitted that he had lied to

3    the police when he said that he had a conversation with Mr. Sanders on the night of September

4    27, 1980, or that he lied when he said he had seen him in jail. He told the police these lies

5    because he "was nervous at the time." Freeman RT 8245-8246.

6    Gilcrest admitted that he had previously testified he did not have to wear glasses.

7    But in fact, he did wear glasses. Freeman RT 8206.

8    Gilcrest repeated his assertion that the love letters he wrote to Stewart when she

9    was in jail were "all lies" (Freeman RT 8317) which he wrote to protect himself and "make her

10   feel better." Freeman RT 8341.

11   Gilcrest claimed that his previous testimony that he knew about the "$10,000"

12   reward "the first day it was on the news" was untrue. Freeman RT 8526.

13   Gilcrest testified that neither he nor his mother were interested in the reward

14   money. Freeman RT 8472. To them, $10,000 was not a lot of money as they both could make

15   much more than that in very little time by working. Freeman RT 8472. Gilcrest said he did not

16   work for a company but made a lot of money -- enough to pay income taxes; however, he did not

17   in fact pay income taxes. Freeman RT 8473.

18   Gilcrest said he did electrical work, painting, and plumbing, but he was not a

19   licensed contractor. He worked "under someone else's license" and had been prosecuted once

20   for a violation of the Business and Professions Code. DDA Giss offered to give him "immunity"

21   if he was "afraid to tell the truth as to how he's making a living." Freeman RT 8475. The court

22   appointed an attorney to advise him. Freeman RT 8482.

23   Thereafter, Gilcrest refused to explain how he made a living and/or how much he

24   made:

25   • Defense counsel: "Do I understand your testimony

26   during this trial to be that you were making good money?"

27   • Gilcrest: "I refuse to answer. Self

28   incrimination."

42

- Defense counsel: "Mr. Gilcrest, are you interested in getting the reward?"

  - Gilcrest: "I refuse to answer the question on the grounds of self-incrimination." (Freeman RT 8500)

- Defense counsel: "Mr. Gilcrest, you told us this morning, did you not, that you could earn more than $10,000 in six months? .... How could you earn that?"

  - Gilcrest: "I refuse to answer on grounds of self-incrimination." (Freeman RT 8505-8506)

- Defense counsel: "Did you tell us that because of your ability to earn that money, you were not interested in the $10,000 reward?"

  - Gilcrest: "I refuse to answer on grounds of self-incrimination?" (Freeman RT 8506)

- Defense counsel: "When you went to the police and reported this crime, was it to obtain the $10,000 reward?"

  - Gilcrest: "I refuse to answer on the grounds of self-incrimination." (Freeman RT 8506)

- Gilcrest: "The reward money. And the reason I was saying the reward is this: I knew that if I was -- if I simply was coming out about the reward, maybe I wouldn't have been asked why I knew so much about it. That was why." Defense counsel: And that's because you had an income at the time; is that right?"

  - Gilcrest: "I refuse to answer the question on grounds of self-incrimination." (Freeman RT 8507)

- Defense counsel: "And you have had an income ever since; isn't that right?"

1          • Gilcrest: "I refuse to answer the question on the

2          grounds of self-incrimination." (Freeman RT 8507-

3          8508)

4          • Defense counsel: "Now, Mr. Gilcrest, does it matter to

5          you one way or the other whether you tell us the truth about your

6          income?"

7          • Gilcrest: "I refuse to answer the question on grounds of

8          self-incrimination." (Freeman RT 8517)

9          • Defense counsel: "Are you an electrical contractor?"

10         • Gilcrest: "No. Refuse to answer on the grounds of self-

11         incrimination." (Freeman RT 8711)

12         • Defense counsel: "Have you ever been an electrical

13         contractor?"

14         • Gilcrest: "I refuse to answer on the grounds of

15         self-incrimination." Freeman RT 8712 (emphasis

16         added).

17

18         As for the reward money, not only had Gilcrest denied at Mr. Sanders' trial that

19  he was motivated by the reward, but his mother, Martha Simmons, testified at Mr. Sanders' trial

20  that she did not even know about the reward when she urged her son to go to the police.  RT

21  13,192.[79]  At Freeman's trial she testified that her son never told her there was a reward

22  (Freeman RT 9384); that she herself had never requested a reward on her son's behalf; nor did

23  she intend for her son to benefit financially by contacting the police.  Freeman RT 9389-9390.[80]

24         According to the Los Angeles City Attorney's Office, however, after the trial was

25  over Andre Gilcrest and his mother received reward money.  Although LAPD was to determine

26

27  [79]  This portion of Simmons' testimony is attached as exh. 60.

28  [80]  This portion of Simmons' testimony at Freeman's trial is attached as exh. 61.

