**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICARDO RENE SANDERS,
*Petitioner-Appellant*,

v.

VINCE CULLEN, Acting Warden,
*Respondent-Appellee.*

No. 10-99009

D.C. No.
2:96-cv-07429-JFW

OPINION

Appeal from the United States District Court
for the Central District of California
John F. Walter, District Judge, Presiding

Argued and Submitted May 11, 2017
Pasadena, California

Filed October 13, 2017

Before: Morgan Christen, Jacqueline H. Nguyen,
and Paul J. Watford, Circuit Judges.

Opinion by Judge Christen

2                   SANDERS V. CULLEN

## SUMMARY[*]

### Habeas Corpus / Death Penalty

The panel affirmed the district court's denial of Ricardo Rene Sanders's habeas corpus petition challenging his conviction and death sentence for four counts of first-degree murder.

The panel held that because Sanders failed to prove that any of four eyewitnesses provided material, false testimony or that the prosecution knew they committed perjury, the state court's rejection of Sanders's claims under *Mooney v. Holohan*, 294 U.S. 103 (1935), and *Napue v. Illinois*, 360 U.S. 264 (1959), relating to those eyewitnesses was neither contrary to clearly established federal law nor objectively unreasonable. The panel held that the state court reasonably denied Sanders's *Mooney-Napue* claims relating to two non-eyewitnesses.

The panel held that the state court reasonably denied Sanders's claims that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose material, exculpatory impeachment evidence about five trial witnesses.

The panel held that the state court reasonably denied Sanders's claims relating to the exposure of two eyewitnesses, who provided in-court identifications of Sanders, to a gag photograph of Sanders and a codefendant holding fake guns. The panel wrote that assuming that the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

eyewitnesses' exposure to the photograph was exculpatory evidence that was not disclosed, Sanders did not demonstrate that it was material under *Brady* because the eyewitnesses identified Sanders at a lineup before they saw the photo.

Regarding Sanders's claim that he was entitled to relief under *Mesarosh v. United States*, 352 U.S. 1 (1956), which applies in those rare situations where the credibility of a key government witness has been wholly discredited by the witness's commission of perjury in other cases involving substantially similar subject matter, the panel held that the state court could have reasonably distinguished this case from *Mesarosh*.

The panel held that the state court reasonably denied Sanders's claim that the prosecution failed to preserve a witness's lineup card in bad faith.

The panel held that the state court reasonably denied Sanders's claim under *Massiah v. United States*, 377 U.S. 201 (1964), that the prosecution planted a witness next to Sanders in a jailhouse van after Sanders's preliminary hearing in order to obtain an incriminating statement in violation of his Sixth Amendment right to counsel.

Regarding Sanders's claim that counsel was ineffective for failing to move to suppress a lineup, the panel held that the state court could have reasonably determined that defense counsel did not render deficient performance by failing to file a motion that was unlikely to succeed.

The panel concluded that because Sanders did not show that there were multiple deficiencies in his guilt-phase trial, cumulative error does not require reversal of his convictions.

## COUNSEL

Verna J. Wefald (argued), Pasadena, California; William J. Genego, Santa Monica, California; for Petitioner-Appellant.

Dana Muhammad Ali (argued), Michael J. Wise, and A. Scott Hayward, Deputy Attorneys General; Lance E. Winters, Senior Assistant Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Office of the Attorney General, Los Angeles, California; for Respondent-Appellee.

## OPINION

CHRISTEN, Circuit Judge:

Ricardo Rene Sanders appeals from the district court's denial of his petition for a writ of habeas corpus under 28 U.S.C. § 2254. Sanders was convicted of four counts of first-degree murder in 1982 stemming from his involvement in a robbery at a Bob's Big Boy restaurant in December 1980. He is currently on death row in California.

The witnesses against Sanders at trial included four eyewitnesses and two informants. Sanders did not present an alibi; instead, he argued that the eyewitnesses incorrectly identified him as one of the gunmen and the police arrested the wrong person. Sanders's trial counsel attacked the accuracy of the eyewitness identifications and the informants' credibility through vigorous cross-examination. In his federal habeas petition, Sanders continues to attack both.

Sanders's petition argues that the prosecution knowingly used perjured testimony from witnesses at his trial in

violation of *Mooney v. Holohan*, 294 U.S. 103 (1935), and
*Napue v. Illinois*, 360 U.S. 264 (1959), and that the State
failed to disclose material, exculpatory information as
required by *Brady v. Maryland*, 373 U.S. 83 (1963). Sanders
also argues that the prosecution improperly influenced two in-
court identifications, failed to preserve exculpatory evidence
and planted a jailhouse informant in a van with Sanders to
obtain an incriminating statement from him. Finally, Sanders
raises one ineffective assistance of counsel claim for the
failure to move to suppress eyewitness identifications made
at a lineup shortly after the crime occurred. Because we
conclude that the California Supreme Court's resolution of
Sanders's claims was not contrary to clearly established
federal law nor based on an unreasonable determination of
the facts, we affirm the district court's denial of the petition
for a writ of habeas corpus.

## BACKGROUND

### I. Facts

At around 2 a.m. on December 14, 1980, there was an
armed robbery at Bob's Big Boy restaurant on La Cienega
Boulevard in Los Angeles, California.[1] Two customers and
nine employees were inside when two men forced their way
into the restaurant, just as it was closing. Four of these
individuals died as a result of injuries suffered during the
course of the robbery. Four of the surviving witnesses
identified Sanders at trial: Tami Rogoway, one of the

---

[1] The following account of the crime is derived from *People v.
Sanders*, 905 P.2d 420, 428–31 (Cal. 1995).

6                    SANDERS V. CULLEN

customers; Michael Malloy, the night manager; Rhonda Robinson, a waitress;[2] and Ismael Luna, a busboy.[3]

Night manager Malloy was in the office preparing to count money from the cash register when the cook, Derwin Logan, told Malloy that the two remaining customers wanted to be let out. As the door opened, two robbers shoved their way inside. The robbers did not wear masks or otherwise cover their faces. The taller of the two men (allegedly Sanders) said, "It's a jack. It's a stickup." He grabbed the keys and the shorter robber (allegedly codefendant Franklin Freeman Jr.) hit one of the employees on the head with the butt of his shotgun.

The taller robber took Malloy, Rogoway, Logan, and David Burrell, the other customer, to the back of the restaurant and ordered them to lie on the floor in a hallway outside of a walk-in freezer and the office. He asked for the manager and Malloy stood up. The taller robber ordered Malloy to give him the money in the safe, which amounted to roughly $1,300. Some of the coins were wrapped in Bank of America coin wrappers.

The taller robber then told Malloy, Rogoway, Logan, and Burrell to "get up off the floor . . . We are going to the back.

---

[2] Rhonda Robinson was married after the crime occurred and changed her last name. This opinion refers to her as "Robinson" throughout for consistency.

[3] Ismael Luna's real name is Moreno Luna Cortez. He used his older brother's name to obtain employment at Bob's Big Boy because he was too young to work at the restaurant. He revealed his real name partway through Sanders's guilt-phase trial. Because the witnesses at trial referred to him as "Ismael Luna," this opinion does as well.

You're going to get hurt."  He directed them into the freezer, where the employee who had been hit with the rifle was lying on the floor unconscious.  The rest of the employees were waiting there as well.  The taller robber said:  "I want watches, wallets, and jewelry."  Malloy gathered the items in a bucket, and handed it to the taller robber.  No one resisted, but some people pleaded for the robbers not to hurt them. The robbers ordered everyone to turn around to face the wall and kneel.  The two men then fired their guns into the backs of the group until they ran out of ammunition.  Then they closed the freezer door and left.

Inside the freezer people lay piled on top of each other and on the floor.  One of the customers and two employees were dead.  Ismael's father, Cesario Luna, who was also a restaurant employee, died several months later from complications related to a bullet wound in his brain.  Night manager Malloy was shot in the right eye, which he lost. Rogoway, the other customer, suffered shotgun injuries to her back and spine, resulting in numbness on her right side and the periodic inability to walk.    Two other employees sustained serious injuries, including Dionne Irvin, a waitress. The three remaining victims—Ismael Luna, Robinson, and Logan—were physically unharmed.

## A.  The Initial Investigation

Later that day, the police showed many of the eyewitnesses photographs from the West Los Angeles Division CRASH book,[4] which contained photographs of

---

[4]  "CRASH" stands for "Community Resources Against Street Hoodlums," a gang repression unit at the Los Angeles Police Department's West Bureau.

suspected gang members in the West Los Angeles area. The
book did not include photos of Sanders or codefendant
Freeman. Rogoway, Robinson, and Logan all selected
photograph No. 132 as the taller robber. Photograph No. 132
depicted a man named David Hall, a person who bore a
striking resemblance to Sanders according to the state trial
court.

On the morning after the robbery, the police interviewed
several Bob's Big Boy employees who were not at the
restaurant during the robbery the night before. The
employees suggested that a former waitress, codefendant
Carletha Stewart, may have been involved in the crime.
Stewart and Sanders were dating at the time of the robbery
and Freeman was Stewart's cousin. None of the employees
mentioned Sanders or Freeman as possible suspects.

Brenda Givens, a waitress at Bob's Big Boy, worked with
Stewart at the restaurant for several months. Givens provided
a statement to the police about an encounter she had with
Stewart in September 1980, when she ran into Stewart while
visiting her boyfriend at Los Angeles County Jail.[5]

According to Givens, Stewart said that it was a "good
thing" that the two women ran into each other "because they
gonna rob Bob's Big Boy tonight." Stewart told Givens that
she did not want Givens to get hurt, but did not say who

---

[5] Givens told a private investigator working for codefendant Freeman
that this encounter took place in the first two weeks of September, but she
testified at Sanders's trial that it happened the same day that another
murder took place near the Bob's Big Boy restaurant. This other murder
took place a few blocks from Bob's Big Boy on September 27, 1980,
around 9:15 p.m.

specifically was going to rob the restaurant. At Sanders's
trial, Givens testified that two men were at the jail with
Stewart on the day Stewart warned her about the robbery, but
the men were not present for the conversation. Givens
testified that she told the police about the two men when she
was interviewed on December 14, but the men were not
mentioned in her signed statement.[6]

On the same day Givens saw Stewart at the jail, she
reported for her evening shift at Bob's Big Boy and told four
managers about her conversation with Stewart. Store
manager Kim Clark and night manager Rodell Mitchell were
among the managers to whom Givens reported. According to
Givens, Stewart came to the restaurant that night with another
man at around 11:30 p.m. Givens later learned the man's
name was Andre Gilcrest.

Givens testified that Stewart called her after leaving the
restaurant with Gilcrest that evening. She asked what time
Givens would be leaving and how many employees remained
in the restaurant, and Givens answered that she did not know.
Givens recalled staying until after the restaurant closed at
2 a.m. and remembered that Stewart knocked on the front
door and window shortly after closing while employees were
cleaning their assigned stations. The door was locked and

---

[6] Before Sanders's trial, Givens told a private investigator working for
Freeman that Stewart was alone on the day that she warned Givens about
the robbery, and that she saw Stewart at the jail with one man on a
different day. She attended a lineup with Sanders and Freeman on
December 23, 1980, and selected both. On the lineup card identifying
Freeman, she wrote "I have seen him and Carletha both at the County Jail
while I was visiting." She did not write any similar comments on
Sanders's lineup card.

Mitchell did not open the door.  Stewart left before Givens
went home.[7]

### B.  Andre Gilcrest Implicated Sanders Shortly After the Crime

Within days after the December 14 robbery, several other
individuals came forward with information implicating
Sanders.  On December 20, 1980, Andre Gilcrest went to the
Los Angeles Police Department (LAPD) and gave a statement
implicating Sanders, Stewart, and Freeman.  Gilcrest was
Stewart's ex-boyfriend and he had been romantically
involved with her on and off for about five years.  According
to Gilcrest, he went with Stewart to Bob's Big Boy sometime
before the robbery.  Gilcrest could not recall the precise date
of this nighttime visit, but, like Givens, he recalled that there
had been another murder a few blocks away that night.