1   who would be paid the reward money,[81] the City Attorney advises that LAPD has no records on

2   this matter.[82] Marriott Corporation, which used to own Bob's Big Boy Restaurants, has also thus

3   far been unable to locate any records on the reward. According to Deputy City Attorney Donna

4   Weisz Jones, DDA Giss told her that he believed Gilcrest, his mother, and one of the victims

5   were recipients of the reward.[83]

6           DDA Giss' handwritten notes on a "Motion for Discovery" made by Freeman's

7   attorney and dated June 21, 1983, also prove that Giss knew for a fact that Gilcrest was

8   motivated by the reward money. Freeman's attorney requested discovery of "any and all

9   consideration or promises of consideration .... which could arguably create an interest or bias in

10  the witness in favor of the state or against the defense or act as an inducement to testify or to

11  color testimony." Giss wrote : "reward of $10,000   no [sic] are promised anything except

12  Gilcrest talks of $."[84]

13          Giss, testifying at the suppression hearing in <u>Garmanian</u>, was asked if he had

14  "enough experience to recognize that at some point an informant was very likely to ask you for

15  some quid pro quo?" Giss replied, "Probably. Nobody does that for nothing, you think."

16  <u>Garmanian</u> RT 721-722. Giss also testified, "I'm telling you now, you couldn't find an informant

17  in this state that would say I've let him down." <u>Garmanian</u> RT 746.

18          A manual prepared for the deputies on the Los Angeles County District

19  Attorney's Office on how to deal with informants also cautions: "If you alienate the informant,

20  you run the risk of his recanting the testimony you agreed to use."[85]

21

22

---

23  [81]  See December 16, 1980 letter from Ralph E. Schub, Legal Counsel, Marriott Corp. to Lt.
    Ron Lewis, LAPD, Robbery-Homicide, attached as exh. 62.

24  [82]  See April 25, 1995, letter from Donna Weisz Jones to Verna Wefald, attached as exh. 63.

25  [83]  See January 18, 1995 and June 5, 1995 letters from Vic Marmo, Director of Casualty
26  Claims, Marriott International, Inc. to Verna Wefald, attached as exh. 64.

27  [84]  See motion with Giss' handwritten notations, attached as exh. 65.

28  [85]  See p. 11 (emphasis added), DDA Elliott Alhadeff, "Use of Jail House Informant,"
    attached as exh. 66.

45

### G. **Brenda Givens**

As discussed above, Brenda Givens, a waitress at Bob's Big Boy (but who was not working on the night of the robbery), testified to having been told by Stewart on an earlier occasion that the restaurant was going to be robbed that same evening, a date police fixed as September 27. See section I, E, supra. Givens saw Stewart, accompanied by Gilcrest, at the restaurant that evening, and Stewart tried to enter the restaurant as it was closing at 2:00 a.m. When she testified at Mr. Sanders' trial, neither Givens nor the prosecutor disclosed that she had received psychiatric treatment and had been prescribed medication. At Freeman's trial, however, she disclosed that at the time of Freeman's preliminary hearing in February 1981, she "was just real nervous and upset. And I went to see a psychiatrist."[86]  Freeman RT 7098.

At a 402 hearing, Givens testified that she saw a psychiatrist after the incident on December 14, 1980, but not before. Freeman RT 7124. She said she went to the psychiatrist "for about two months" because she was "nervous and scared," but on four separate occasions she denied taking any medication. Freeman RT 7124. She also denied ever being hospitalized or taking drugs. RT 7129.

Givens said she only saw the psychiatrist, Dr. Kovan, "four times" beginning in February or March 1981, and last saw him in April or May 1981, which was before she testified at Mr. Sanders' trial. Freeman RT 7130-34. According to Givens, Dr. Kovan gave her "no treatment" but rather just let her talk her problems out. Freeman RT 7134. She also denied that her visits to a psychiatrist were a "serious mental episode" and said that she "just needed someone to talk to." Freeman RT 7177-7178.

---

[86]  Givens also revealed at Freeman's trial that after the incident she would imagine "hearing voices" when she went into the women's room as if Dita Agtani, her best friend and co-employee who had not survived, was calling out to her from the locker. Freeman RT 7127, 7133. She also said she had a miscarriage at ten weeks in the bathroom at work, which she believed had been caused by the incident. Freeman RT 7128.  Referenced excerpts of the testimony at Freeman's trial are attached as exh. 67.

1    Dr. Robert Kovan testified -- from memory and from medical records -- that he

2    first began treating Givens on November 4, 1981.[87]  Freeman RT 11,388.  She was "extremely

3    depressed" and "complained about some difficulty with her parents."  At that time he did not

4    form a conclusion as to the cause of her depression, but knew that she was having a "great deal

5    of problems with the man she was living with."  Freeman RT 11,389.  Dr. Kovan said Givens

6    eventually did mention the Bob's Big Boy incident but never said she felt she had not done

7    enough and did not mention hearing voices.  Freeman RT 11,390-392.  Nor did she tell him she

8    had miscarried at ten weeks.  Freeman RT 11,391.  Dr. Kovan concluded that the source of her

9    depression was a "combination of what had happened at Bob's Big Boy and also some of her

10   home problems."  Freeman RT 11,390.