Gilcrest was given immunity and testified at Sanders's
trial.  He testified that before he and Stewart went to the
restaurant on September 27, Stewart told him that Sanders
and Freeman were going to rob Bob's Big Boy that night.
Gilcrest described going with Stewart to the restaurant
between 11:30 p.m. and 12:30 a.m. to drink coffee because
Stewart wanted to see how many people were working.
Gilcrest testified that while they were there Stewart asked the
waitresses which managers were working and how many
people were still there.  They left about fifteen minutes before

---

[7] Mitchell also testified at Sanders's trial about Stewart's visit to the
restaurant with Gilcrest on September 27, 1980.  The parties stipulated
that if called to testify, store manager Kim Clark would have confirmed
that he was present with Mitchell when Givens told them about her
conversation with Stewart at the Los Angeles County Jail.

closing and went to Stewart's house.  Gilcrest believed that
the robbery would take place after they left, and he testified
that he saw Sanders and Freeman at Stewart's house later that
night.  Gilcrest saw Stewart talking to Sanders and Freeman
in a blue Cadillac, and also saw Sanders show Stewart a
sawed-off, short-barrel shotgun.   According to Gilcrest,
Freeman also had a short-barrel shotgun braced against his
leg.  Gilcrest testified that after Sanders and Freeman left,
Stewart said that they had gone to rob Bob's Big Boy.  When
they did not return within an hour, Stewart told Gilcrest that
she was going to Bob's Big Boy to find them.  According to
Gilcrest, Stewart did not find them at the restaurant, but
Sanders called Stewart later that night to report that they did
not go through with the robbery because the manager did not
come out.  Gilcrest and Stewart did not discuss the robbery
again.

Gilcrest heard about the December 14 robbery at Bob's
Big Boy the day after the crime and he told his younger
brother about what had happened when he went to the
restaurant with Stewart on September 27.  The brother told
their mother, and she confronted Gilcrest with the ultimatum
that she would call the police if Gilcrest did not come
forward.  Gilcrest contacted the police roughly two days later.

## C.  Sanders's Arrest

On December 22, 1980, roughly one week after the crime,
the police arrested Sanders, Stewart, and Freeman.  Sanders
testified at a pretrial motions hearing that he did not resist,
but police officers kicked and beat him with a shotgun during
the course of the arrest.  At trial the parties stipulated that X-
rays of Sanders's chest taken on December 24, 1980, showed

three fractured ribs and subcutaneous emphysema, which is a type of swelling below the skin.

The police also executed search warrants at Sanders's, Stewart's, and Freeman's residences.  They found a sawed-off shotgun, a full-length shotgun, and shotgun shells in Sanders's bedroom, and additional shotgun rounds and an empty holster in his father's bedroom.  The police found another shotgun at Freeman's father's house, but the State's ballistics expert acknowledged that he could not connect any of the guns or ammunition to the Bob's Big Boy robbery.  At Stewart's residence, the police found $90 in $1 bills and rolls of coins in Bank of America wrappers.  The money was not conclusively linked to the crime, and no jewelry or other personal property belonging to the victims was found.

### D.  The December 23, 1980 Lineup

The LAPD held a lineup that included Sanders and Freeman on December 23, 1980, the day after their arrest. The lineup consisted of two lines: Lines 3 and 4.[8]  Sanders was Number 4 in Line 3 and Freeman was Number 3 in Line 4.  The other men in Sanders's line were of similar height, weight, build, and complexion to Sanders.  They all had some facial hair.  Sanders was the only one in his line with a Jheri curl hairstyle, but the suspects had similar length hair. Sanders was also the only person not wearing shoes.  His feet were not visible in the videotape of the lineup.  All of the men in the lineup were wearing long-sleeve shirts under their prison uniforms and Sanders's injuries from the alleged

---

[8] The police held a live lineup on December 19, 1980, before Sanders and Freeman were arrested, consisting of Lines 1 and 2.  Sanders and Freeman were not included in either line.

police beating were not visible. Sanders was not represented by counsel at the lineup because counsel was not appointed until his arraignment, which took place the following day.

Three eyewitness employees attended the live lineup held December 23: Logan, Robinson, and Ismael Luna. Logan made an identification from each line, but selected neither Sanders nor Freeman. Robinson selected Sanders from Line 3, and wrote "positive" next to her identification on the lineup card, but she also noted that "No. 6 sounds like the robbers." Luna tentatively selected Sanders from Line 3.

Night manager Malloy viewed a videotape of the lineup on December 23 because he arrived late. He selected Sanders from Line 3, and wrote that he was "positive" about his choice in the remarks section of the lineup card. At trial, Malloy remembered writing "positive" on the card, but he also testified that the handwriting on the card did not look like his.

Rogoway and Irvin were both injured in the robbery and unable to attend the December 23 lineup, but they watched the videotape of it on January 2, 1981 after they were discharged. Rogoway's and Irvin's lineup cards were lost sometime after February 1981 and Rogoway gave conflicting testimony at Sanders's preliminary hearing and trial with respect to whether she selected anyone from the lineup. At the preliminary hearing, Rogoway testified that she did not choose anyone, but at trial she watched the videotape again and stated that she selected Sanders on January 2. After watching the videotape at trial, she said she was "pretty certain" about the identification when she selected Sanders on January 2. Irvin also selected Sanders after viewing the

videotape, but she did not testify at trial because the court declared her incompetent to do so.

### E. Bruce Woods Implicated Stewart After the Arrest

In late December, Bruce Woods came forward with information after seeing a newspaper article about the robbery. Woods was in county jail on a pending burglary charge. According to Woods, he was riding in a car with Stewart and a mutual friend in August 1980, when Stewart asked the friend if he would like to make some money by robbing Bob's Big Boy. The friend replied, "Are you crazy?" and the conversation ended. Woods explained that he met Stewart through the mutual friend and had seen her five or six times before this conversation took place.

### F. Information and Preliminary Hearing

Sanders, Stewart, and Freeman were charged with four counts of first-degree murder, six counts of robbery, two counts of attempted robbery, seven counts of assault with a deadly weapon, and one count of conspiracy to commit robbery.[9] The State alleged that the defendants committed the murders under the special circumstances of multiple murder and felony-murder robbery.

All seven surviving eyewitnesses testified at Sanders's and Stewart's joint preliminary hearing held over the course

---

[9] The information originally charged the defendants with three murders but it was amended to add a fourth murder count after Cesario Luna's death.

of five days on March 20 and March 23–26, 1981.[10]  The
prosecution asked five of the eyewitnesses—Malloy,
Rogoway, Robinson, Luna, and Logan—to identify Sanders
in court.  Sanders was seated behind a blackboard while the
witnesses testified.  The blackboard was removed at the end
of each witness's testimony, and the witnesses were asked
whether they recognized Sanders.  Malloy unequivocally said
that he recognized Sanders as the taller robber.  Rogoway
also testified that she could positively identify Sanders as the
taller robber.

Robinson, Luna, and Logan were far less certain.
Robinson could not identify Sanders.  She testified that she
did not know whether Sanders was one of the robbers nor
whether he even looked like the person she selected at the
December 23 lineup.  Luna similarly testified that Sanders did
not "seem to be" one of the robbers, and that he was "not
really sure" whether Sanders was the man he selected.  Logan
testified that Sanders was "a very good likeness," but he
"couldn't identify him positively."[11]

Givens, Mitchell, Gilcrest, and Woods all testified about
their interactions with Stewart leading up to the robbery.
Gilcrest positively identified Sanders, but the others were not
asked to do so.  Woods testified over the course of two days
while still in custody for the pending burglary charge.  On
March 20, Woods and Sanders were transported back to jail
in the same van even though Woods was in protective

---

[10] Freeman's preliminary hearing occurred roughly one month earlier,
in late February 1981.

[11] Jackson and Irvin testified about their experiences during the
robbery, but were not asked to identify Sanders.

custody and was supposed to be kept away from Sanders. Woods had not met Sanders before the van ride.

Roughly one week after the preliminary hearing, Woods informed two officers that Sanders had threatened him in the van.  Woods recounted the threat in his testimony at Sanders's trial, describing that Sanders told him not to testify against the defendants because Stewart was young, and because, if convicted, Sanders would get "the gas."  Woods also testified that Sanders indicated "they" knew where Woods lived, and that Woods's family would "get involved" if Woods talked.

### G. Sanders's Trial

The three codefendants were tried separately.  Sanders's trial was held first, beginning in May 1982 and lasting for roughly three months.  The case was prosecuted by Deputy District Attorney Harvey Giss.  Sanders was represented by Leslie Abramson.

The State's case consisted primarily of eyewitness accounts; testimony from Givens, Mitchell, and Gilcrest about the events of September 27, 1980; Bruce Woods's testimony about his August 1980 encounter with Stewart and their mutual friend; and the physical evidence found at Sanders's and Stewart's homes.  Four eyewitnesses identified Sanders at trial with varying degrees of certainty.  Malloy was the State's first witness, and he identified Sanders as the taller robber without hesitation.  Rogoway also identified Sanders as the taller robber.  Robinson identified Sanders as one of the robbers, but admitted that she was unable to identify him at the preliminary hearing.  When Luna was asked if there was anyone in the courtroom who was present

on the night of the robbery, he answered "I think he's there in front of that lady," and pointed to Sanders.

The defense attacked Gilcrest's and Woods's credibility and the accuracy of the eyewitness identifications, pointing out inconsistencies in their testimony and emphasizing the lack of physical evidence from the crime scene. Defense counsel also questioned the evidence found at Sanders's and Stewart's homes because it was not conclusively linked to the crime.

After deliberating for four days, the jury convicted Sanders of all charges. The penalty phase started on August 25, 1982 and lasted for four days. After two-and-a-half days of deliberations, the jury recommended a death sentence. The court imposed a death sentence on December 3, 1982.[12]

## II. Post-Trial Jailhouse-Informant Scandal

### A. The Scandal

Six years after Sanders's trial, a scandal erupted in Los Angeles surrounding the use of jailhouse informants in criminal prosecutions. In October 1988, Leslie White demonstrated to the Los Angeles Sheriff's Department how he and other informants had obtained information "about defendants they had never met" to fabricate claims that they

---

[12] Stewart pleaded guilty to four counts of first-degree murder in February 1983. She was sentenced to four concurrent terms of life with the possibility of parole. A jury found Freeman guilty of four counts of first-degree murder with special circumstances in December 1983. Freeman's first penalty-phase trial ended in a hung jury; in March 1985, the second jury returned a verdict of life without the possibility of parole.

heard confessions while in jail. *Gonzalez v. Wong*, 667 F.3d 965, 1004 (9th Cir. 2011) (W. Fletcher, J., concurring in part). White explained that he was one of several prisoners who gave bogus testimony about such confessions in order to get better deals in their own cases, and for other privileges. *Id*. at 1005 (9th Cir. 2011). A grand jury was empaneled to look into the improper use of informant testimony by the Los Angeles County District Attorney's Office. *Id.* The grand jury issued a 150-page report painting "a harrowing picture of the role of jailhouse informants in the Los Angeles County criminal justice system during this period" and noted the "appalling number of instances of perjury or other falsifications to law enforcement" by informants. *Id*. at 1005–06. The report found that informants were given numerous benefits for their fabricated confessions, such as being transferred to jails perceived to be more desirable. *Id.* at 1007.

The District Attorney's Office reviewed all cases from the previous ten years in which: (1) a jailhouse informant testified as a witness for the State "at a preliminary hearing or trial to admissions or confessions made by a defendant to the informant while the informant and the defendant were in custody together;" or (2) Leslie White testified as a witness for the State on any subject matter. Leslie White did not testify at Sanders's trial, but he was romantically linked to one of the eyewitnesses who did, Tami Rogoway.

*B. Leslie White's Connection to Eyewitness Tami Rogoway*

Roughly one month before jury selection started for Sanders's trial, Deputy District Attorney Giss testified at a discovery hearing about a connection between Tami

Rogoway and Leslie White. Giss testified that White
forwarded a letter that had been written by a prospective
defense witness and prison inmate, Richard Quine. The letter
was addressed to Quine's girlfriend, Gina Gutierrez.
Gutierrez was Rogoway's friend and it was through these
mutual acquaintances that Rogoway met White. In his letter,
Quine offered himself as a fake informant against
codefendant Freeman. In relevant part, the letter stated:

> I need you [Gina] to tell Tami that I can help
> her out on putting Freeman away . . . . Ask
> her if she is going to court on him still, and if
> so, all she has to do is tell me about his case,
> then call the D.A. and tell him she knows
> someone that Freeman told he did what he is
> in jail for . . . .