11    Dr. Kovan also testified contrary to Givens' testimony, that she was hospitalized

12   for three or four days at Brotman Memorial Hospital from February 18 to 21, 1982, because she

13   was "extremely depressed, extremely anxious, [a]lmost to the point of being hysterical."

14   Freeman RT 11,393.  She was given anti-depressant drugs and sleeping medication.  Freeman RT

15   11,391.  Dr. Kovan said that when Givens was discharged her mental status had "improved" but

16   she was "still somewhat anxious and somewhat depressed" and he "would have liked to have

17   kept her in longer." Freeman RT 11,394-95.

18    Dr. Kovan further testified that if Givens had testified that she had not been

19   hospitalized, she had not told the truth, and if Givens had testified that she had not been given

20   medication, she had not told the truth.  Freeman RT 11,402.

21

22    **H. Rodell Mitchell**

23    Mitchell was called at Mr. Sanders' trial by the prosecution to support and

24   corroborate the prosecution's theory that--as reported by Givens--Stewart, Mr. Sanders, and

25   Freeman had planned to rob the Bob's Big Boy on September 27.  See Section I, F, supra.  The

26   ///

27

28

---

[87] Dr. Kovan's testimony is attached as exh. 68.

47

1   prosecution even had Mitchell testify that he had contacted the police by telephone after Givens

2   told him of the planned robbery. Id.

3         Two years after Mr. Sanders' trial in September, 1984, LAPD detective Richard

4   Stallcup provided sworn testimony at Rogoway's civil lawsuit that impeached Mitchell's

5   credibility and discredited the testimony he gave at Mr. Sanders' trial. In Stallcup's deposition,

6   he testified that he "personally" checked the records of the police watch commander in West

7   L.A., where the restaurant was located and there was no log found "with any notation about a

8   call coming in about a robbery, an impending robbery."[88]  Stallcup RT 27. Stallcup further

9   testified that the watch commander is required to keep a "log of all activities that occur on his

10  watch."

11        Detective Stallcup also provided testimony that discredited Mitchell's testimony

12  at Mr. Sanders' trial that the police had not responded until he had called in the report several

13  times, that when the police finally did respond, he personally reported the robbery threat, and

14  also discredited his pretrial statement to the police that the two men he said he had seen talking

15  with Gilcrest had been stopped by the police. See Section I, F, supra. Stallcup explained that if

16  the police receive a call that a robbery "may take place," it would be "high-priority" information

17  and would be given the "same response as a robbery in progress." Stallcup RT 37. The policy of

18  the police department would be to "set up an immediate surveillance with plain clothes officers or

19  a looser surveillance with uniformed officers at the location." The police would "attempt to

20  identify the suspects and watch the establishment through the hours that this thing was supposed

21  to take place or occur, which might be through closing, and this could go on for two to three

22  days." Stallcup RT 38. If no crime occurred but suspects had been identified, the police would

23  "confront the individuals that were involved, believed to be involved, in the planning of the

24  robbery and let them know that we knew what they were up to at that location." Although

25  Stallcup knew that would not stop the suspects from committing a crime, "it would take a fool to

26

27

---

28   [88]  See deposition of Richard Stallcup taken in Rogoway v. Marriott, et al., referenced
     excerpts of which are attached as exh. 69.

1   go back to that location when they know that we know what they are up to at that spot."

2   Stallcup RT 37-38.

3         At Mr. Sanders' trial, Mitchell had also testified that he wrote out an "incident

4   report" about the robbery threat on September 27 and turned it over to David Lind who was in

5   charge of security for Bob's Big Boy. RT 11,192, 11,250, 11,256. He said he was "required" to

6   write down that a robbery had been threatened or that something peculiar had occurred. RT

7   11,255. As noted above, Lind testified at Mr. Sanders' trial that he did not receive any incident

8   report regarding the threatened robbery. RT 11,777. During Rogoway's civil lawsuit, in 1986,

9   however, Lind not only said he had not received such a report, but explained further that the

10  "comments by Carletha Stewart were such that they could not be considered an occurrence of an

11  incident that would trigger any report."[89] Lind also declared that if anyone would have been

12  required to prepare a report it would have been Kim Clark, the store manager, not Mitchell.

13  Lind also declared that he had reviewed the incident reports "from this particular Bob's Big Boy

14  Restaurant" and found nothing concerning comments by Carletha Stewart. "Consequently, it is

15  clear that no incident report was prepared or exists stemming from the September 1980 remarks

16  by Carletha Stewart to Brenda Givens concerning any particular problems that might occur at

17  Bob's Big Boy Restaurant at that time."[90] (Emphasis added).

18

19      **I. Derwin Logan**

20        Derwin Logan was the restaurant cook who opened the front door to let

21  Rogoway and Burrell out, which allowed the robbers to force their entry into the restaurant. RT

22  6739-6742, 10431. Logan escaped unharmed, and along with Ismael Luna, helped the police

23  prepare the composite pictures. Logan, however, did not identify either Mr. Sanders or Freeman

24

---

25   [89] See June 6, 1986, declaration of David Lind which accompanied the "Notice of Motion for
26   Summary Judgment ...." filed by Ryan C. Knapp on behalf of Marriott Corporation, attached as
     exh. 70.