Giss testified that White told him about Quine's offer to give
false testimony about five months before the discovery
hearing, and that the prosecution planned to produce a tape
recording of its follow up interview with White because the
interview might be relevant to defense efforts to impeach
Tami Rogoway. Defense counsel Abramson expressed
concern that White might have tampered with witnesses.
Giss responded, under oath, "Leslie White was never used as
an agent of the police," and the prosecution "never made a
deal with him, never offered anything, never asked for
anything."

The state trial court ruled that defense counsel could only
question Tami Rogoway about Richard Quine, Leslie White,
and the letter offering false testimony against Freeman if
Quine was first called to testify. Neither Quine nor White
were called. On May 15, 1982, roughly two weeks after

Sanders's trial started, White signed an affidavit stating that:
(1) he had no knowledge adverse to the defense in the Bob's
Big Boy case; (2) he received no statements about the case
from Sanders or Freeman; (3) everything he knew about the
case he learned from his ex-girlfriend Tami Rogoway; (4) he
had not been asked by the prosecution to solicit information
from Sanders or Freeman; and (5) he was not "an informant
in any capacity."   Police notes from a contemporaneous
interview with White indicate he told the police that both
Sanders and Freeman approached him in prison and asked
him to testify that Rogoway said she did not know who shot
her on the night of the robbery.   White's May 15, 1982
affidavit made no mention of Sanders and Freeman
approaching White in prison.

On March 13, 1989, White testified as a defense expert on
the use of jailhouse informants in an unrelated state court
case, *People v. Marshall*.[13]   In that testimony, White claimed
that in 1981 a Deputy District Attorney who was not involved
with the Bob's Big Boy case arranged for White to be
transferred from Chino State Prison to Long Beach City Jail,
where White was released on regular weekend furloughs.
Furlough orders—signed by a judge not involved in the Bob's
Big Boy case—corroborate that White was released from jail
repeatedly for long weekends between October and
December 1981.

In the *Marshall* case, White testified that he gave
information to the prosecution in the Bob's Big Boy case
during the period he was receiving furloughs.   He
characterized his involvement as "basically behind the scenes

---

[13] The case's docket number in the Superior Court of the State of
California for the County of Los Angeles is A954922.

in the sense [that Giss] was asking me to do certain things on
the street and in jail I was doing - - I would collect the
results." White also testified in the *Marshall* case that he was
romantically involved with one of the eyewitnesses in the
Bob's Big Boy prosecution, that Deputy District Attorney
Giss knew that White was "having sexual relations" with
Rogoway, and that over the course of his three month
relationship with Rogoway, he told her false information
from other jailhouse informants that was detrimental to
Sanders and Freeman, but he did not know what Rogoway did
with the information.

On August 8, 1989, White again testified about his
relationship with Rogoway, this time before the grand jury
investigating the jailhouse-informant scandal. He stated that
his relationship with Rogoway started before his furloughs
from the Long Beach City Jail, that he met Rogoway through
Gutierrez and Quine, and that he corresponded with Rogoway
while he was at Chino State Prison. White claimed that after
he was transferred to Long Beach City Jail, he was allowed
to have contact visits with Rogoway. He also testified that
Giss was aware of the situation, and that Giss told him "to
keep [his] mouth shut about the relationship." According to
White, Giss asked him to find out anything he could related
to Quine or other defense witnesses, and asked White for any
letters Quine sent to Gutierrez.

## III.    Procedural History

In September 1995, while Sanders's case was pending on
automatic appeal, Sanders filed a state habeas corpus petition
in the California Supreme Court. The California Supreme
Court affirmed Sanders's conviction and death sentence in
November 1995. *People v. Sanders*, 905 P.2d 420 (Cal.

1995).   In February 1996, the California Supreme Court summarily denied Sanders's state habeas petition on the merits, and Sanders's conviction became final on October 7, 1996, when the United States Supreme Court denied his petition for writ of certiorari.   *See Sanders v. California*, 519 U.S. 838 (1996).

Sanders timely filed a federal habeas petition in the Central District of California raising forty-five claims.   In 1998 and 1999, the district court dismissed roughly half his claims in response to dispositive motions filed by the State. None of the claims dismissed in those orders are before this court on appeal.

In December 1999, Sanders filed a motion for an evidentiary hearing on seventeen of the eighteen claims that are at issue in this appeal.[14]   The district court denied Sanders's motion for an evidentiary hearing and ruled that the seventeen claims before this court did not have a "colorable basis."   In January 2002, Sanders filed a motion to vacate the order denying his request for an evidentiary hearing or, alternatively, to reconsider.   The parties had fully briefed this motion by May 23, 2002, but the case was transferred several times and the district court did not rule on it until October 20, 2009.   The motion was denied.   On May 6, 2010, the district court denied Sanders's federal habeas petition in its entirety, issued a final judgment, and denied a certificate of appealability as to all claims.

---

[14] He did not request an evidentiary hearing on the claim that cumulative error during the guilt-phase trial requires the court to reverse his conviction.

SANDERS V. CULLEN                23

Sanders timely appealed and this court granted a
certificate of appealability on eighteen claims pertaining to
Sanders's guilt-phase trial.   We have jurisdiction under
28 U.S.C. § 1291.

## STANDARDS OF REVIEW

We review de novo the district court's denial of Sanders's
habeas corpus petition.  *Hurles v. Ryan*, 752 F.3d 768, 777
(9th Cir. 2014).   The Antiterrorism and Effective Death
Penalty Act of 1996 (AEDPA) governs his petition.  Under
AEDPA, a federal court may grant a writ of habeas corpus
only if the state court's decision on the merits:

> (1) resulted in a decision that was contrary to,
> or involved an unreasonable application of,
> clearly established Federal law, as determined
> by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in
> light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d); *see also Glebe v. Frost*, 135 S. Ct. 429,
430 (2014).   As contemplated by AEDPA, "clearly
established Federal law . . . is the governing legal principle or
principles set forth by the Supreme Court at the time the state
court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63,
71–72 (2003) (internal quotation marks omitted).

A summary denial from the California Supreme Court is
an adjudication on the merits for AEDPA purposes.  *See
Harrington v. Richter*, 562 U.S. 86, 98 (2011); *Cullen v.*

*Pinholster*, 563 U.S. 170, 187 (2011) ("Section 2254(d) applies even where there has been a summary denial."). "Under California law, the California Supreme Court's summary denial of a habeas petition on the merits reflects that court's determination that 'the claims made in th[e] petition do not state a prima facie case entitling the petitioner to relief.'" *Pinholster*, 563 U.S. at 188 n.12 (alterations in original) (quoting *In re Clark*, 855 P.2d 729, 741–42 (Cal. 1993)). In evaluating a state habeas petition, the California Supreme Court "generally assumes the allegations in the petition to be true, but does not accept wholly conclusory allegations, *People v. Duvall*, 886 P.2d 1252, 1258 (Cal. 1995), and will also 'review the record of the trial . . . to assess the merits of the petitioner's claims.'" *Id.* (quoting *Clark*, 855 P.2d at 742).

Because the California Supreme Court summarily dismissed Sanders's petition, he can satisfy "§ 2254(d)(1) only by showing that 'there was no reasonable basis' for the California Supreme Court's decision." *Pinholster*, 563 U.S. at 187–88 (quoting *Richter*, 562 U.S. at 98). This court "must determine what arguments or theories . . . could have supporte[d] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 188 (first alteration in original) (quoting *Richter*, 562 U.S. at 102).

Section 2254(d)(2) provides state prisoners an avenue for relief only when the state court's determination of the facts was "not merely wrong," but objectively unreasonable. *See Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004). Relief under § 2254(d)(2) is proper only if the panel is "convinced that an appellate panel, applying the normal standards of

appellate review, could not reasonably conclude that the finding is supported by the record." *Id.* at 1000.

## DISCUSSION

### I.  *Mooney-Napue* Claims Relating to the Four Eyewitnesses

Sanders first argues that the four eyewitnesses who identified him at trial—Malloy, Rogoway, Robinson, and Luna—each provided material, false testimony in violation of his constitutional rights to a fair trial and due process under the Sixth and Fourteenth Amendments.[15]  The clearly established Supreme Court precedent governing these claims is *Mooney v. Holohan*, 294 U.S. 103 (1935), and *Napue v. Illinois*, 360 U.S. 264 (1959).

Under *Mooney*, "a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue*, 360 U.S. at 269 (describing *Mooney*, 294 U.S. at 112–13). *Napue* held that the "same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.*  To demonstrate a constitutional violation under *Mooney-Napue*, Sanders must show: "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) the false testimony was material." *Reis-Campos v. Biter*, 832 F.3d 968, 976 (9th Cir.

---

[15] This argument encompasses five claims from his federal habeas petition: claims 1, 2, 6, 8, and 11.

2016), *cert. denied*, 137 S. Ct. 1447 (2017) (quoting *Jackson v. Brown*, 513 F.3d 1057, 1071–72 (9th Cir. 2008)).[16]

### A. Tami Rogoway's Allegedly False Testimony

In claims 1 and 2 of his federal habeas petition, Sanders alleges that the prosecution suborned perjury and knowingly presented false identification in Tami Rogoway's trial testimony. On appeal, Sanders no longer uses the word "suborn," but continues to maintain that the prosecution knew or should have known Rogoway's identification testimony was false. Rogoway was one of the two customers at the restaurant on the night of the robbery. She testified at trial that she observed the taller robber for roughly eleven seconds over the course of the robbery: three seconds when he first entered through the front door and another eight seconds while she was in the freezer. Sanders argues that Rogoway's testimony was false because: (1) her identification testimony changed over time; and (2) she was allegedly unable to identify Sanders until after the prosecution arranged for jailhouse informant Leslie White to be released from jail on illegal furloughs and White persuaded Rogoway to lie about her ability to identify Sanders.

---

[16] Sanders argues that he does not have to show that the prosecution knew or should have known the testimony was false to prove a constitutional violation, but he does not cite any clearly established Supreme Court precedent for this point. Even if Sanders is not required to prove prosecutorial knowledge, his *Mooney-Napue* claims fail because he has not shown that any of the eyewitness testimony was false, as explained in detail below.

1. *Changes in Rogoway's Identification Testimony Over Time*

In the immediate aftermath of the crime, while Rogoway was still in the hospital, she selected photograph No. 132 from the CRASH book (the photo of the man named David Hall) as the taller robber.  She initially stated that No. 132 "*looked like* the tall suspect," but, upon further questioning, she stated that No. 132 "*was* the tall suspect."  (Emphasis added).  By the time of Sanders's trial, Rogoway could not remember whether she selected anyone from the CRASH book.  Rogoway was given morphine for pain during the initial stage of her treatment, and likely was taking morphine when she viewed the CRASH book.

Rogoway did not attend the live lineup on December 23, 1980 because she was still hospitalized, but she viewed a videotape of the lineup on January 2, 1981.  The lineup card she used to record her impressions was lost sometime after February 1981 and she gave conflicting testimony at Sanders's preliminary hearing and trial about whether she selected anyone when she watched the videotape.  At the preliminary hearing, Deputy District Attorney Giss asked a series of questions about *Freeman*'s preliminary hearing and lineup, and then asked "Now, you never picked anyone out of any video tape line-ups; is that correct?" Rogoway answered: "I don't believe so."  Her response was consistent with the uncontested fact that she did not select Freeman from the lineup.  At the end of Rogoway's testimony, the blackboard was moved so that it no longer blocked Sanders, and Giss asked whether Rogoway could positively identify him as "one of the two individuals involved with the incident that evening."  She answered, "Yes . . . .  He was there."

Outside the presence of the jury, the court held a
California Evidence Code section 402 hearing regarding the
loss of Rogoway's lineup card.[17]  Officer Wesselink testified
that he was present on January 2 when Rogoway viewed the
videotape, that he was responsible for collecting her lineup
card and that he recalled Rogoway selected Sanders.
Detective Jacques also testified that he recorded Rogoway's
selection in the police log after seeing the lineup card, and
similarly recalled that Rogoway picked Sanders.  The police
log states "videotape of lineups shown to Rogoway and Irvin
at [Police Administrative Building].  Both picked Sanders.
Neither picked Freeman."  Rogoway testified at the 402
hearing that she selected someone from one of the two lines
as the taller robber.