27   [90] Shortly before testifying at Freeman's trial, an armed robbery case against Mitchell was
28   voluntarily dismissed at the preliminary hearing stage. DDA Giss said that he had nothing to do
     with the dismissal and did not even know about the charges. Freeman RT 7264-65.

49

1  at any lineup or in court, and actually made unqualified identifications of two other individuals

2  from the lineup that included Mr. Sanders and Freeman. RT 10,668-671.

3         Logan, who essentially exculpated Mr. Sanders, was initially treated as a suspect

4  in the crimes by the police, who lied to Logan in an attempt to get him to incriminate Mr.

5  Sanders, and also subjected him to a polygraph exam.

6         The prosecution's attempt to have Logan incriminate Mr. Sanders by lying to him

7  was not disclosed. The prosecution's treatment of Logan was first discovered during Freeman's

8  trial, when Logan was overheard speaking to Rogoway in the hallway as they waited to testify.

9  Logan said the police told him "Ricky Sanders and Frank Freeman had told the police that he,

10  Mr. Logan, was involved in this crime." Freeman RT 9775. Upon hearing Logan tell this to

11  Rogoway, defense counsel spoke with Logan personally to verify that he had heard Logan

12  correctly. Logan replied that the story was true and that "it had been some time ago that the

13  officers had said this to him." [91]  Freeman RT 9777. The police, however, had lied to Logan in

14  an effort to get him to incriminate Mr. Sanders and Freeman, as Mr. Sanders and Freeman made

15  no statements to police.

16         The polygraph exam was kept secret until February 25, 1988, when DDA Giss

17  testified on Logan's behalf at the change of plea hearing for a drug trafficking offense for which

18  Logan received a probationary sentence.[92] Giss said that Logan was a "cooperative witness,

19  attended two lengthy preliminary hearings and two very lengthy trials and was always

20  cooperative and he **even subjected himself to a polygraph examination at one time when a**

21  **very thorny issue arose as to whether or not he had any role in the incident and we were**

22  **questioning everybody that worked inside and he voluntarily submitted to a polygraph.**"

23  Logan RT 5 (emphasis added).

24  ///

25  ///

26

---

27  [91] See the relevant portions of this transcript which are attached as exh. 71.

28  [92] See transcript of plea hearing on February 25, 1988 in People v. Derwin Logan, Los
Angeles Superior Court No. A961251, attached as exh. 72.

50

## K. Jerry Lankford

Jerry Lankford, who testified as a prosecution witness, has disclosed in a sworn declaration that he "was asked by Deputy District Attorney Harvey Giss on several occasions to testify to things which I had previously told him were not true."[93] Exh. 73, ¶ 4. Lankford, who in December 1980 was on felony probation and had recently been arrested on a drug charge was the caller who first gave the police the name Ricky Sanders. He signed a statement on December 19, 1980, which was prepared by police and according to the statement, he told the police that Mr. Sanders had approached him about robbing the Bob's Big Boy two weeks earlier. Although Lankford repudiated the statement at trial, the prosecution was still allowed to introduce the statement as direct evidence against Mr. Sanders.[94] In his recent declaration, however, Lankford explains that when he was interrogated by police, the "atmosphere was very threatening and I felt very intimidated. At one point an officer shoved a piece of paper in front of me and asked if that was my 'statement.' I acknowledged that it was so that I would be allowed to leave. I did not look at the statement at all because my only thought was to get out of the police station as fast as I could." Exh. 73, ¶ 2.

Lankford also discloses in his declaration that even though he told the prosecution before trial that he did not know Mr. Sanders personally, but only by sight from the neighborhood, "Giss put considerable pressure" on him to testify that he had personal contact with Ricky Sanders. Exh. 73, ¶ 3, 4.

At trial, the prosecution attempted to impeach Lankford's repudiation of the police prepared statement by suggesting that Lankford had been threatened by Mr. Sanders family or friends. However, in his declaration, Mr. Lankford says that "[t]he only people who

---

[93] See June 9, 1995 declaration of Jerry Alan Lankford attached as exh. 73.

[94] Under California law, unlike federal law, prior inconsistent statements are admissible for the truth of the matter asserted, see California v. Green, 399 U.S. 149, 26 L.Ed.2d 489, 90 S.Ct. 1930 (1970). In federal court, if the prosecutor is aware prior to trial that a witness will not testify in confirmity with his pretrial statement, the prosecutor may not call the witness solely to impeach him with what would otherwise be inadmissible hearsay, United States v. Crouch, 731 F.2d 621 (9th Cir. 1984). Had Mr. Sanders been tried in federal court, Lankford would not have been able to testify at all.