During trial, Rogoway watched the videotape of the
lineup again and testified that she selected Sanders as the
taller robber when she originally saw the tape on January 2,
1981.  She further stated that she was "pretty certain" about
the identification on January 2.  In the courtroom, before the
jury, she identified Sanders as the taller robber.

The record shows that Rogoway's in-court identifications
of Sanders, at his preliminary hearing and at trial, did not
change.  She testified inconsistently about whether she
selected anyone at the video lineup, but Wesselink's and
Jacques's testimony at the 402 hearing suggests that it is
more likely that she misunderstood Giss's question at the
preliminary hearing than that she gave false, or even
inconsistent, testimony.  Giss asked Rogoway whether she

---

[17] California Evidence Code section 402(b) permits a California trial
court to "hear and determine the question of the admissibility of evidence
out of the presence or hearing of the jury . . . ."

ever selected anyone at the lineups after asking her a series of
questions about Freeman's preliminary hearing and video
lineup.  According to the police log, she did not make a
selection.  The state court could have reasonably determined
that Rogoway's identification testimony did not change and
that Rogoway thought Giss was only inquiring whether she
selected Freeman from a lineup.  More to the point, in order
to prevail on these Sixth and Fourteenth Amendment claims,
Sanders would have to show that Rogoway gave *false*
testimony, not just that she testified inconsistently over time.
This he did not do.

### 2. Leslie White's Impact on Rogoway's Identification Testimony

Sanders argues that Rogoway changed her identification
testimony due to Leslie White's influence during illegal
furloughs.  This argument fails because it does not account
for Rogoway's identification of Sanders at his preliminary
hearing, *before* she began her relationship with White.  The
furloughs took place between October and December 1981.
White testified that his relationship with Rogoway lasted for
three months coinciding with the period when he was at the
Long Beach City Jail in the fall of 1981.  There is no
evidence in the record that Rogoway had any interactions
with White prior to the time she viewed the lineup on January
2, 1981, or before her identification of him at the preliminary
hearing in March 1981.  At a sidebar during Sanders's trial,
Deputy District Attorney Giss told the court that Rogoway's
visit to Chino State Prison with Gina Gutierrez—which led to
her introduction to Leslie White—took place some time after
Sanders's preliminary hearing.

White testified before the grand jury investigating the jailhouse-informant scandal that he told Rogoway false, detrimental information about Sanders during his furloughs, but this could not have influenced the preliminary hearing testimony she had already given, and her identification of Sanders at the preliminary hearing was consistent with her identification of him at trial. Sanders has not shown that Rogoway *changed* her identification of Sanders, or that White could have influenced her pre-trial identification of Sanders.

The state court also could have reasonably rejected this *Mooney-Napue* claim because Sanders did not show the prosecution knowingly offered false testimony. Sanders points to a note obtained from the District Attorney post-trial pursuant to the Public Records Act and argues that Giss knowingly allowed Rogoway to give false testimony. The handwritten note, allegedly authored by Giss, states: "Les had a conjugal visit with Tami. One regular visit (no forms – police escort)." At best, the note shows that the prosecution was aware of the relationship between White and Rogoway, but that much is clear; Giss testified about the relationship at the pretrial discovery hearing on February 24, 1982. It does not indicate that the prosecution knew, or even suspected, that Rogoway's identification testimony was false.

It is also possible the state court reasonably determined that Rogoway's identification testimony was not pivotal in the context of the State's overall case because Michael Malloy's eyewitness testimony was much stronger. Malloy was the night manager on duty at the time of the robbery and he had a much longer opportunity to observe the taller robber while removing money from the safe and collecting the victims' wallets, watches, and jewelry. Malloy testified at trial that he "got a good three minute look" at the taller robber

while they were in the office getting money from the safe,
and that he stared at the robber for roughly half that time.
Malloy never wavered in his identification of Sanders and he
was a more prominent part of the state's case, testifying over
the course of eight days.  The prosecutor also relied heavily
on Malloy's testimony during closing argument.  It would not
have been unreasonable for the state court to decide that the
jury would have convicted Sanders, even without Rogoway's
testimony, based solely on the strength of Malloy's
identification.

### B.  Michael Malloy's Allegedly False Testimony

In claim 8 of his federal habeas petition, Sanders contends
that Michael Malloy's trial testimony about how he knew to
go to the December 23, 1980 lineup was false.  Sanders
points to an alleged inconsistency between Malloy's trial
testimony and a deposition he gave after Sanders's trial, in a
civil lawsuit Tami Rogoway filed against Bob's Big Boy
restaurant.  The district court ruled that the deposition
testimony did not contradict Malloy's trial testimony and that
Sanders failed to prove Malloy's trial testimony was false.
We agree with both rulings.

In Sanders's trial, Malloy was asked a series of questions
about what he knew before he went to the December 23
lineup:

> Abramson:  Had you heard before you were
> told that you were going to go downtown to
> identify anybody, had you heard that there
> were suspects arrested and in custody for the
> incident?

Malloy:  No, I didn't.

Abramson: Did a policeman call you and tell you you had to go downtown to try to identify somebody?

Malloy:  I don't recall.

Abramson:  Well, how did you know you had to go down?

Malloy:  I believe someone called me, but I don't know when.

Abramson:  Okay.  Apart from when, do you know who?

Malloy:  No, I can't — no, I don't.

Three years after Sanders's trial, Malloy was asked at his deposition when he first talked to anyone from Bob's Big Boy after the crime:

Attorney:  When did anybody from Bob's talk to you after this incident?

Malloy:  I believe after I got out of the hospital.

Attorney:  Who did you talk to?

Malloy:  David Lind.

Attorney:  Where?

Malloy:  I went in a lineup.  I went downtown
to a lineup. . . .

Attorney:  Is that the first time you saw Dave
Lind after this incident was at the lineup?

Malloy:  At the lineup.

Attorney:    Did  he  talk  to  you  about  the
incident?

Malloy:  No.  He just told me I was coming
downtown for a lineup, identify the guys.

Attorney:  He called you and asked you if you
would come down to the lineup?

Malloy:  LAPD called me.

Attorney:  What did Dave Lind —

Malloy:  Escorted me down.

In short, Malloy testified at Sanders's trial that he could not
remember who called to tell him to come to the December 23
lineup, and at his deposition he testified that the LAPD called
him and David Lind, the Director of Safety and Security for
Bob's Big Boy, escorted him to the lineup.

Whether Malloy's recollection was accurate or not, the
fact that he later recalled being contacted by LAPD about
attending the lineup does not come close to demonstrating
that his trial testimony was false or that the prosecution knew,
or should have known, that it was wrong.  Nor does Sanders

explain how this detail calls into question Malloy's identification of Sanders at the video lineup, much less his in-court identification. The state court could have reasonably decided that Sanders failed to prove any of the three *Mooney-Napue* elements with respect to Malloy's testimony.

### C. Rhonda Robinson's Allegedly False Testimony

In claim 6 of his federal habeas petition, Sanders maintains that Rhonda Robinson's trial testimony was false because it was inconsistent with testimony she gave at a hearing in Freeman's case about whether she had seen a photograph of Sanders and Stewart before Freeman's preliminary hearing. Rhonda Robinson was a Bob's Big Boy waitress. The shorter robber ordered her to lay on the floor in the kitchen before she was told to enter the freezer. She testified at trial that she observed the taller robber for three to four seconds in the freezer. The district court correctly ruled that there was "no conflict between Robinson's testimony at Petitioner's trial and her testimony at Freeman's trial."

During the December 1981 search of Sanders's apartment, the police seized a carnival photograph of Sanders and Stewart holding fake guns. The trial court initially ruled that the photograph was inadmissible, but after a detective who participated in the search mentioned it during his testimony, the defense introduced the photograph and the court admitted it into evidence. Defense counsel also called Richard Price, who took the photograph, to testify that in December 1980 he managed a photographic studio near an amusement park where people could pose with props and costumes. Price testified that Sanders and Stewart posed for such a photograph with a replica gun and a toy gun as a gag.

In an effort to undermine the reliability of Robinson's
identification testimony, defense counsel questioned whether
Robinson and other witnesses saw the gag photo while they
were waiting to testify at Freeman's February 1981
preliminary hearing.  The photograph was apparently in a
blue notebook inside a cardboard evidence box.  Defense
counsel Abramson asked Robinson whether she remembered
seeing a blue notebook while she was waiting to testify at
Freeman's preliminary hearing, and Robinson answered, "I
don't remember."   Abramson then asked whether she
remembered "any of the witnesses going through any
notebooks or making comments about any photographs," to
which Robinson answered "Yes."  After a sidebar about a
hearsay objection, Abramson inquired whether Robinson
remembered the other witnesses "mentioning Ricky
Sanders'[s] name" or "suggesting that Ricky Sanders was one
of the guys who did this thing."  Robinson again answered
"Yes."  The transcript of the sidebar discussion suggests that
Abramson asked these questions to explore whether Robinson
identified Sanders at trial because she heard other witnesses
say that he was one of the robbers, but Robinson was not
asked whether she saw the photograph itself.

At a hearing in Freeman's trial held pursuant to California
Evidence Code section 402, Robinson was again asked about
what happened while she was waiting to testify at Freeman's
preliminary hearing.  Robinson said she remembered seeing
a cardboard box and that she remembered people looking
inside the box.  She could not recall who, "but someone
opened the notebook, and [the witnesses] saw a photo."
Robinson further testified that it was a blue notebook, and
that it contained a photograph of Sanders and a girl "standing
together holding a gun."

The only inconsistency between Robinson's testimony at
Sanders's trial and Robinson's testimony at the hearing held
during Freeman's case concerns whether she recalled seeing
the blue notebook; Robinson did not deny seeing the
photograph at either proceeding, and the fact that she
remembered seeing the notebook at Freeman's evidentiary
hearing does not show that she lied at Sanders's trial.

Sanders maintains that the prosecution knew Robinson
lied about her memory of the notebook because the police
showed the photograph to her. But the only evidence he cites
to support this argument is Robinson's testimony at
Freeman's evidentiary hearing, and it only establishes that the
police had Robinson wait in the same room with the evidence
box and notebook. There is no evidence the prosecution had
reason to doubt the testimony Robinson actually gave, that
she did not recall the blue notebook. Nor does Sanders
explain how Robinson's memory about the blue notebook
might have made a material difference to the jury. She
testified at Sanders's trial that other witnesses made
comments about a photograph while they were waiting to
testify at Freeman's preliminary hearing, but she was not
asked whether she saw the photograph nor whether the
photograph had any impact on her identification of Sanders.
As discussed in more detail below, Robinson had already
identified Sanders in person, at the December 23, 1980
lineup. The state court could have reasonably determined that
Sanders failed to support any of the three *Mooney-Napue*
elements with respect to Robinson's testimony.

### D. Ismael Luna's Allegedly False Testimony

In claim 11, Sanders asserts that Ismael Luna admitted at
Freeman's trial that he testified falsely about his ability to

distinguish black people and his ability to identify Sanders.
Ismael Luna was a busboy at Bob's Big Boy, and his father
died several months after the crime as a result of injuries he
sustained during the robbery. The district court ruled that
Luna's testimony was neither perjurious nor material. We
agree with the district court. Luna's identification of Sanders
was always qualified and the jury heard him testify at
Sanders's trial that he had difficulty identifying black people.

Luna tentatively selected Sanders from Line 3 at the
December 23, 1980 lineup. He wrote on his lineup card, "It
seems to be No. 4." At Sanders's preliminary hearing, Luna
testified that Sanders did not "seem to be" one of the robbers,
and that he was "not really sure" whether Sanders was the
man he selected at the lineup. He acknowledged that Sanders
looked like the man he selected, but with "a little more hair."
At Sanders's trial, Luna was asked "to look in this courtroom
and see if you see one of the two men in this room that was
there that night." Luna responded, "Well, I think he's there
in front of that lady," and pointed to Sanders. But on cross-
examination Luna admitted, "in general, young black men
tend to look a lot alike" to him. He said that the man he
selected at the lineup looked like the taller robber, while
Sanders now looked more like the shorter robber, and he
could not say for sure whether Sanders was the same man he
selected at the lineup. In her closing argument, defense
counsel emphasized that Luna admitted "all black men
basically look alike to him."