51

have attempted to threaten or intimidate me about this matter have been connected to law enforcement." Exh. 73, ¶ 6 (emphasis added).

Dated: April 7, 1997                                    Respectfully Submitted,

                                                        VERNA WEFALD

                                                        WILLIAM J. GENEGO

                                                        Attorneys for Petitioner,
                                                        Ricardo Rene Sanders

## INDEX TO EXHIBITS -- VOLUME I

| Exh. No. | Exhibit Description | Page |
|---|---|---|
| 1 | March 22, 1995 letter from Verna Wefald to George Palmer; April 3, 1995 letter from George Palmer to Verna Wefald; April 5, 1995 letter from Verna Wefald to George Palmer and relevant news articles: Vartabedian, "The Power, Peril at our Fingertips" <u>Los Angeles Times</u> April 12 1995 [new fingerprint technology]; Dolan "When the Mind's Eye Blinks" <u>Los Angeles Times</u> February 11, 1995 [unreliability of eyewitness identification]; Curriden "Secret Threat to Justice" <u>National Law Journal</u> February 20, 1995 [unreliability of informants]; July 20, 1995 letter from Verna Wefald to George Palmer; Berg "Overturned" July 20, 1995 [new fingerprint technology overturns murder conviction] | 1 |
| 2 | Petition for Writ of Habeas Corpus, filed on April 2, 1984, by Carletha Stewart pro per | 28 |
| 3 | "Application for Extension of Time to File Appellant's Opening Brief" and Declaration of Marta L. Leventhal, filed February 14, 1992 | 33 |
| 4 | Dresslar "Limping Along, State Public Defender Fights" <u>Los Angeles Daily Journal</u>, August 29, 1994, and Dresslar "Under Fire, State Public Defender's Personnel Practices Target of Criticims" <u>Los Angeles Daily Journal</u>, August 30, 1994 | 41 |
| 5 | Composite drawings prepared by LAPD from interviews w/ Derwin Logan and Ismael Luna | 47 |
| 6 | Color photograph of lineup on December 23, 1980; Mr. Sander is number 4. | — |
| 7 | LAPD Videotape of lineup on December 23, 1980 (contains lineups for both Mr. Sanders and Mr. Freeman) | — |

## INDEX TO EXHIBITS -- VOLUME I

| Exh. No. | Exhibit Description | Page |
|---|---|---|
| 1 | March 22, 1995 letter from Verna Wefald to George Palmer; April 3, 1995 letter from George Palmer to Verna Wefald; April 5, 1995 letter from Verna Wefald to George Palmer and relevant news articles: Vartabedian, "The Power, Peril at our Fingertips" <u>Los Angeles Times</u> April 12 1995 [new fingerprint technology]; Dolan "When the Mind's Eye Blinks" <u>Los Angeles Times</u> February 11, 1995 [unreliability of eyewitness identification]; Curriden "Secret Threat to Justice" <u>National Law Journal</u> February 20, 1995 [unreliability of informants]; July 20, 1995 letter from Verna Wefald to George Palmer; Berg "Overturned" July 20, 1995 [new fingerprint technology overturns murder conviction] | 1 |
| 2 | Petition for Writ of Habeas Corpus, filed on April 2, 1984, by Carletha Stewart pro per | 28 |
| 3 | "Application for Extension of Time to File Appellant's Opening Brief" and Declaration of Marta L. Leventhal, filed February 14, 1992 | 33 |
| 4 | Dresslar "Limping Along, State Public Defender Fights" <u>Los Angeles Daily Journal</u>, August 29, 1994, and Dresslar "Under Fire, State Public Defender's Personnel Practices Target of Criticims" <u>Los Angeles Daily Journal</u>, August 30, 1994 | 41 |
| 5 | Composite drawings prepared by LAPD from interviews w/ Derwin Logan and Ismael Luna | 47 |
| 6 | Color photograph of lineup on December 23, 1980; Mr. Sander is number 4. | — |
| 7 | LAPD Videotape of lineup on December 23, 1980 (contains lineups for both Mr. Sanders and Mr. Freeman) | — |