During Freeman's trial, Luna was again asked about his
selection of Sanders at the lineup. He testified, "it was kind
of difficult to identify the black person," and admitted: "It is
very difficult for me to identify black people due to the fact
that I don't live with black people." Although his testimony

at Freeman's trial more explicitly stated that Luna had trouble identifying black people, it does not demonstrate that the uncertain testimony he gave at Sanders's trial was false. The state court could have reasonably determined that Luna's testimony was neither perjurious nor material because he was consistently uncertain. Sanders does not point to any evidence that the prosecution knew or suspected that Luna's identification testimony was false.

Because Sanders failed to prove that any of the eyewitnesses provided material, false testimony or that the prosecution knew they committed perjury, we hold that the state court's rejection of Sanders's *Mooney-Napue* claims relating to Rogoway, Malloy, Robinson, and Luna was neither contrary to clearly established federal law nor objectively unreasonable. We affirm the district court's denial of Sanders's habeas petition with respect to these claims.

## II.  *Mooney-Napue* Claims Relating to Rodell Mitchell and Bruce Woods

Sanders also argues that the prosecution knowingly used material, false testimony from two non-eyewitnesses—Rodell Mitchell and Bruce Woods—in violation of *Mooney-Napue*. This argument encompasses claims 20 and 22.

### A.  *Rodell Mitchell's Allegedly False Testimony*

Rodell Mitchell was one of the Bob's Big Boy managers whom Brenda Givens told about her encounter with Stewart at the Los Angeles County Jail. In claim 20, Sanders maintains that Mitchell lied when he claimed that he responded by calling the police and filing an internal incident

report.    Sanders points to deposition testimony from
Detective Stallcup, who participated in the initial
investigation of the robbery, and a declaration David Lind
gave in Tami Rogoway's civil suit, to demonstrate that
Mitchell's trial testimony was false.    The district court
correctly ruled that Sanders's argument was "conclusory,"
and that it did not establish that Mitchell gave false
testimony.

At Sanders's trial, Mitchell testified that he called the
police after Givens told him about her conversation with
Stewart.    According to Mitchell, he called the police about
fifteen to twenty minutes before the police arrived to ask
about a different murder that took place near the restaurant
that night.    He told the police about his conversation with
Givens in his phone call, and pointed out Stewart and Gilcrest
to them when they visited the restaurant.    Mitchell testified
that he called the police more than once and they came to the
restaurant multiple times that night.    He also said he mailed
an incident report to David Lind, head of security for Bob's
Big Boy, sometime after September 27, 1980.    David Lind
denied receiving such a report.

During Rogoway's civil lawsuit, a police detective
testified that he checked logs maintained by the sergeant who
served as LAPD Watch Commander on September 27, 1980,
and found no record of any report of an impending robbery.
He explained that a "robbery call" would have been a "high
priority" and "procedure would have been to have something
done" such as setting up immediate surveillance of the
location and eventually confronting any individuals believed
to be involved.

The declaration David Lind submitted in the civil suit
stated that he had not received an incident report regarding
the Stewart robbery threat, and that store manager Kim
Clark—as opposed to night manager Rodell Mitchell—would
have been the correct employee to file such a report.  But
according to Lind, this was also not the type of incident that
would have triggered a reporting requirement because Bob's
Big Boy only required managers to report incidents occurring
on restaurant premises.  Stewart allegedly told Givens about
her plans to rob the restaurant at the county jail.

Neither the detective's testimony nor David Lind's
declaration show that Mitchell testified falsely at Sanders's
trial.  At most, this record demonstrates that the prosecution
was aware of Mitchell's and Lind's conflicting accounts
about the incident report.  Nor has Sanders shown how
Mitchell's testimony was material.  Givens's report about her
conversation with Stewart at the county jail was corroborated
by Givens's trial testimony and the stipulation concerning
what Kim Clark would say if called to testify.  Stewart's visit
to the restaurant on the night of September 27 was
corroborated by Givens's and Gilcrest's trial testimony.
Whether Mitchell called the police or filed an incident report
were not important facts, and the jury was aware of the
inconsistency between Mitchell's and Lind's version of
events.  The state court reasonably denied the *Mooney-Napue*
claim related to Mitchell's testimony.

### B.  *Bruce Woods's Allegedly False Testimony*

Bruce Woods was the jailhouse informant who testified
at Sanders's and Stewart's joint preliminary hearing about
Stewart's August 1980 attempt to solicit their mutual friend
to rob Bob's Big Boy.  In claim 22, Sanders contends that

Woods provided material, false testimony at Sanders's trial about statements Sanders allegedly made to Woods in a van after the preliminary hearing, including Sanders threatening Woods's family.

In support of the claim that Woods's testimony was false, Sanders points to "the grand jury findings about the widespread practice of using jailhouse informants, the sheer improbability that Sanders would have made incriminating admissions to Woods, and the evidence of other misconduct." The state court reasonably denied this claim because Sanders did not support the claim that Woods lied or that the prosecution knew his testimony was false. We affirm the district court's denial of Sanders's habeas petition with respect to the Mitchell and Woods *Mooney-Napue* claims.

## III.    *Brady* Claims

Sanders next argues that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose material, exculpatory impeachment evidence about five trial witnesses: Tami Rogoway, Michael Malloy, Andre Gilcrest, Gilcrest's mother, and Brenda Givens.[18]

Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87. "Evidence favorable to the accused" includes evidence that would help the defendant impeach a witness. *Giglio v. United States*, 405 U.S. 150, 154–55 (1972). In *United States v. Bagley*, the Supreme Court "held that regardless of request, favorable evidence is

---

[18] This argument encompasses claims 3, 7, 18, and 19.

material, and constitutional error results from its suppression
by the government, 'if there is a reasonable probability that,
had the evidence been disclosed to the defense, the result of
the proceeding would have been different.'" *Kyles v. Whitley*,
514 U.S. 419, 433–34 (1995) (quoting *United States v.
Bagley*, 473 U.S. 667, 682 (1985) (Blackmun, J.)).   To
establish a *Brady* violation, Sanders must show: "(1) the
evidence at issue is favorable to the accused, either because
it is exculpatory or because it is impeaching; (2) the evidence
was suppressed by the government, regardless of whether the
suppression was willful or inadvertent; and (3) the evidence
is material to the guilt or innocence of the defendant." *United
States v. Sedaghaty*, 728 F.3d 885, 899 (9th Cir. 2013).

With respect to materiality, "[t]he question is not whether
the defendant would more likely than not have received a
different verdict with the evidence, but whether in its absence
he received a fair trial, understood as a trial resulting in a
verdict worthy of confidence."   *Kyles*, 514 U.S. at 434.
Suppressed evidence must be considered "collectively, not
item by item." *Id.* at 436.

   *A.  Failure to disclose that the prosecution obtained
       illegal furloughs and conjugal visits for Leslie White
       so that White could persuade Tami Rogoway to
       falsely identify Sanders at trial*

In claim 3, Sanders argues that the prosecution failed to
disclose evidence that Leslie White was released from the
Long Beach City Jail on illegal furloughs to have sex with
Tami Rogoway and persuade her to testify falsely.  Sanders
contends that this evidence could have been used to impeach
Rogoway's identification testimony because Rogoway was
unable to identify Sanders until after her "secret liaisons"

with White. To support this claim, Sanders points to the same evidence cited in support of his claim that the prosecution knowingly used Rogoway's false identification testimony at trial.

### 1. The prosecution disclosed the Rogoway-White relationship

As a preliminary matter, defense counsel was aware of the relationship between Rogoway and White because Deputy District Attorney Giss testified to its existence at the pretrial discovery hearing held on February 24, 1982. At the evidentiary hearing about the loss of Rogoway's lineup card, Abramson informed the court that she intended to cross-examine Rogoway about whether she knew Quine and White, and whether she had discussed her identification of Freeman with them. The court expressed concern about suggesting to the jury that Rogoway had attempted to procure perjured testimony against Freeman without any concrete proof, but expressed its willingness to convene a hearing outside the presence of the jury in which Quine and White could be questioned. Abramson indicated that she intended to call Quine as a witness during the defense part of the case, but ultimately chose not to call Quine or White.

### 2. Sanders failed to prove that White was an agent of the prosecution

Sanders acknowledges that the prosecution disclosed the Rogoway-White relationship at the pretrial discovery hearing, but argues that the prosecution did not disclose that it obtained illegal furloughs and conjugal visits for Leslie White so that the prosecution could use White as an agent to influence Rogoway's identification testimony. This argument

assumes: (1) that White had a conjugal visit with Rogoway before Sanders's trial; (2) that White was working as an agent of the prosecution in the months leading up to Sanders's trial; and (3) that Rogoway changed her identification of Sanders after she became involved with White.

At the pretrial discovery hearing, Giss did not testify about the conjugal visit mentioned in the handwritten note obtained from the District Attorney because the note had not yet been produced. The handwritten note states, "Les had a conjugal visit with Tami. One regular visit (no forms – police escort)." The note is dated "2-17-82" at the top of the page, but then refers to something that happened on "12-12-82" in the first paragraph of text. Thus, it is not clear whether the note was written before the pretrial discovery hearing on February 24, 1982 or after Sanders's guilt- and penalty-phase trials had concluded. The court sentenced Sanders on December 3, 1982.

Giss did not mention furloughs at the pretrial discovery hearing, but he did testify that "Leslie White was never used as an agent of the police," and the prosecution "never made a deal with him, never offered anything, never asked for anything." To support his theory that the prosecution obtained the furloughs for White and used White as an agent, Sanders points to White's testimony before the grand jury investigating the jailhouse-informant scandal in 1989, seven years after Sanders's trial, and the testimony he gave as a defense expert in *People v. Marshall*, which also took place in 1989.

Before the grand jury and in *Marshall*, White explained that Deputy District Attorney Andrew Diamond, who was not involved with the Bob's Big Boy case, arranged for White to

be transferred to the Long Beach City Jail so that White could have regular weekend furloughs between October and December 1981. According to White, a state court judge not involved in Sanders's case signed the furlough orders. White testified that he gave information to the prosecution in the Bob's Big Boy case during this period. He described his involvement as "basically behind the scenes in the sense [that Giss] was asking me to do certain things on the street and in jail I was doing - - I would collect the results." White testified that Giss asked him to find out anything he could related to Quine or other defense witnesses.

White also testified about his relationship with Rogoway. He recalled that the relationship started before he was transferred to the Long Beach City Jail, continued during the furloughs, and lasted for three months. White testified that Giss knew White was "having sexual relations" with Rogoway, and told White "to keep [his] mouth shut about the relationship." White also testified that he told Rogoway false information that was detrimental to the defense during their relationship, but that he did not know what Rogoway did with the information.

White did not mention any conjugal visits with Rogoway or that he ever attempted to persuade Rogoway to change her identification testimony for Sanders's trial, but he did contradict Giss's pretrial testimony about whether the prosecution used White as an agent.

The state court could have reasonably decided to credit Deputy District Attorney Giss's sworn testimony that he did not use White as an agent over the testimony of a jailhouse informant who admitted to providing false evidence on numerous occasions. Furthermore, as discussed, Sanders fails

to account for the evidence that Rogoway identified Sanders
at the lineup and in court at the March 1981 preliminary
hearing, before White claims their relationship started and
before there is any record of him obtaining his furloughs from
the Long Beach City Jail.  Sanders's assertion that Rogoway
changed her identification of Sanders as a result of her
relationship with White is speculative and it ignores her
earlier identifications.    The state court could also have
reasonably determined that the evidence was not material due
to the relative weakness of Rogoway's testimony compared
to Malloy's identification.  Defense counsel thoroughly cross-
examined Rogoway, exposing inconsistencies in her
testimony about Sanders, and Abramson chose not to call
Quine or White to try to further impeach Rogoway.  On this
record, we cannot say the state court unreasonably denied
Sanders's *Brady* claim pertaining to Rogoway.