| Exh. No. | Exhibit Description | Page |
|---|---|---|

| 8 | Excerpts of testimony by Tami Rogoway on March 23, 198 at Mr. Sanders' preliminary hearing. | 50 |
| 9 | Excerpts of testimony by Jerry Lankford on     December 12, 1981 [pretrial motions hearing] and June 23, 1982 [trial] at Mr. Sanders' trial. | 54 |
| 10 | Excerpts of testimony by Bruce Woods on June 23, 1982, at Mr. Sanders' trial. | 68 |
| 11 | Rohrlich "Review of Murder Cases Ordered, Jailhouse Informant Casts Doubt on Convictions Based on Confessions" <u>Los Angeles Times</u>, Oct. 29, 1988; "Special Directive 88-10" from Chief Deputy District Attorney Gregory Thompson to All District Attorney Personnel, "Criminal Case Information Security," Nov. 1, 1988; Acknowledgement of Discovery Form | 90 |
| 12 | "The Snitch" <u>60 Minutes</u> (transcript of February 26, 1989 broadcast); Reinhold "California Shaken Over an Informer," <u>New York Times</u>, February 17, 1989 | 95 |
| 13 | Video tape of <u>60 Minutes</u> broadcast with Leslie White | — |
| 14 | Rohrlich "Trading Lies for Freedom, "<u>Los Angeles Times</u>, Apr. 16, 1989 | 101 |
| 15 | Rohrlich "Jailhouse Informant Says He Lied at 3 Murder Trials," <u>Los Angeles Times</u>, Nov. 5, 1989; Rohrlich "Police Go Fishing for Jailhouse Confessions," <u>Los Angeles Times</u>, Mar. 4, 1990 | 110 |

| Exh. No. | Exhibit Description | Page |
|----------|---------------------|------|

16    Special Directive 88-11, From Gregory Thompson to All Deputy District Attorneys (Criminal) "Jail House Informants," November 1, 1988;  Berg "Defense Attorneys Notified of Jailhouse Informant Use" <u>Los Angeles Daily Journal</u>, January 18, 1989 and Berg "Call Renewed to Reopen Jailhouse Informant Cases" <u>Los Angeles Daily Journal</u>, February 9, 1989            119

17    Berg, "Judge Forbids Destruction of Records by DA," <u>Los Angeles Daily Journal</u>, Dec. 12, 1996 and Abramson, "Judge Prevents D.A.'s Office From Destroying Old Files," <u>Los Angeles Times</u>, Dec. 13, 1996.  Tenative ruling of Honorable Diane Wayne granting preliminary injunction in <u>Calif. Attys. for Crim. Justice, et al. v. LADA, et al</u> (LA County Superior Court No. BC161572) and notice of appeal filed by District Attorney.            124

18    Special Directive 88-15, from Gregory Thompson to All Deputy District Attorneys (Criminal) "Jail House Informants," November 23, 1988            135

## INDEX TO EXHIBITS -- VOLUME II

| Exh. No. | Exhibit Description | Page |
|---|---|---|
| 19 | Report of the 1989-90 Los Angeles County Grand Jury "Investigation of the Involvement of Jail House Informants in the Criminal Justice System in Los Angeles County," June 26, 1990 | 136 |

# INDEX TO EXHIBITS -- VOLUME III

| Exh. No. | Exhibit Description | Page |
|---|---|---|
| 20 | August 29, 1990 order of Richard P. Byrne, Presiding Judge, <u>In re the Matter of the Grand Jury re: Jail House Informants</u> | 292 |
| 21 | Rohrlich "Report on Informants Draws Fire" <u>Los Angeles Times,</u> July 11, 1990 | 293 |
| 22 | Berg "Jury's Report on Informant's May Spur Suit, Defense Lawyers Blast Secrecy of Year Long Probe" <u>Los Angeles Daily Journal</u>, July 11, 1990; Editorial "Make it a Federal Case    -- Grand Jury Report on Informant Scandal Doesn't Go Far Enough" <u>Los Angeles Times</u>, July 11, 1990 | 294 |
| 23 | Editorial "Grand Jury Report on Jailhouse Informants -- A Favor for Your Lies -- L.A. County Prosecutors Have Shown More Interest in Winning than in Discovering Whether Their Witnesses are Telling the Truth" <u>Los Angeles Daily Journal</u>, July 30, 1990 | 297 |
| 24 | Memorandum on "Informants" from Richard Hecht to Denis K. Petty, November 1, 1988; Memorandum from Richard Hecht to Philip Wynn, on "Management Staff Discussion(s) Regarding Establishment of a Central Index of Jail House Informants," December 7, 1988; | 299 |
| 25 | Memorandum from Michael E. Tranbarger to Denis K. Petty, "Informant File," January 26, 1987; also Berg "D.A. Memo Airs Private Suspicions of Snitch Misuse -- 'Massiah' Issue at the Jail?" <u>Los Angeles Daily Journal</u>, August 17, 1989 | 301 |
| 26 | Rohrlich "Perjurer Sentenced to 3 Years" <u>Los Angeles Times</u>, May 20, 1992. | 305 |

| Exh. No. | Exhibit Description | Page |
|---|---|---|

27    Berg "Informant Sought in Perjury Count Arrested in N.Y." <u>Los Angeles Daily Journal</u>, February 19, 1992; Rohrlich "L.A. Jailhouse Informant Seized on Perjury Charge" <u>Los Angeles Times</u>, February 20, 1992; Berg "Testimony of Informants Now under Scrutiny" <u>Los Angeles Daily Journal</u>, February 24, 1992; Rohrlich "AIDS Kills Informant Awaiting Extradition" <u>Los Angeles Times</u>, March 31, 1992; Berg "Jail House Informant Dies of AID," <u>Los Angeles Daily Journal</u>, March 31, 1992.