> B. *Failure to disclose that David Lind told Michael
>    Malloy to "identify the guys" before the December
>    23, 1980 lineup*

In claim 7 of his federal habeas petition, Sanders contends
that the prosecution failed to disclose that David Lind told
Malloy "that the right suspects had been arrested and he
should go down and identify them."   Sanders argues that
David Lind was a de facto prosecution agent, and that Malloy
testified at a deposition in Tami Rogoway's civil suit that
Lind told him to identify the suspects before the December 23
lineup.[19]  The district court concluded that Sanders: (1) failed

---

[19] Sanders also relies on a statement by Derwin Logan, another
restaurant employee, made outside the courtroom during Freeman's trial.
Allegedly, prior to the lineup, Lind told Logan the police had arrested
someone they believed committed the crime.  Even assuming that this

to prove that Lind was an agent of the prosecution or that the prosecution otherwise had knowledge of Lind's pre-lineup statement; (2) failed to show how his statement was unnecessarily suggestive; and (3) failed to establish materiality under *Brady*. We affirm.

Sanders maintains that Lind was a de facto prosecution agent because he sat at the prosecution's counsel table during the preliminary hearing, cooperated with the LAPD investigation, and assisted with transporting Bob's Big Boy employees to and from the courthouse. Sanders also emphasizes that Deputy District Attorney Giss wrote a letter to Bob's Big Boy after the trial praising Lind and thanking Bob's Big Boy for Lind's assistance "with the details and logistics" of the trial. Although Sanders cites to Supreme Court cases holding that the Fourth Amendment applies when the government uses private citizens to conduct searches, he does not cite to any established Supreme Court authority for the proposition that a citizen qualifies as a member of the prosecution team for *Brady* purposes based on the type of role David Lind played in the Bob's Big Boy case. Sanders also mischaracterizes the deposition testimony Malloy gave in Rogoway's civil suit. Roughly three years after Sanders's guilt-phase trial, Malloy gave deposition testimony in which he said that Lind "escorted" him to the lineup and told Malloy to go "downtown for a lineup, identify the guys." When read in context, Malloy's testimony suggests that Lind simply explained that a police lineup was going to occur, not that he instructed Malloy to make a selection. The state court could have reasonably determined that Sanders did not show that

---

statement was true, it cannot be assumed that Lind said the same thing to Malloy.

Lind made any improperly suggestive statements to Malloy
that could have been used to impeach Malloy's identification.

Even assuming Lind's statement amounted to a "mandate
to identify the suspects," as Sanders argues, Sanders does not
explain how this statement suggested to Malloy that he
should select Sanders. In *United States v. Bowman*, this court
rejected the defendant's argument that a lineup was
unnecessarily suggestive because the witnesses "knew that
suspects were in custody and they should make a pick."
215 F.3d 951, 965–66 (9th Cir. 2000). The court explained
that the defendant's "fear that the lineups were impermissibly
suggestive because witnesses knew that the suspects were in
custody [was] misplaced" because "it stands to reason that
there *is* a suspect at the lineup stage." *Id.* at 966. The court
noted that the police told the witnesses "they need not make
an identification if they were not confident" before the lineup.
*Id.*

When Malloy arrived at the police station on December
23, 1980, he was shown a videotape of the lineup because he
was too late to attend the live lineup. In the video, officers
provided preliminary instructions to the witnesses, including:
"If you cannot identify anyone, please so indicate." Although
their instruction did not explicitly state that the witnesses
need not identify anyone if they were not confident, the state
court could have reasonably determined that the officers'
instruction communicated as much, and cured any suggestion
conveyed by Lind's comment. The state court's denial of
Sanders's *Brady* claim was not unreasonable.

> C. *Failure to disclose that Andre Gilcrest and his mother*
>    *were promised reward money in exchange for their*
>    *testimony*

In claim 18, Sanders contends that the prosecution failed to disclose that Andre Gilcrest and his mother were tacitly or explicitly promised a $10,000 reward in exchange for their testimony. As Stewart's ex-boyfriend and an early informant in the case, Gilcrest told the police that Stewart confided in him on September 27, 1980, about Sanders's and Freeman's plan to rob the restaurant. Both Gilcrest and his mother testified at Sanders's trial.

Bob's Big Boy restaurant and its parent company, the Marriott Corporation, offered a $10,000 reward, "in exchange for information leading to the apprehension, arrest and final conviction of the person, or persons, responsible for" the Bob's Big Boy robbery. In a December 16, 1980 letter notifying the LAPD about the reward, the Marriott Corporation stated: "The final determination as to whom shall be eligible to receive all, or part, of the aforesaid reward shall be made by the Police Department of the City of Los Angeles." Neither the Marriott Corporation nor the LAPD have any record of who received the reward, but an April 25, 1995 letter from the Los Angeles City Attorney to Sanders's current counsel states that Deputy District Attorney Giss said "that he thought reward money was paid to Andre and his mother and to one of the victims . . . well after the trial was over." The district court correctly ruled that Sanders failed to show the prosecution promised Gilcrest money or suppressed any information about the reward.

First, Sanders points to Giss's notes, handwritten on a discovery motion in Freeman's trial, as evidence that the

prosecution promised Gilcrest the reward.  The notes state:
"Reward of $10,000 no [sic] are promised anything except
Gilcrest talks of $."  If anything, the notes suggest that the
prosecution did not promise any witness the reward, but that
Gilcrest expressed an interest in it.

Second, the defense was well aware of the reward at the
time of the trial.  Gilcrest was cross-examined extensively
about his motivations for coming forward and although he
denied making a written request for the reward, he admitted
that he may have verbally asked for it.  He also conceded that
he originally told the police he came forward "[f]or the
money and being a good citizen."  Based on this testimony,
the state court could have reasonably determined that the
prosecution did not suppress any information about the
reward or Gilcrest's motives.

Sanders also cites to Giss's later testimony at a
suppression hearing in *People v. Garmanian*, and a Los
Angeles County District Attorney manual on how to manage
informants, as evidence of an implicit or express promise for
the reward.  In the *Garmanian* case, Giss acknowledged that
informants are likely to ask for "some quid pro quo," and
testified that "you couldn't find an informant in this state that
would [] say I've let him down."  The District Attorney
manual warns:  "If you alienate the informant, you run the
risk of his recanting the testimony you agreed to use."
Neither Gilcrest's statements nor the manual establish
anything about this case and the state court did not
unreasonably deny the *Brady* claim pertaining to Gilcrest, his
mother, and the reward money.

### D. Failure to disclose that Givens received mental health treatment after the robbery

In claim 19 of his federal habeas petition, Sanders contends that he was denied due process and a fair trial based on the failure to disclose that Brenda Givens received mental health treatment after the robbery and before testifying at trial. Givens was the Bob's Big Boy waitress whom Stewart warned about the robbery when the two ran into each other at the Los Angeles County Jail. Givens was not at the restaurant on the night of the murders, but she testified at Sanders's trial about the conversation she had with Stewart at the county jail, and Stewart's visit to the restaurant that night.

Sanders maintains that neither Givens nor the prosecution disclosed that Givens received psychiatric treatment, took medication, and was hospitalized before trial. He argues that he was deprived of the opportunity to question her about this treatment. He cites to both *Brady* and *Mooney-Napue* case law to support this argument. Regardless of how the issue is framed, the state court reasonably denied this claim.

Sanders concedes that neither the prosecution nor the defense questioned Givens about her mental state or any treatment for it at his trial. He relies on testimony Givens gave at a hearing during Freeman's trial. There, she testified that she saw a psychiatrist after the robbery but denied taking any medication or ever being hospitalized. She stated that she went to see Dr. Robert Kovan starting in March or April 1981, and met with him twice a month for about two months after suffering a miscarriage. Dr. Kovan gave a conflicting description of Givens's treatment at Freeman's trial. He stated that he first began treating her in November 1981, that she was hospitalized for a few days in February 1982 due to

extreme anxiety and depression, and that she was treated with
antidepressants and sleeping medication while she was in the
hospital.  Dr. Kovan also testified that the cause of Givens's
anxiety and depression was a combination of difficulties she
was having at home with the man with whom she was living
and the Bob's Big Boy robbery.  He did not recall her ever
telling him about a miscarriage.

The state court could have reasonably determined that
Sanders failed to assert a *Mooney-Napue* violation because
Givens did not testify about mental health treatment at his
trial.  The state court also could have reasonably concluded
that Sanders failed to prove a *Brady* violation because he did
not show that the prosecution knew about Givens's mental
health treatment before Freeman's trial.

Even assuming the prosecution was aware that Givens
received this treatment and withheld the information from
defense, the state court could have reasonably determined that
the suppression of this evidence did not undermine its
confidence in the outcome of the trial.  The issue at trial was
the identity of the robbers, and Givens did not identify either
of them.  The testimony she did provide at Sanders's trial was
corroborated by Rodell Mitchell, who stated that she reported
the conversation she had with Stewart at the county jail to
several managers at Bob's Big Boy.  The parties stipulated
that Kim Clark would testify to the same effect.  Mitchell and
Gilcrest also corroborated Givens's testimony concerning
Stewart's visit to the restaurant that night.  The state court
had ample reason to deny this claim.

## IV.    Improper Influence on Robinson's and Malloy's In-Court Identifications

Sanders next maintains that the prosecution improperly influenced Rhonda Robinson's and Michael Malloy's in-court identifications by exposing them to the gag photograph of Sanders and Stewart holding fake guns before Freeman's preliminary hearing in February 1981.[20]  The district court concluded "Malloy's and Robinson's identification testimony was not prejudiced by exposure to the photo because by that time they had already identified Petitioner from the lineup." This claim was properly denied.

Sanders's legal characterization of these claims has shifted over time from an improperly influenced identification claim to a *Brady* claim.  In his state and federal habeas petitions, Sanders argued that the improperly influenced identifications violated his constitutional rights to a fair trial and due process.  He cited *United States v. Wade*, 388 U.S. 218 (1967) and *Simmons v. United States*, 390 U.S. 377 (1968) as the clearly established Supreme Court precedent governing these claims.

In *Wade*, the Supreme Court held that a post-indictment lineup is a "critical stage of the prosecution" at which the accused is entitled to counsel.  388 U.S. at 236–37.  In discussing the importance of pretrial lineups, the Court noted that a "major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification."  *Id.* at 228.  *Simmons* held that "convictions

---

[20] This argument encompasses claims 5 and 9.

based on eyewitness identification at trial following a pretrial
identification by photograph will be set aside on that ground
only if the photographic identification procedure was so
impermissibly suggestive as to give rise to a very substantial
likelihood of irreparable misidentification." 390 U.S. at 384.

In *Neil v. Biggers*, the Supreme Court distilled "general
guidelines" from the cases governing "the relationship
between suggestiveness and misidentification." 409 U.S.
188, 198 (1972). *Biggers* emphasized that courts must
determine, under the totality of the circumstances, whether an
in-court identification was reliable even though a pretrial
identification procedure was suggestive. *Id.* at 199. The
Court outlined five factors "to be considered in evaluating the
likelihood of misidentification," including "the opportunity
of the witness to view the criminal at the time of the crime,
the witness'[s] degree of attention, the accuracy of the
witness'[s] prior description of the criminal, the level of
certainty demonstrated by the witness at the confrontation,
and the length of time between the crime and the
confrontation." *Id.* at 199–200.

On appeal, Sanders frames these claims as *Brady*
violations for the first time and asserts that the prosecution
failed to disclose that Robinson and Malloy saw the gag
photograph. He still cites to *Wade* and *Simmons* and argues
that the fact that Robinson and Malloy saw the photograph
constitutes exculpatory impeachment evidence because the
photo was unnecessarily suggestive.

As explained in the discussion of the Robinson *Mooney-
Napue* claim, Robinson was not asked at Sanders's trial
whether she saw the photograph of Sanders and Stewart
holding fake guns. At a hearing held in Freeman's case, she

stated that she saw the photograph while waiting to testify at
Freeman's preliminary hearing in February 1981. Likewise,
Malloy was not asked about the photograph during Sanders's
trial, but he testified at Freeman's trial that he saw it while
waiting to testify at the preliminary hearing. Neither
Robinson nor Malloy saw who put the photograph in the
room where the witnesses were waiting, nor who opened the
blue notebook that contained the photograph, but they both
testified that police officers escorted them to the room.

Assuming that the prosecution intentionally placed the
gag photo in the room where the witnesses for Freeman's
preliminary hearing were waiting, it remains that both
Robinson and Malloy identified Sanders at the December 23,
1980 lineup, roughly one week after the crime and two
months before they saw the fake gun photograph at
Freeman's preliminary hearing.