307

28    Testimony by DDA Harvey Giss at pretrial motions hearing on February 24, 1982, in Mr. Sanders' case, about Quine, White, and Rogoway

316

29    Excerpts of 402 Hearing [Rogoway], October 20, 1983, in <u>People v. Franklin Freeman</u>, A364692

332

30    Excerpts of sidebar during Rogoway's testimony at Mr. Sanders' trial on May 13, 1982.

357

31    May 15, 1982, "Affidavit/Statement" of Leslie White

374

32    Handwritten police report re interview with Leslie White

375

33    Excerpts of testimony by Leslie White on March 13, 1989, in <u>People v. Marshall and Harris</u>, Los Angeles Superior Court No. A954922

376

34    Berg "He's a Liar; He was Horny, DA Denies Informer Got Weekends out of Jail to Woo a Witness," <u>Los Angeles Daily Journal</u>, March 15, 1989, p.5

391

| Exh. No. | Exhibit Description | Page |
|----------|---------------------|------|
| 35 | Order for Transfer of Prisoner (Ex parte application of Leslie Vernon White, Los Angeles Superior Court No. A148932) | 392 |
| 36 | Furlough orders (In re Leslie Vernon White, Los Angeles Superior Court No. A148932) dated 10/14/81, 10/22/81, 10/29/81, 11/2/81, 11/9/81, 11/16/81, 11/24/81, 12/7/81, and 12/9/81 | 397 |
| 37 | DDA Giss' handwritten note dated 2/17/82 -- "Les had a conjugal visit with Tami" (and Acknowledgement of Discovery Form) | 418 |
| 38 | Handwritten "Points and Authorities in Opposition to Motion for Mistrial and Dismissal" filed on November 2, 1983, by DDA Harvey Giss in People v. Freeman, A364692. | 419a |
| 39 | DDA Giss' hand written note -- "Tami Rogoway, 1. Only for injuries and not for ID as it opens up a can of worms re prison visits and Les White" | 429 |
| 40 | "Declaration of Harvey Giss" in People v. Sanders, Los Angeles Superior Court No. A364692, dated July 2, 1982 (and Acknowledgement of Discovery Form) | 430 |
| 41 | "Order" prepared by DDA Giss in People v. Sanders, Los Angeles Superior Court No. A364692 | 434 |
| 42 | Excerpts of testimony of DDA Harvey Giss on October 1990, in People v. Rodney Garmanian, Los Angeles Superior Court No. A738948 | 435 |

## INDEX TO EXHIBITS -- VOLUME IV

| Exh. No. | Exhibit Description | Page |
|---|---|---|
| 43 | Excerpts of closing argument by DDA Giss on August 9 and 10, 1982, at Mr. Sanders' trial | 475 |
| 44 | May 26, 1989 memorandum from DDA Harvey Giss to Richard W. Hecht, Director, Bureau of Branch and Area Operations re "Response to Special Directive 88-11 | 479 |
| 45 | 12-6-80 "Arrest Report" of Bruce Llewellyn Woods | 482 |
| 46 | Excerpts of testimony by Rhonda Robinson on June 3, 1982, at Mr. Sanders' trial. | 483 |
| 47 | Black and white photograph of Mr. Sanders and codefendant Carletha Stewart taken at the Long Beach Pike. | — |
| 48 | Excerpts of testimony by Rhonda Robinson on October 13, 1983, in People v. Freeman, Los Angeles Superior Court No. A364692 | 492 |
| 49 | Excerpts of testimony by Michael Malloy at Mr. Sanders' trial on May 11, 1982. | 524 |
| 50 | California Department of Justice rap sheet dated 7/16/91 for Michael Eugene Malloy | 526 |
| 51 | Local Criminal History Summary stating "NO PRIOR RECORD WITH LAPD" FOR Michael Malloy | 527 |

| Exh. No. | Exhibit Description | Page |
|---|---|---|
| 52 | March 28, 1985, letter from Harvey Giss to Tom Petika, CEO, Bob's Big Boy re David Lind (and Acknowledgement of Discovery Form) | 529 |
| 53 | Excerpts of testimony by Derwin Logan at Mr. Sanders' trial on June 10, 1982. | 532 |
| 54 | Excerpts of deposition of Michael Malloy on July 12, 1985 in Rogoway v. Marriott, et al., Los Angeles Superior Court No. C397948 (pp. 87-89) | 534 |
| 55 | Excerpts of testimony by Michael Malloy on October 17, 1983 in People v. Freeman, Los Angeles Superior Court No. A364692 | 540 |
| 56 | Excerpts of testimony by Ismael Luna on October 18, 1983, in People v. Freeman, Los Angeles Superior Court No. A364692 | 558 |
| 57 | DDA Giss' handwritten note "does this then show how thin my case is against Freeman" (and Acknowledgement of Discovery Form) | 609 |