Furthermore, the state court could have reasonably
determined that Robinson's and Malloy's in-court
identifications at trial, after they saw the fake gun photo, were
reliable under the *Biggers* factors. Malloy had three
opportunities to view the taller robber: (1) when the two
robbers forced their way into the restaurant; (2) when Malloy
removed the money from the safe; and (3) when Malloy
handed the victims' personal belongings to the taller robber
in the freezer. In all, Malloy estimated that he had "a good
three minute[s]" to view the taller robber. While Robinson
had less of an opportunity to see the robbers, she was able to
observe the taller robber for three to four seconds. Both
Robinson and Malloy demonstrated a high level of certainty
when they selected Sanders at the lineup shortly after the
crime, and they were confident in their identifications at trial.

Assuming that Robinson's and Malloy's exposure to the gag photograph was exculpatory evidence that was not disclosed, Sanders has not demonstrated that it was material under *Brady* because Robinson and Malloy identified Sanders at the lineup before they saw the photo. The state court reasonably denied Sanders's claims relating to Robinson's and Malloy's exposure to the fake gun photograph, and we affirm the district court's denial of Sanders's habeas petition with respect to these claims.

## V. *Mesarosh* Claim Relating to Gilcrest

In claim 17, Sanders maintains that Gilcrest's testimony at Freeman's trial revealed that "Gilcrest was a complete and total liar." Stewart's ex-boyfriend, Gilcrest was one of the first informants to implicate Sanders in the robbery and his trial testimony about his visit to Bob's Big Boy with Stewart on September 27 was critical to establishing the existence of a conspiracy. The district court analyzed this claim under *Mooney-Napue*, but Sanders has consistently cited *Mesarosh v. United States*, 352 U.S. 1 (1956) as the clearly established Supreme Court precedent for this claim.

In *Mesarosh*, the defendants were convicted of violating the Smith Act for advocating the violent overthrow of the United States government. 352 U.S. at 3. When the case reached the Supreme Court on direct review, the Solicitor General informed the Court that one of the principal government witnesses had given false testimony in other similar proceedings, which raised serious doubt as to his veracity in the *Mesarosh* case. *Id.* at 4–7. In fact, the Solicitor General conceded that without the witness's testimony, the conviction of two of the five defendants could not stand. *Id.* at 10. The government suggested that the case

be "remanded to the District Court for a full consideration of
the credibility of the testimony" of the witness. *Id.* at 8.
Instead, the Supreme Court reversed the judgments below and
directed the lower court to grant the defendants a new trial.
*Id.* at 14. The Court explained: "The dignity of the United
States Government will not permit the conviction of any
person on tainted testimony. This conviction is tainted, and
there can be no other just result than to accord petitioners a
new trial." *Id.* at 9.

The Court deemed the situation in *Mesarosh* "entirely
different" from "a motion for a new trial initiated by the
defense, . . . presenting untruthful statements by a
Government witness subsequent to the trial as newly
discovered evidence affecting his credibility." *Id.* at 9–10.
One of the reasons cited by the Court was that the
government questioned the credibility of its own witness
based on testimony "in other proceedings in the same field of
activity," some of which was "positively established as
untrue." *Id.* at 10. The Supreme Court concluded it would be
unreasonable to find the witness "testified truthfully in this
case . . . , yet concurrently appeared in the same role in
another tribunal and testified falsely." *Id.* at 13.

*Mesarosh* applies in "those 'rare' situations 'where the
credibility of a key government witness has been "wholly
discredited" by the witness'[s] commission of perjury in other
cases involving substantially similar subject matter.'" *United
States v. Berry*, 624 F.3d 1031, 1043 (9th Cir. 2010) (quoting
*United States v. Krasny*, 607 F.2d 840, 845 (9th Cir. 1979)).
We have granted habeas relief twice in factual circumstances
that closely paralleled those found in *Mesarosh*. *See Williams
v. United States*, 500 F.2d 105 (9th Cir. 1974); *United States
v. Chisum*, 436 F.2d 645 (9th Cir. 1971). In both cases, the

government's case relied heavily on the testimony of
narcotics agents who were subsequently charged with perjury
and conspiracy to deprive a defendant of his civil rights "in
an investigation similar in nature and contemporaneous in
time" to the investigation of the habeas petitioners.  *See
Williams*, 500 F.2d at 106–08; *Chisum*, 436 F.2d at 646–48.

This case is not one of the rare situations governed by
*Mesarosh.*  Sanders identifies a series of inconsistencies
between Gilcrest's testimony at Sanders's trial and Gilcrest's
testimony at Freeman's trial but they are a far cry from
testimony "in the same field of activity" that was "positively
established as untrue."   The first alleged inconsistency
pertains to Gilcrest's testimony at Sanders's trial that he went
to the restaurant "just to drink coffee with [Stewart]," and that
Stewart "wanted to go to see how many people [were]
working that night."  At Freeman's trial, Gilcrest testified that
Stewart "wanted to see who all was going to work that night
or how many people [were] going to be there during closing,"
and was then asked: "You have never told us this before, have
you?"  Gilcrest answered, "No," apparently forgetting that he
gave very similar testimony during Sanders's trial.

Second, Gilcrest was asked explicitly at Freeman's trial
whether he was part of a plan or conspiracy with the people
who told him they were going to rob Bob's Big Boy, and
whether he willingly joined such a plan.  Gilcrest answered
"yes."  When asked what he meant by that, Gilcrest stated:
"I went to the restaurant with her to do the planning.  I knew
what was going down."  But Gilcrest also denied that he
intended to take part in the robbery on September 27 and
testified that he was not involved in the events of December
14.

Third, at Sanders's trial, Gilcrest testified that he *may* have asked for the $10,000 reward, but at Freeman's trial he unequivocally stated that he asked for the money.

Fourth, at Freeman's trial, Gilcrest admitted that he often lied about his name to avoid getting in trouble and that he used a fake name for traffic tickets and to forge stolen money orders. Asked about his use of false names, Gilcrest testified that he did not have a "moral objection to lying to the police" or to Deputy District Attorney Giss, and admitted that he lied at Sanders's and Stewart's joint preliminary hearing about whether he wore glasses for farsightedness.

Gilcrest also admitted that he lied to the police in his initial statement about a conversation he allegedly had with Sanders, Stewart, and Freeman. He testified at Freeman's trial that he had never spoken to Sanders, and that he made up the conversation because he "was nervous at the time."

Finally, Sanders argues that Gilcrest may have lied about his income and employment when he testified at Freeman's trial that he could make $10,000 in six months and that he made "pretty good money." After testifying that he did electrical work, painting, and plumbing "under somebody else's license," the court appointed an attorney to advise Gilcrest, and he thereafter refused to answer questions about his income and employment on the grounds of self-incrimination.

Gilcrest's testimony at Freeman's trial demonstrates that he lied on a number of occasions and had little hesitation about doing so. He was certainly much more forthcoming about his role in planning the failed robbery attempt at

Freeman's trial,[21] but Gilcrest was also exposed as a liar at Sanders's trial.

For example, Sanders's defense counsel cross-examined Gilcrest about two letters that he sent to Stewart in jail after she was arrested.  Defense counsel went through the letters line-by-line with Gilcrest, eliciting multiple admissions that the letters were replete with lies that Gilcrest told Stewart to make himself "look good."  In her closing argument at Sanders's trial, defense counsel emphasized that the letters contained thirty-seven lies.  Also during Sanders's trial, defense counsel cross-examined Gilcrest extensively about his motivations for coming forward shortly after the crime, and argued in closing that Gilcrest was motivated by the reward money, by jealousy of Sanders's relationship with Stewart, and by a desire to protect himself from being implicated in the crime.

The state court could have distinguished the present case from *Mesarosh* on at least three grounds.  First, unlike the witnesses in *Mesarosh*, *Williams*, and *Chisum*, Gilcrest was not a government agent.  Second, Gilcrest's testimony was only critical to the conspiracy conviction and it was corroborated, at least in part, by Givens's and Mitchell's testimony at Sanders's trial.

Finally, the state court could have reasonably distinguished *Mesarosh* because Sanders's jury had multiple reasons to doubt Gilcrest's credibility, and their findings with

---

[21] Giss described Gilcrest as "everything we all despise and detest," "slippery," "evasive," "selfish," "possibly immoral," "an opportunist," and a "type of sleaze," among other disparaging remarks, in his closing argument at Freeman's trial.

respect to the overt acts of the conspiracy demonstrate that
they did not believe all of what Gilcrest had to say.  The jury
found that Stewart went to the restaurant on September 27,
1980 "for the purpose of planning and facilitating a robbery,"
and that she went to the restaurant "a second time to take
Brenda Givens home."  Contrary to Gilcrest's testimony, the
jury found that Stewart did *not* meet with Sanders and
Freeman that night for the purpose of planning the robbery.
This suggests that the jury may have only believed the parts
of Gilcrest's testimony that were corroborated by Givens and
Mitchell.  For all of these reasons, we affirm the district
court's denial of Sanders's habeas petition with respect to the
Gilcrest *Mesarosh* claim.

## VI.    Failure to Preserve Rogoway's Lineup Card

In claim 13 of his federal habeas petition, Sanders
contends that the prosecution failed to preserve Tami
Rogoway's lineup card in bad faith.  Sanders bases this
argument on Rogoway's testimony at Sanders's preliminary
hearing that she did not pick anyone at the lineup, and the
loss of her lineup card sometime after Freeman's preliminary
hearing.  The clearly established Supreme Court precedent
governing this claim is *California v. Trombetta*, 467 U.S. 479
(1984), and *Arizona v. Youngblood*, 488 U.S. 51 (1988).

Under *Trombetta*, the government's failure to preserve
evidence violates a defendant's due process rights if the
unavailable evidence "possess[ed] an exculpatory value that
was apparent before the evidence was destroyed, and [is] of
such a nature that the defendant would be unable to obtain
comparable evidence by other reasonably available means."
467 U.S. at 489.  In *Youngblood*, the Supreme Court held that
"unless a criminal defendant can show bad faith on the part

of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58. "*Youngblood*'s bad faith requirement dovetails with the first part of the *Trombetta* test: that the exculpatory value of the evidence be apparent before its destruction." *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993). "The presence or absence of bad faith turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *Id.* The district court ruled that this claim was not unreasonably denied because Sanders failed to show Rogoway's lineup card was lost in bad faith.

As discussed, the state court held a California Evidence Code section 402 hearing regarding the loss of Rogoway's lineup card. Officer Wesselink and Detective Jacques testified that they saw the card after the lineup, and that it reflected that Rogoway selected Sanders. From the card, Detective Jacques recorded Rogoway's selection in the police log.

Rogoway similarly testified at the 402 hearing and at trial that she attended the lineup and selected Sanders. Based on this testimony, the state court could have reasonably concluded: (1) that Sanders did not show the lineup card possessed an exculpatory value before it was lost; and (2) that Sanders was able to obtain comparable evidence of what the card indicated from witness testimony and the police log. The state court reasonably denied Sanders's claim that the prosecution failed to preserve Rogoway's lineup card in bad faith, and we affirm the district court's ruling on this claim.

## VII.    *Massiah* Claim Relating to Bruce Woods

In claim 21, Sanders maintains that the prosecution planted Bruce Woods next to Sanders in a jailhouse van after Sanders's preliminary hearing in order to obtain an incriminating statement from Sanders in violation of his Sixth Amendment right to counsel. This claim is based on the same evidence cited in support of the claim that Woods testified falsely. In brief review, Woods testified at Sanders's and Stewart's joint preliminary hearing about a conversation between Stewart and a mutual friend in August 1980, in which Stewart asked if the friend wanted to make some money by robbing Bob's Big Boy. At Sanders's trial, Woods testified about threatening remarks Sanders allegedly made on the way back to county jail after Sanders's preliminary hearing. The clearly established Supreme Court precedent governing this claim is *Massiah v. United States*, 377 U.S. 201 (1964).

*Massiah* prohibits the government from "deliberately elicit[ing]" incriminating statements from a defendant after the Sixth Amendment right to counsel attaches. 377 U.S. at 206. *United States v. Henry*, 447 U.S. 264 (1980) extended this prohibition to "the use of jailhouse informants who relay incriminating statements from a prisoner to the government." *Randolph v. California*, 380 F.3d 1133, 1143 (9th Cir. 2004) (describing *Henry*, 447 U.S. at 270–71). But "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." *Maine v. Moulton*, 474 U.S. 159, 176 (1985). "[A] defendant does not make out a violation of that right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the

police. Rather, the defendant must demonstrate that the
police and their informant took some action, beyond merely
listening, that was designed deliberately to elicit
incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. 436,
459 (1986).