## INDEX TO EXHIBITS -- VOLUME V

| Exh. No. | Exhibit Description | Page |
|----------|--------------------|------|
| 58 | Excerpts of Giss' closing argument about Andre Gilchrest on December 5, 6, 13, and 14, 1983, in <u>People v. Freeman</u>, Los Angeles Superior Court No. A364692 | 611 |
| 59 | Excerpts of testimony by Andre Gilchrest on August 25, September 26, 29, October 3, 4, and 5, 1983  in <u>People v. Freeman</u>, Los Angeles Superior Court No. A364692 | 679 |

x

# INDEX TO EXHIBITS -- VOLUME VI

| Exh. No. | Exhibit Description | Page |
|---|---|---|
| 60 | Excerpts of testimony by Martha Simmons in Mr. Sanders' trial on July 14, 1982. | 780 |
| 61 | Excerpts of testimony by Marth Simmons on October 17, 1983, in <u>People v. Freeman</u>, Los Angeles Superior Court No. A364692 | 784 |
| 62 | December 16, 1980 letter from Ralph E. Schub, Legal Counsel, Marriott Corp. to Lt. Ron Lewis, LAPD, Robbery-Homicide | 788 |
| 63 | April 25, 1995, letter from Donna Weisz Jones to Verna Wefald | 789 |
| 64 | January 18, 1995 and June 5, 1995 letters from Vic Marmo, Director of Casualty Claims, Marriott International, Inc. to Verna Wefald | 790 |
| 65 | DDA Giss' handwritten notations on "Motion for Discovery" filed by Madelynn Kopple in <u>People v. Freeman</u>, Los Angeles Superior Court No. A364692 (and Acknowledgement of Discovery Form) | 792 |
| 66 | Los Angeles County DDA Elliott Alhadeff "Use of Jail House Informant" | 795 |
| 67 | Excerpts of testimony by Brenda Givens on September 19, 1983, in <u>People v. Freeman</u>, Los Angeles Superior Court No. A364692 | 810 |
| 68 | Testimony by Dr. Robert Kovan on November 14, 1983, in <u>People v. Freeman</u>, Los Angeles Superior Court No. A364692 | 843 |

**xi**

| Exh. No. | Exhibit Description | Page |
|---|---|---|
| 69 | Excerpts of deposition of Richard Stallcup on September 11, 1984, in Rogoway v. Marriott, et al., Los Angeles Superior Court No. C397948 | 863 |
| 70 | June 6, 1986, declaration of David Lind which accompanied the "Notice of Motion for Summary Judgment ...." filed by Ryan C. Knapp on behalf of Marriott Corporation | 876 |
| 71 | Excerpts of 402 Hearing [Logan] on October 19, 1983, People v. Freeman, Los Angeles Superior Court No. A364692 | 879 |
| 72 | Transcript of plea hearing on February 25, 1988, in People v. Derwin Logan, Los Angeles Superior Court No. A961251 | 893 |
| 73 | Declaration of Jerry Alan Lankford on June 9, 1995 | 901 |
| 74 | People's exhibits 6 and 7 [pages 503 and 532 of Bob's Big Boy Manager's Manual] | 903 |
| 75 | Excerpts of 402 hearing re loss of Rogoway's lineup card [Wesselink, Rogoway, Jacques] | 905 |

**xii**

## INDEX TO EXHIBITS -- VOLUME VII

| Exh. No. | Exhibit Description | Page |
|---|---|---|
| 76 | Excerpts of testimony by Deputy Public Defender Francis Bardley on August 4, 1982, re Mr. Sanders' injuries in police custody and stipulation | 950 |
| 77 | DDA Steve Trott, "The Use of Snitches, Informants and Accomplices as Witnesses for the Prosecution in a Criminal Case," October 1982 | 967 |
| 78 | Pratt and Morgan v. Attorney General of Jamaica (en banc) 3 SLR 995, 2AC 1, 4 All ER 769 (1993) | 981 |
| 79 | Riley v. Attorney General of Jamaica, 3 All ER 469 (1982) | 1004 |
| 80 | Catholic Comm'n for Justice and Peace in Zimbabwe v. Attorney General, No. S.C. 73 (Zimb. June 24, 1993) | 1019 |
| 81 | Soering v. United Kingdom, 11 Eur. Hum. Rgts. Rep. 439 (1989) | 1069 |
| 82 | Kaplan "Anger and Ambivalence," Newsweek August 7, 1995 | 1115 |
| 83 | Kozinski and Gallagher "For an Honest Death Penalty," New York Times, March 8, 1995 | 1120 |
| 84 | Declaration of Patricia Donohue (formerly Bateman) | 1125 |
| 85 | Samples of Art Work by Ricardo Sanders while confined on death row | —— |

xiii