To show that the State violated his Sixth Amendment
rights by obtaining and using Woods's testimony, Sanders
must establish that Woods "was acting as an agent of the
State when he obtained the information" and that Woods
"made some effort to 'stimulate conversations about the
crime charged.'" *Randolph*, 380 F.3d at 1144 (quoting *Henry*,
447 U.S. at 271 n.9). The district court ruled that this claim
was reasonably denied because Sanders failed to show either
element. We affirm.

Sanders relies on the grand jury's findings about the
widespread practice of using jailhouse informants and the
"sheer improbability that Woods would have found himself
seated next to Sanders by happenstance when there was a
keep away order." But unlike *Massiah* and *Henry*, there is no
evidence that Woods's conversation with Sanders was
recorded or that Woods had agreed to report back to the
government. *See Massiah*, 377 U.S. at 203 (informant
allowed government agent to install a radio transmitter in his
car to transmit a conversation with the defendant); *Henry*,
447 U.S. at 270 (informant acted under government
instructions and was paid for his services).

Woods testified at trial that he pleaded no contest to a
burglary charge on February 23, 1981, roughly one month
before Sanders's and Stewart's joint preliminary hearing, and
he said that he entered his plea before he "ever had any kind
of understanding with any law enforcement authorities

worked out" related to the Bob's Big Boy case.  The parties
stipulated at trial that Woods's sentencing was held off until
after he testified at the preliminary hearing.  He was
sentenced immediately after the hearing, and Giss informed
the sentencing judge that Woods was a witness in the Bob's
Big Boy case.

By the time of Sanders's trial, Woods was no longer in
jail and had moved to Alabama.  The prosecution paid for
Woods to fly back to Los Angeles to testify, but Sanders did
not show that Woods stood to gain further benefit from
testifying against Sanders; Woods had already finished
serving his sentence for the burglary charge.  Based on this
record, the state court could have reasonably concluded that
Sanders did not show that Woods agreed to serve as the
prosecution's agent.

There is also no evidence that Woods initiated the
conversation with Sanders in the van or made any effort to
elicit incriminating statements.  Woods did not testify that he
asked Sanders any questions or otherwise attempted to
engage him in conversation.  The state court reasonably
denied Sanders's *Massiah* claim.

## VIII.   Ineffective Assistance of Counsel

In claim 14, Sanders alleges ineffective assistance of
counsel for the failure to move to suppress the December 23,
1980 lineup.  "The clearly established federal law for
ineffective assistance of counsel claims, as determined by the
Supreme Court, is *Strickland v. Washington*, 466 U.S. 668
(1984)."  *Andrews v. Davis*, No. 09-99012, 2017 U.S. App.
LEXIS 13960, at *43 (9th Cir. Aug. 1, 2017).  To prevail on
this claim, Sanders must establish that his counsel's

performance was constitutionally deficient and "the deficient
performance prejudiced the defense." *Strickland*, 466 U.S. at
687.

The "deficient performance" prong requires a defendant
to show "that counsel's representation fell below an objective
standard of reasonableness" such that "counsel was not
functioning as the 'counsel' guaranteed the defendant by the
Sixth Amendment." *Id.* at 687–88. In evaluating counsel's
performance, "a court must indulge a strong presumption that
counsel's conduct falls within the wide range of reasonable
professional assistance; that is, the defendant must overcome
the presumption that, under the circumstances, the challenged
action might be considered sound trial strategy." *Id.* at 689
(internal quotation marks omitted). The "prejudice" prong
requires a defendant to show "there is a reasonable
probability that, but for counsel's unprofessional errors, the
result of the proceeding would have been different. A
reasonable probability is a probability sufficient to undermine
confidence in the outcome." *Id.* at 694.

"Under [] AEDPA, the primary issue is whether the state
court adjudication of the *Strickland* claims was objectively
reasonable." *Woods v. Sinclair*, 764 F.3d 1109, 1131 (9th
Cir. 2014); *see also Richter*, 562 U.S. at 101. "The standards
created by *Strickland* and § 2254(d) are both highly
deferential, and when the two apply in tandem, review is
doubly so." *Richter*, 562 U.S. at 105 (internal citations and
quotation marks omitted). Thus, even if a federal court would
find—on de novo review—that the petitioner proved
constitutionally deficient performance under *Strickland*,
"AEDPA requires that a federal court find the state court's
contrary conclusions [] objectively unreasonable before
granting habeas relief." *Woods*, 764 F.3d at 1132.

Sanders argues that his trial counsel should have moved to suppress the lineup on two grounds: (1) Sanders was not represented by counsel at the lineup; and (2) the lineup was impermissibly suggestive. The district court rejected both arguments, concluding that Sanders's right to counsel had not attached at the time of the lineup and the lineup was not impermissibly suggestive. We affirm.

### A.  Right to Counsel at the Lineup

In *Kirby v. Illinois*, a plurality of the Supreme Court held that the "Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against [the defendant]." 406 U.S. 682, 688 (1972). The Supreme Court confirmed this holding in a long line of subsequent cases. *See United States v. Gouveia*, 467 U.S. 180, 187–88 (1984) (collecting cases). The government may initiate judicial criminal proceedings "by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby*, 406 U.S. at 689. Thus, while a defendant has a right to counsel at a post-indictment lineup, *see Wade*, 388 U.S. at 236–37, there is no clearly established right to counsel at a pre-charge lineup.

Sanders was arrested on December 22, 1980, but was not arraigned until December 24, the day after the lineup. Charges were not filed against him until March 18, 1981. Since Sanders's right to counsel did not attach until after the lineup, it is unlikely that the court would have granted a motion to suppress on this basis. The state court could have reasonably determined that trial counsel was not ineffective for failing to file a motion to suppress on this ground because an attorney is not ineffective for failing to file an

unmeritorious motion. *Sexton v. Cozner*, 679 F.3d 1150,
1157 (9th Cir. 2012).

### B. Impermissibly Suggestive

It is always necessary to scrutinize any pretrial
identification because the "Due Process Clause of the Fifth
and Fourteenth Amendments forbids a lineup that is
unnecessarily suggestive and conducive to irreparable
mistaken identification." *Kirby*, 406 U.S. at 691; *see also
Simmons*, 390 U.S. at 384. Sanders argues that the December
23 lineup was impermissibly suggestive because he was the
only suspect with a Jheri curl hairstyle and not wearing shoes,
and was conspicuously in pain from the police beating he
suffered during his arrest.

Having examined the record carefully, we conclude that
the state court could have reasonably determined that the
lineup was not unnecessarily suggestive. The videotape and
photograph of the lineup show that all six suspects were
similar in height, weight, build, and complexion. They had
similar hair color and all had some facial hair. Although
Sanders was the only one with a Jheri curl, all the suspects
had roughly the same length hair. The suspects appear to be
in the same age range. They were dressed in identical
clothing, with the exception of their footwear. Two of the
suspects were wearing slippers, three were wearing tennis
shoes, and Sanders was barefoot.

The record shows that the suspects' feet are not visible in
the videotape, so neither Michael Malloy nor Tami Rogoway
saw that Sanders was barefoot when they selected him from
the recorded lineup. The record does not make clear whether
Sanders's feet were visible to the witnesses who attended the

live lineup, including Rhonda Robinson and Ismael Luna, but
Detective Stallcup testified at trial that he did not "believe
they could have seen [Sanders's] feet," based on the physical
layout of the auditorium where the lineup was held.
Detective Stallcup also testified that there was no evidence in
the case suggesting that the robbers were barefoot when they
committed the crime.

Sanders had three fractured ribs and subcutaneous
emphysema, which is a type of swelling below the skin, on
the day of the lineup. Sanders's argument that the lineup was
impermissibly suggestive because he was conspicuously in
pain from the alleged police beating also fails because the
state court could have reasonably determined that he was not
noticeably in pain. Sanders acknowledges that his clothing
covered all of his injuries, but argues that when he was asked
to repeat key phrases from the robbery, he had difficulty
speaking up. He was instructed to speak louder several times
and closed his eyes when he finally spoke loud enough. The
video recording shows that four other suspects in the lineup
were also instructed to speak louder and it is not clear
whether Sanders closed his eyes in pain or in frustration at
being asked to repeat himself. He moved somewhat more
slowly than the other suspects, but did not appear to have
difficulty walking.

On this record, the state court could have reasonably
determined that the lineup was not unnecessarily suggestive
and that a suppression motion would have been unlikely to
succeed. "The failure to raise a meritless legal argument does
not constitute ineffective assistance of counsel." *Baumann v.
United States*, 692 F.2d 565, 572 (9th Cir. 1982). In light of
the "doubly" deferential standard created by *Strickland* and
§ 2254(d), the state court could have reasonably concluded

that Sanders failed to show his counsel's performance was
constitutionally deficient.  We affirm the district court's
denial of Sanders's habeas petition with respect to the
ineffective assistance of counsel claim for the failure to move
to suppress the lineup.

## IX.    Cumulative Error

Finally, in claim 27, Sanders contends that the cumulative
effect of the guilt-phase errors rendered his trial
fundamentally unfair and requires reversal of his convictions.
Sanders is correct that "prejudice may result from the
cumulative impact of multiple deficiencies," *Woods*, 764 F.3d
at 1139 (quoting *Cooper v. Fitzharris*, 586 F.2d 1325, 1333
(9th Cir. 1978)), but Sanders has not shown that there were
multiple deficiencies in his guilt-phase trial.

The prosecution disclosed Tami Rogoway's relationship
with notorious jailhouse informant Leslie White before trial,
and the best indication we have is that the relationship began
several months after Rogoway identified Sanders at his
preliminary hearing and at the December 23, 1980 lineup.
Sanders has not demonstrated that White was in a position to
influence Rogoway's identification before the lineup or the
preliminary hearing, and has similarly failed to prove that
Rogoway's lineup card had exculpatory value before it was
lost.

Although Rhonda Robinson and Michael Malloy were
exposed to the photograph of Sanders and Stewart holding
fake guns, they both identified Sanders at the lineup two
months before they saw the photo.  Defense counsel was
aware of the risk that they had seen the photograph at trial.

At most, Robinson testified incorrectly about whether she saw the blue notebook that contained the photograph.

Whether or not Malloy incorrectly recalled who told him to attend the December 23 lineup, he had the best opportunity to observe the taller robber and he never wavered in his testimony identifying Sanders.  David Lind's statement to Malloy to attend the lineup to "identify the guys" did not suggest that Malloy should select Sanders.  Ismael Luna's identification was always weak and he admitted at both Sanders's and Freeman's trials that he had difficulty identifying black people.

Brenda Givens was not asked at Sanders's trial whether she received mental health treatment after the robbery, and there is no evidence that the prosecution suppressed this information.  Givens's testimony about her conversation with Stewart at the county jail was corroborated by Rodell Mitchell's testimony and the stipulation that, if called to testify, Kim Clark would have stated that he was also present when Givens told Mitchell about the robbery threat.  Detective Stallcup's deposition testimony and David Lind's declaration in Rogoway's subsequent civil suit do not demonstrate that Mitchell lied about calling the police or filing an incident report.   The jury heard conflicting testimony from Mitchell, the police, and David Lind about the phone calls and the incident report, and had the opportunity to evaluate Mitchell's credibility.

Andre Gilcrest's testimony at Freeman's trial demonstrates that he lied on many extraneous details, and had little compunction about lying.  But he was also exposed as a liar with dubious motivations at Sanders's trial, and it is clear that the jury did not accept all of his testimony.  The

facts of this case are distinguishable from *Mesarosh*.  Sanders
offers only general evidence about the jailhouse-informant
scandal to support his claim that the prosecution planted
Bruce Woods in the jailhouse van to obtain incriminating
remarks, and there is no evidence in the record that Woods
was a government agent or took any action to solicit the
threats from Sanders.  Finally, the state court could have
reasonably determined that defense counsel did not render
deficient performance by failing to file a motion to suppress
because such a motion was unlikely to succeed.  Cumulative
error does not require reversal of Sanders's convictions.

## CONCLUSION

For the foregoing reasons, we affirm the district court's
denial of Sanders's petition for a writ of habeas corpus.

**AFFIRMED.**